CC-1999-969                    1

En el Tribunal Supremo de Puerto Rico

| Municipio de San Juan<br>        Peticionario<br><br>              V.<br><br>Junta de Calidad Ambiental,<br>Administración de Reglamentos y<br>Permisos, Development Management<br>Group, Inc.<br><br>        Recurridos | Certiorari<br><br>2000 TSPR 183 |
|---|---|

Número del Caso: CC-1999-969

Abogados del Municipio de San Juan:

                    Lcdo. Alberto Omar Jiménez Santiago
                    Lcdo. Luis H. Sánchez Caso

Abogado de la Junta de Calidad Ambiental:

                    Lcdo. Normán Velázquez-Torres

Abogada de la Administración de Reglamentos y Permisos:

                    Lcda. Ana I. Vázquez Sánchez

Abogados de Development Management Group, Inc.:

                    Lcdo. Nestor Durán
                    Lcda. Angélica Toro-Lavergne

Abogado de Hotel Development Corporation:

                    Lcdo. Pedro A. Delgado Hernández

Agencia: Junta de Calidad Ambiental

Tribunal de Circuito de Apelaciones: Circuito Regional I San Juan

Juez Ponente:  Hon. Héctor Urgell Cuebas

Fecha: 14/diciembre/2000

Materia: Revisión de Decisión Administrativa


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de San Juan

    Demandante-Peticionario

        vs.                    CC-1999-969      Certiorari

Junta de Calidad Ambiental,
Etc.

    Demandados-Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 14 de diciembre de 2000.

Nuevamente debemos revisar unas determinaciones administrativas relativas al proyecto para la demolición del Condado Trío y la construcción del complejo conocido como Condado Beach Resort.

I.

El 22 de mayo de 1998, Development Management Group (DMG) presentó ante la Administración de Reglamentos y Permisos (ARPE) una consulta sobre la conformidad con el Reglamento de Zonificación del proyecto "Condado Beach Resort", a localizarse en la Avenida Ashford en el área del Condado en el Municipio de San Juan. La propiedad en cuestión

pertenecía a la Corporación de Desarrollo Hotelero (CDH) que, con arreglo a las recomendaciones de un Comité de Privatización, le concedió a DMG la opción de comprar y desarrollar los terrenos y edificaciones de la propiedad referida.

El proyecto consiste en el desarrollo de un complejo hotelero y comercial en una finca de 9.66 cuerdas. Incluye la demolición de todas las estructuras existentes con excepción del antiguo hotel Condado Vanderbilt (conocido como Hotel Condado Beach) así como la construcción de lo siguiente: 125 unidades de apartamentos de tiempo compartido ("time share"), 71 habitaciones de hotel "time share" en el antiguo Condado Beach, un hotel de 400 habitaciones, un edificio de apartamientos de 72 unidades, un centro comercial para el alquiler de locales, así como áreas de entretenimiento y de servicios. El proyecto también incluye la construcción de un sótano para estacionamientos.

El 24 de noviembre de 1998, el Municipio de San Juan (Municipio) solicitó intervenir en la referida consulta ante la ARPE. Esta agencia nunca emitió dictamen o resolución alguna en relación a la referida solicitud de intervención del Municipio, previo a la aprobación del anteproyecto el 30 de julio de 1999. **De hecho no fue hasta un mes después de aprobado el anteproyecto, el 26 de agosto de 1999, que se le notificó al Municipio que la solicitud de intervención había sido aprobada**.

Como parte de la consulta, DMG preparó una Declaración de Impacto Ambiental Preliminar (DIA-P), que la ARPE presentó

ante la Junta de Calidad Ambiental (JCA) el 31 de julio de 1998. La DIA-P fue circulada entre las agencias pertinentes y estuvo disponible para la inspección del público. Asimismo, la JCA celebró vistas públicas en las que las partes interesadas, entre ellas el Municipio, pudieron presentar sus comentarios a la DIA-P.

El 7 de diciembre de 1998, el panel examinador de la JCA sometió su informe. Concluyó que la DIA-P requería mayor información sobre ciertos aspectos de significativa importancia que debían ser suplidos en una Declaración de Impacto Ambiental Final (DIA-F).

La JCA, mediante una resolución de 8 de diciembre de 1998, aprobó en su totalidad el informe referido. Posteriormente, el 3 de febrero de 1999, la ARPE y DMG presentaron la DIA-F. El 2 de marzo del mismo año, la JCA emitió una resolución, **carente de determinaciones de hecho y conclusiones de derecho**, en la que concluyó que la DIA-F cumplía adecuadamente con los requisitos exigidos por la Ley de Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, 12 L.P.R.A. secs. 1121 et seq.

El 23 de marzo de 1999, el Municipio solicitó la reconsideración ante la JCA de su resolución aprobando la DIA-F referida. **Dicha reconsideración fue declarada sin lugar el mismo día**. El Municipio entonces acudió en revisión al Tribunal de Circuito de Apelaciones e impugnó la referida resolución de la JCA. El foro apelativo confirmó la resolución de la JCA en cuanto a la DIA-F presentada por la ARPE.

Inconforme, el Municipio acudió ante nosotros mediante un recurso de certiorari. El 5 de octubre de 1999, luego de haber paralizado las obras de demolición del proyecto, expedimos el recurso solicitado y emitimos una sentencia en la que revocamos la decisión del Tribunal de Circuito y dejamos sin efecto la resolución de la JCA sobre la DIA-F. Resolvimos entonces que la resolución de la JCA no contenía determinaciones de hecho y conclusiones de derecho, las cuales eran requeridas por la Ley de Procedimiento Adminis-trativo Uniforme (LPAU), Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. sec. 2101. Municipio de San Juan v. Junta de Calidad Ambiental, res. el 5 de octubre de 1999, 149 D.P.R. ___ (1999), 99 TSPR 147, 99 JTS 152.   El 19 de noviembre de 1999, la JCA emitió una nueva resolución mediante la cual concluyó que la ARPE había dado cumplimiento a la Ley de Política Pública Ambiental, por lo que aprobó nuevamente la DIA-F. Dicha resolución, una de las dos objeto de este recurso, fue impugnada oportunamente por el Municipio ante el Tribunal de Circuito de Apelaciones.

Mientras tanto, el 30 de julio de 1999, la ARPE resolvió en los méritos la consulta ante sí y emitió una resolución aprobando el anteproyecto. **En esta resolución la ARPE concedió múltiples variaciones a los requisitos reglamentarios**. Una de las variaciones redujo los requisitos de estacionamiento para el proyecto, para lo cual se utilizó

como fundamento una resolución de la Junta de la Planificación del 1 de julio de 1999.[1]

Posterior a su dictamen aprobando el anteproyecto, el 26 de agosto de 1999, la ARPE informó al Municipio que había accedido a su solicitud de intervención. Para esa fecha, ya el Municipio había solicitado oportunamente la reconsideración del dictamen de la ARPE aprobando el anteproyecto. A pesar de que la ARPE acogió la referida moción de reconsideración presentada por el Municipio, transcurrió el término legal fijado por la LPAU para resolverla sin que la ARPE actuara, por lo que el Municipio acudió al Tribunal de Circuito de Apelaciones mediante otro recurso.

El 17 de diciembre de 1999, los dos recursos del Municipio mencionados antes fueron referidos a la consideración de un panel de jueces del Tribunal de Circuito de Apelaciones. **Apenas cinco días después, el 22 de diciembre de ese año, luego de consolidar los dos recursos, y de supuestamente considerar y estudiar los complejos asuntos planteados en ambos recursos, el foro apelativo emitió una resolución mediante la cual denegó la expedición de los recursos solicitados**. Dicha resolución fue notificada ese mismo día.

El día siguiente, 23 de diciembre de 1999, el Municipio presentó ante nosotros una solicitud de certiorari y una solicitud de orden en auxilio de jurisdicción mediante las cuales impugnaba la resolución referida. Con el propósito de

---

[1] Resolución #JPZ-4-15-99.

evaluar ponderadamente el recurso presentado, paralizamos las obras de demolición y de construcción del proyecto. También concedimos un término a las partes para que expusieran sus puntos de vista. Luego de varios trámites procesales, incluyendo varias prórrogas concedidas, la solicitud de certiorari presentada por el Municipio ante nos quedó sometida.

Tenemos, pues, ante nuestra consideración la impugnación que el Municipio hace de la aprobación por la JCA de la DIA-F del proyecto conocido como "Condado Beach Resort", al igual que la impugnación que el Municipio hace de la aprobación por la ARPE del anteproyecto correspondiente. Con la comparecencia de todas las partes, procedemos a resolver.

II.

Antes de discutir los méritos del caso de autos, es importante precisar cuál es el ámbito y los límites de la revisión judicial de decisiones administrativas.

Reiteradamente hemos resuelto que las determinaciones de los organismos administrativos especializados merecen gran consideración y respeto. Misión Industrial de P.R. v. Junta de Calidad Ambiental, res. el 29 de junio de 1998, 145 D.P.R. ___ (1998), 98 TSPR 85, 98 JTS 77; San Vicente v. Policía de P.R., res. el 12 de noviembre de 1996, 142 D.P.R.___(1996), 96 JTS 148; Metropolitana, S.E. v. A.R.P.E., res. el 10 de abril de 1995, 138 D.P.R.____(1995), 95 JTS 39; Fuertes v. A.R.P.E. II, 134 D.P.R. 947 (1993); y Asoc. Drs. Med. Cui. Salud v. v. Morales, 134 D.P.R. 567

(1993). La LPAU, en su sección 4.5, establece los límites de la revisión judicial de decisiones administrativas y dispone que las determinaciones de hecho de las agencias serán sostenidas por el Tribunal si se basan en evidencia sustancial que obre en el expediente administrativo. 3 L.P.R.A. sec. 2175. Por lo tanto, estamos obligados a sostener tales determinaciones si están respaldadas por evidencia suficiente que surja del expediente administrativo considerado en su totalidad. Misión Industrial, supra; Facultad de Ciencias Sociales v. Consejo de Educación Superior, 133 D.P.R. 521 (1993).

Sin embargo, las conclusiones de derecho de los organismos administrativos que no involucren interpretaciones efectuadas dentro del ámbito de especialización de la agencia concernida, son revisables en toda su extensión. Id.; Rivera Rentas v. A & C Development Corp., res. el 26 de noviembre de 1997, 144 D.P.R. ____ (1997), 97 JTS 143. Como regla general, los tribunales deben darle peso a las interpretaciones que la agencia administrativa hace de aquellas leyes particulares que le corresponde poner en vigor, T-JAC v. Caguas Centrum Limited, res. el 12 de abril de 1999, 148 D.P.R. ___ (1999), 99 TSPR 54, 99 JTS 60; Comisionado de Seguros v. Antilles Ins. Co., res. el 2 de abril de 1998, 145 D.P.R. ___ (1998), 98 TSPR 39, 98 JTS 38; Calderón v. Adm. Sistemas de Retiro, 129 D.P.R. 1020 (1992); pero aun esta deferencia judicial al "expertise" administrativo cede ante una actuación irrazonable o ilegal. T-JAC v. Caguas Centrum Limited, supra.

En resumen, la revisión judicial de las determinaciones administrativas está limitada a determinar si la actuación administrativa fue razonable y cónsona con el propósito legislativo o si por el contrario fue irrazonable, ilegal o si medió abuso de discreción. T-JAC v. Caguas Centrum Limited, supra; Rivera Rentas v. A & C Development Corp., supra; Agosto v. Fondo del Seguro del Estado, 132 D.P.R 866 (1993).

Por todo lo anterior, en casos como el de autos, nuestra función se limita a verificar si la JCA y la ARPE han cumplido cabalmente con todas sus obligaciones legales y si formularon sus determinaciones fundamentadamente. No nos corresponde pasar juicio sobre los méritos sustantivos de la acción propuesta. En otras palabras, no nos corresponde sustituir nuestro criterio sobre dichos méritos por los de la agencia proponente o de la JCA. Misión Industrial v. Junta, supra. Sólo nos toca adjudicar la legalidad de la acción administrativa.

Con estos principios en mente, pasamos a resolver los señalamientos de error alegados por el Municipio.

III.

A.  La variación de los requisitos reglamentarios sobre estacionamiento.

En su primer señalamiento de error, el Municipio alega que las variaciones autorizadas por la ARPE sobre los espacios de estacionamiento requeridos para el proyecto propuesto, fueron concedidas ilegalmente. Ello debido a que

la ARPE utilizó como fundamento para dichas variaciones una resolución nula de la Junta de Planificación.

La referida resolución de la Junta de Planificación autoriza a la ARPE a que considere las siguientes circunstancias como factor para conceder variaciones o excepciones a los requisitos reglamentarios sobre estacionamientos:

1) que exista un sistema de transportación colectivo que minimice las necesidades de proveer espacios,

2) que exista en una distancia no mayor de 200 metros facilidades de estacionamiento con paga o que el negocio u otro uso haya separado espacio de estacionamiento para alguna actividad en particular,

3) que exista un sistema de "valet parking" donde la Administración de Reglamentos y Permisos verifique el funcionamiento y lo encuentre normal.

Resolución JPI-4-15-99 de 1 de julio de 1999.

La resolución también autoriza a que, en la evaluación de las necesidades de facilidades de estacionamiento para instalaciones con usos combinados que no sean simultáneos, la ARPE pueda considerar estudios sobre el particular basados en metodología científica, y pueda asimismo dispensar del requerimiento del total de los espacios de estacionamiento para todos los usos, cuando el estudio así lo determine. Además, permite a la ARPE considerar el concepto de "estacionamiento compartido entre dos o más proyectos o usos" cuando ello esté justificado.

El Municipio alega que esta resolución es nula porque al aprobarla no se cumplió con el trámite provisto en la LPAU

para promulgar una reglamentación. Las partes recurridas, por su parte, alegan que la referida resolución de la Junta de Planificación es sólo una "resolución interpretativa", por lo que está exenta del trámite de notificación, publicación y participación ciudadana requerido por la LPAU. Veamos quién tiene razón.

La LPAU exige que se lleve a cabo un proceso formal, con el cumplimiento de determinados requisitos, al momento de formular y aprobar una reglamentación. Para que la reglamentación administrativa sea válida, deben cumplirse cuatro requisitos básicos: 1) notificar al público de la reglamentación a adoptarse, 2) proveer una oportunidad para la participación ciudadana, 3) presentar la reglamentación ante el Departamento de Estado para la aprobación por su Secretario, y 4) publicación de la reglamentación. Este procedimiento exige que se notifique a la ciudadanía de la intención de adoptar, enmendar o derogar un reglamento; y que se conceda un plazo razonable para que se sometan comentarios por escrito sobre la reglamentación a adoptarse. 3 L.P.R.A. secs. 2121-2123. Una vez adoptado el reglamento es necesario que éste sea presentado ante el Secretario de Estado, quien posee la facultad de rechazarlo, modificarlo o aprobarlo. 3 L.P.R.A. sec. 2131. Si el reglamento es aprobado por el Secretario de Estado, entonces debe publicarse en un diario una síntesis de éste, el cual comenzará a regir, con excepciones, pasados treinta días de su presentación. 3 L.P.R.A. sec. 2128.

Este procedimiento aplica a todas las reglas o reglamentos promulgados por agencias administrativas, con excepción de aquellas que la propia LPAU exime. Así pues, en lo pertinente, quedan excluidas del procedimiento formal de reglamentación, las siguientes:

1) Reglas relacionadas con la administración interna de la agencia que no afectan directa y sustancialmente los derechos o los procedimientos o prácticas disponibles para el público en general.

2) Formas e instrucciones, declaraciones interpretativas y declaraciones de política general, que son meramente explicativas y no tienen ningún efecto legal.

3 L.P.R.A. sec. 2102 (*l*)(1) y (2).

Estos dos tipos de reglamentación son generalmente agrupados bajo el nombre común de "reglas interpretativas" y están exentas del procedimiento legal para su promulgación a pesar de vincular administrativamente. Sobre estas reglas, ya antes hemos expresado que son creadas cuando las agencias administrativas aprueban directrices u otras reglamentaciones informales con el propósito de darle uniformidad a sus propios procesos, pautar la discreción administrativa u otros fines internos. Agosto Serrano v. Fondo, supra. Una regla interpretativa puede, en síntesis, ser considerada como una expresión de la agencia que ofrece una clarificación de la ley que administra o de sus reglas o reglamentos. D. Fernández, Derecho Administrativo, Ed. Forum, 1993, pág. 142.

La jurisprudencia estadounidense distingue entre las reglas interpretativas y las reglas legislativas según el

efecto que éstas tienen con respecto a los derechos y obligaciones de las partes. Así, se ha establecido que una regla legislativa es aquella que crea derechos, impone obligaciones y establece un patrón de conducta que tiene fuerza de ley. La Casa del Convaleciente v. Sullivan, 965 F. 2d 1175 (1er Cir. 1992). Véase además, Hoctor v. Dept. of Agriculture, 82 F. 3d 165 (7mo Cir. 1996); Mother Francis Hospital v. Shalala, 15 F. 3d 423 (5to Cir. 1994); U. S. Dept. of Labor v. Kast Metals, 744 F. 2d 1145 (5to Cir. 1984). Una regla interpretativa, en cambio, sólo pretende clarificar o dar uniformidad a procedimientos internos, o pautar la discreción administrativa. Agosto Serrano v. Fondo, supra.

Si la nueva regla es irreconciliable con una regla legislativa existente, entonces la nueva regla es propiamente una enmienda a la primera y debe ser considerada de naturaleza legislativa. American Mining Congress v. MSHA, 995 F. 2d 1106 (D.C. Cir. 1993); National Family Planning & Reproductive Health Ass´n v. Sullivan, 979 F. 2d 227 (D.C. Cir. 1992); State of Alaska v. DOT, 868 F. 2d 441 (D.C. Cir. 1989).

A la luz de esta normativa, debemos examinar si la resolución en cuestión emitida por la Junta de Planificación constituía una regla interpretativa o una legislativa. Para ello es necesario examinar los requisitos de estacionamiento establecidos en el Reglamento de Zonificación Núm. 4 (Reglamento Núm. 4) y en el Reglamento de Zonificación Especial del Condado (Reglamento del Condado), ambos

promulgados por la Junta de Planificación, y vigentes al momento en que dicha Junta emitió la resolución que aquí nos concierne sobre variaciones a los requisitos reglamentarios de estacionamiento.

La sección 84.00 del Reglamento Núm. 4 dispone los requisitos de estacionamiento que son aplicables en general para los diferentes tipos de proyectos y establece los métodos para calcular los espacios necesarios para éstos. Estas disposiciones son precisas y específicas en cuanto a la cantidad de espacios necesarios y particularmente en cuanto a la manera de determinar dicha cantidad. Por su parte, el Reglamento del Condado, en la sección 3.11, establece que los requisitos de estacionamiento para proyectos en la zona del Condado se conformarán no sólo a lo fijado en el Reglamento Núm. 4 sino, además, a los varios requisitos particulares allí establecidos para dicha zona.

Al aplicar las disposiciones de los referidos reglamentos concretamente al proyecto "Condado Beach Resort", la ARPE concluyó inicialmente que dicho proyecto requería **1,962 espacios de estacionamiento**. Sin embargo, el proyecto provee sólo para 1,507 espacios, lo que significa **una deficiencia de 455 espacios**. Esta deficiencia del proyecto en cuestión constituye una violación de la reglamentación aplicable, que le impedía a la ARPE aprobar válidamente dicho proyecto, a menos que pudiese concederle al proyecto una variación sobre el requisito reglamentario aludido. El asunto precisamente ante nos es si dicha variación podría otorgarse

válidamente; es decir, si la ARPE actuó lícitamente al conceder la variación referida.

Inicialmente, la ARPE estimó que el Reglamento del Condado no permitía variaciones sobre espacios de estacionamiento para proyectos a realizarse en dicha zona, como el que nos concierne aquí. Esta postura inicial de la ARPE se fundaba en lo dispuesto en la sección 3.11 del Reglamento del Condado, que dispone lo siguiente:

> No se considerará como fundamento para conceder una variación la no-existencia de estacionamiento dentro de una pertenencia construida. Todo requisito de estacionamiento será cumplido a cabalidad. (Enfasis suplido.)

Reglamento de Zonificación Especial del Condado, sec. 3.11, 23 R.P.R. sec. 650.1821.

La ARPE, pues, consideró inicialmente que no procedía una variación al requisito reglamentario sobre estacionamientos. Sin embargo, como el Reglamento Núm. 4 contiene disposiciones generales sobre variaciones, que podía entenderse que eran aplicables al asunto de estacionamiento, la ARPE decidió solicitar a la Junta de Planificación una "interpretación" sobre dicho Reglamento Núm. 4,

> "a los efectos de conocer y examinar opciones que permitan tener unos fundamentos y argumentos en la evaluación de los requisitos de espacios de estacionamiento para los diferentes proyectos que se sometan a la consideración de la ARPE."[2]

La resolución de la Junta de Planificación que el Municipio ha impugnado ante nos, y que la ARPE utilizó para conceder la variación sobre espacios de estacionamiento para

el proyecto "Condado Beach Resort", se emitió precisamente en "respuesta" a la solicitud de la ARPE antes mencionada.

Lo anterior nos trae al asunto preciso que es determinante de la cuestión ante nuestra consideración. Para decidir concretamente si la resolución de la Junta de Planificación que ha sido impugnada aquí es de naturaleza interpretativa o legislativa --y por ende, válida o nula-- es menester comparar lo que dicha resolución establece, con lo dispuesto en el Reglamento Núm. 4 y en el Reglamento del Condado sobre las variaciones a los requisitos de estacionamiento. Si lo establecido en la resolución referida es consistente con lo que fijan los reglamentos en cuestión, la resolución sólo tendría carácter interpretativo. En cambio, si la resolución modifica lo que los reglamentos disponen, tendría carácter legislativo. Veamos.

La sección 6.01 del Reglamento del Condado y la sección 98.06 del Reglamento Núm. 4 disponen los criterios a considerar cuando se solicita una variación a alguno de los requisitos reglamentarios. Así pues, el Reglamento del Condado permite las variaciones en circunstancias excepcionales en casos en que una aplicación literal de los requisitos resultase en la prohibición o restricción irrazonable del disfrute de la propiedad y cuando se demuestre que la variación aliviará un perjuicio claramente demostrable o que habrá de redundar en los mejores intereses de la comunidad. Sección 6.01 del Reglamento del Condado, 23 R.P.R. sec. 650.1851. Además, el Reglamento establece que no

---

[2] Resolución JPI-4-15-99 de 1 de julio de 1999.

podrá otorgarse una variación si no hay datos suficientes para establecer que la autorización de la variación no afectará el valor ni el disfrute de las pertenencias cercanas, que no afectará el funcionamiento de las facilidades públicas existentes o planeadas, y que es consistente con la preservación y conservación de recursos naturales e históricos, entre otros.[3] Por su parte, el

---

[3] La sección 6.04 del Reglamento del Condado establece diez criterios a satisfacer antes de poder conceder una variación. Esta sección dispone:

> No podrá autorizarse una variación (concesión), en todo o en parte, a menos que existan datos suficientes para establecer:
>
> (A)    Que circunstancias excepcionales o extraordinarias, tales como la forma irregular del solar u otras circunstancias, impiden el disfrute o la utilización de la propiedad.
>
> (B)    Que debido a circunstancias excepcionales o extraordinarias la aplicación literal de ciertos requisitos específicos de este Capítulo resultaría en una dificultad práctica o en un perjuicio innecesario no creado o atribuible al dueño de la propiedad.
>
> (C)    Que la variación (concesión) es necesaria para la preservación y el disfrute de un derecho de propiedad y se demuestre que la variación (concesión) aliviará un perjuicio claramente demostrable, cuyo derecho es poseído y disfrutado por otras pertenencias en el mismo distrito, el cual no afecta el bienestar público.
>
> (D)    Que si en la variación (concesión) se solicitara la autorización de un uso no permitido en el distrito de zonificación, el uso solicitado sea compatible con el carácter esencial del distrito.
>
> (E)    Que la variación (concesión) ha de redundar en los mejores intereses de la comunidad, municipio, o del pueblo de Puerto Rico.

Continuación nota al calce 3...

Reglamento Número 4 establece que para conceder una variación hay que tomar en consideración, entre otros, si la magnitud de la variación es la necesaria para asegurar la viabilidad del uso permitido y no es viable considerar otras alternativas para salvar el problema; si la variación solicitada no afectará la infraestructura y el ambiente en el que ubica; y si se logra un desarrollo urbano más compacto. Reglamento Núm. 4, sec. 98.06, 23 R.P.R. sec. 650.1745.

Al examinar ambas disposiciones reglamentarias en conjunto resalta que las disposiciones del Reglamento del

---

(F)   Que la autorización de tal variación (concesión) no afectará adversamente el disfrute y valor de las pertenencias cercanas en su uso presente y para cualquier otro futuro permitido.

(G)   Que la autorización de tal variación (concesión) no encarecerá ni afectará adversamente la idoneidad, la seguridad y el funcionamiento conveniente de las facilidades públicas existentes o planeadas, incluyendo vías, escuelas, disposición de desperdicios y otros servicios esenciales.

(H)   Que la variación (concesión) solicitada está en armonía con los propósitos generales de este Capítulo y con cualquier plan de uso de terrenos adoptado para el área.

(I)   Que la autorización de tal variación (concesión) es consistente con el documento de Objetivos y Políticas Públicas del Plan de Terrenos, el Plan de Desarrollo Integral de Puerto Rico, el Programa de Inversiones de Cuatro Años y con la conservación y preservación de recursos naturales e históricos.

(J) Que el peticionario, a su vez, está en disposición de aceptar las condiciones y requerimientos adicionales a los requisitos reglamentarios que la Junta o la administración

Condado son más específicas y más exigentes que las del Reglamento Núm. 4. Esto es así porque el Reglamento del Condado intenta remediar los problemas particulares que aquejan al sector del Condado, entre los que se encuentra la existencia allí de barras y cafetines no apropiados que generan la necesidad de estacionamiento. Reglamento del Condado, 23 R.P.R. sec. 650.1791. Los serios problemas de estacionamiento y de congestión de tránsito que afectan al área del Condado están, pues, expresamente reconocidos en dicho reglamento, y son, además, de conocimiento general. El Reglamento del Condado, por lo tanto, tiene primacía sobre el Reglamento Núm. 4 no solamente por ser un reglamento especial sino también porque sus disposiciones fueron establecidas con el propósito de atender los problemas específicos que son particulares al área del Condado. Por ende, para conceder variaciones en un proyecto en el área del Condado hay que atenerse en primer lugar a las disposiciones que este Reglamento establece sobre las dispuestas en el Reglamento Núm. 4, que es un reglamento general. Véase Córdova & Simonpietri v. Crown American, 112 D.P.R. 797 (1982).

Al comparar las disposiciones sobre variaciones de los reglamentos referidos con las disposiciones de la impugnada resolución de la Junta de Planificación, es evidente que dicha resolución no se limita a clarificar o interpretar las disposiciones reglamentarias. La llamada resolución interpretativa de la Junta de Planificación claramente **añade**

---

le imponga para beneficio o protección del interés público.

varios criterios a los que ya tenían ambos reglamentos para ser considerados al evaluar una solicitud de variación. Los criterios añadidos por la referida resolución son **diferentes** a las disposiciones de los reglamentos aplicables, por lo que no podemos concluir que dicha resolución es de naturaleza interpretativa. Al autorizar a la ARPE a utilizar criterios no establecidos por los reglamentos vigentes para autorizar una variación, la Junta de Planificación en efecto enmendó tanto el Reglamento del Condado como también el Reglamento Núm. 4, sin cumplir con el procedimiento requerido por la LPAU para ello.

Con respecto al Reglamento del Condado, **que no dispone nada que tenga que ver específicamente con variaciones a estacionamientos**, la resolución de la Junta de Planificación constituye claramente una enmienda a dicho Reglamento. Ello es así porque la resolución referida trata precisamente sobre criterios relativos a variaciones sobre estacionamiento. Es decir, el único asunto que se atiende concretamente y en detalle en la resolución no aparece de ningún modo expreso en el Reglamento del Condado. Lo que se pauta en la resolución no sólo le añade una concreción específica al Reglamento del Condado sobre estacionamientos sino que le añade criterios nuevos sobre variaciones, mucho más laxos que los que dicho reglamento fija.

En cuanto al Reglamento Núm. 4, que sí abarca concretamente el asunto de estacionamientos, la resolución referida no solamente permite la consideración de nuevos factores al evaluar las solicitudes de variaciones sino que

permite además el uso de métodos nuevos y diferentes para calcular la cantidad de espacios de estacionamiento necesarios. En particular, la resolución de la Junta de Planificación enmienda el Reglamento Núm. 4 al permitir el uso de estudios de metodología científica en la evaluación de necesidades de estacionamiento en instalaciones con usos combinados no simultáneos, cuando dicho reglamento lo que dispone específicamente sobre ello es que en casos de usos combinados "se calculará separadamente el estacionamiento requerido para tales fines". El Reglamento Núm. 4 no dispone para el uso de estudios para determinar la necesidad de estacionamiento sino que establece métodos objetivos para hacer los cálculos matemáticos que permiten determinar el número específico de espacios requeridos de acuerdo al tipo de proyecto, al uso y al tamaño del mismo. Dicho Reglamento tampoco provee para el uso de estacionamiento compartido, consideración que fue añadida por la resolución "interpretativa" de la Junta de Planificación.

Resulta a todas luces claro, pues, que la referida resolución de la Junta de Planificación no persigue clarificar la reglamentación en cuestión, ni dar uniformidad a los procedimientos de la ARPE sobre el particular, sino que en efecto introduce enmiendas sustantivas a las disposiciones reglamentarias referidas. Por ello, como se trata evidentemente de una regla legislativa, debió haber sido aprobada mediante el procedimiento establecido por la LPAU para la aprobación de reglamentación administrativa. Como fue aprobada en violación a lo dispuesto por la LPAU, la

resolución de la Junta de Planificación es nula. Por ende, la ARPE erró al utilizar lo dispuesto en ésta como fundamento para conceder las variaciones en el número de estacionamientos requeridos por el proyecto en cuestión. Erró asimismo el Tribunal de Circuito al convalidar esta actuación ilícita.

Al examinar esta cuestión no podemos ignorar la irregularidad del trámite para la adopción de esta resolución de la Junta de Planificación y para la concesión de esta variación en específico. **Los nuevos parámetros que la Junta de Planificación autorizó utilizar a la ARPE en la resolución en cuestión resultaron todos estar presentes en el proyecto propuesto**. Es obvio que se trata de una resolución de encargo, tramitada para racionalizar la variación referida. Además, del expediente administrativo surge que la firma contratada por DMG para realizar el estudio de estacionamiento sometió un informe justificando la variación el 29 de julio de 1999 y, al día siguiente, la ARPE emitió la resolución aprobando el anteproyecto, con la variación solicitada e incorporando en su dictamen los hallazgos del referido informe "pericial".[4] Está ausente aquí la

---

[4] Forma parte del expediente administrativo un memorando preparado por el bufete que representa a la parte promovente del proyecto en el cual se discute el problema del incumplimiento con los requisitos de estacionamiento y el mecanismo de variación como solución a éste. El Tribunal de Circuito, en una nota al calce, resolvió que este memorando no era un documento presentado formalmente ante la ARPE. Expresó el Tribunal de Circuito que "de su tono inferimos que el mismo se preparó en respuesta a una consulta sobre estos aspectos por DMG o sus consultores CMA. Tomamos nota que el memorando de derecho no está fechado, ni firmado, ni indica a Continuación nota al calce 4...

transparencia en los trámites administrativos que es necesaria para suponer que el proceso fue regular. El resultado de toda esta burda artimaña administrativa es que se aprueba un anteproyecto a pesar de que conocidamente tiene una grave falla respecto a espacios de estacionamiento, que sólo puede redundar en hacer más difíciles y onerosos los enormes problemas de tránsito vehícular que afligen al sector del Condado.

Debe recordarse que la Junta de Planificación y ARPE comparten las vitales encomiendas de velar por la planificación y el buen desarrollo urbano del país en general, y más particularmente, de velar por la adecuada utilización de nuestros terrenos y recursos naturales. Comparten también unas facultades de gran alcance, que se pueden prestar para abusos serios, tanto cuando se conceden los permisos que se le solicitan como cuando éstos se deniegan. Por ello, es de primordial importancia que sus actuaciones sean transparentes siempre. Sobre todo en casos como el de autos, en los cuales se aduce que unas agencias gubernamentales han incurrido mediante artimañas en un abuso de su discreción, los tribunales tenemos el deber de

---

quién está dirigido y, además, incluye blancos en la segunda página sobre varios puntos pertinentes." Según la recurrida DMG, el borrador simplemente proponía una alternativa que la ARPE decidió no acoger. No pasamos juicio sobre la intención tras la presentación de este borrador de memorando ante la ARPE ni sobre el uso que la agencia le dio al mismo. Pero, la existencia de este documento en el expediente administrativo es otra señal más de las irregularidades que hemos señalado.

fiscalizar rigurosamente las decisiones de dichas agencias, para asegurar que desempeñen cabalmente sus importantísimas funciones, y para que el país no pierda la fe en sus instituciones de gobierno.

B.   El derecho a intervención del Municipio en los procedimientos ante la ARPE.

En su segundo señalamiento de error, el Municipio alega que fue privado de su derecho a intervenir y participar efectivamente en los procedimientos ante la ARPE relativos al proyecto "Condado Beach Resort". Como hemos señalado antes, el Municipio presentó el 24 de noviembre de 1998 una solicitud de intervención en el procedimiento iniciado por DMG sobre Consulta de Conformidad con el Reglamento de Zonificación. Como la ARPE no respondió esta solicitud, varios meses más tarde, el Municipio volvió a comparecer ante la ARPE y pidió que se contestara la solicitud de intervención pendiente. **La ARPE nunca se expresó sobre ninguna de estas solicitudes del Municipio hasta después de haber aprobado el anteproyecto en cuestión**. En efecto, no fue hasta después de que el Municipio solicitara la reconsideración del dictamen de la ARPE aprobando el anteproyecto, que el Administrador Auxiliar del Centro de Servicios Técnicos de la ARPE envió una carta al Municipio notificándole que su intervención había sido aceptada.

El Municipio alega que se le privó de su derecho a participar efectivamente en el referido asunto ante la ARPE

en vista de que dicha agencia tuvo ante sí numerosos planteamientos relativos al proyecto que la ARPE resolvió de forma exparte, en particular sobre variaciones, que el Municipio no pudo comentar ni objetar. Las recurridas, por su parte, alegan que el Municipio pudo haber intervenido aun sin que la ARPE hubiese accedido a su solicitud ya que tenía acceso al expediente y tenía conocimiento del anteproyecto. La ARPE añade que ni la LPAU ni el Reglamento de Procedimientos Adjudicativos de la ARPE (Reglamento Adjudicativo) requieren que dicha agencia tenga que emitir un dictamen accediendo a una solicitud de intervención. Alega la ARPE que lo único que las referidas normas exigen que se formule por escrito es la denegatoria de una intervención. En esencia, las recurridas plantean que si el Municipio no intervino en los procedimientos ante la ARPE fue porque no quiso hacerlo.

Con respecto a esta controversia, el Tribunal de Circuito de Apelaciones resolvió que el Municipio no tenía derecho a una participación formal adversativa en los procedimientos en cuestión debido a que éstos se encontraban en una etapa de consideración preliminar, en la que el proyecto todavía estaba bajo estudio. Erró el Tribunal de Circuito al resolver de esta manera. La consideración de una solicitud para la aprobación de un anteproyecto, como la que tenía la ARPE ante sí en este caso, es un procedimiento adjudicativo. El propio Reglamento de Procedimientos Adjudicativos de la ARPE señala que un procedimiento

adjudicativo comienza con la presentación de una solicitud, petición o querella. Reglamento de Procedimientos Adjudicativos de la ARPE, sec. 3.01. Luego, en la sección 15.00 del referido reglamento se establece el término para resolver los diferentes tipos de solicitudes, entre las cuales se incluyen expresamente **las solicitudes para la aprobación de anteproyectos**. Es claro, por lo tanto, que al considerar y resolver una solicitud para un anteproyecto la ARPE ejerce una función adjudicativa, no empece la naturaleza preliminar del anteproyecto. **Así lo ha reconocido la propia la ARPE en su comparecencia ante nosotros**.

En efecto, como se señaló antes, la controversia que existe entre las partes no gira en torno a si el Municipio de San Juan tenía derecho o no a intervenir plenamente en los procedimientos referidos. Ello no ha sido planteado como controversia por las partes. Lo que está en controversia es si la ARPE estaba obligada a notificar al Municipio de la aceptación de su intervención en dichos procedimientos, y si al no hacerlo, privó por ello al Municipio de su derecho a participar efectivamente en el procedimiento administrativo. La ARPE alega que como ni la LPAU ni el Reglamento Adjudicativo requieren que se notifique de la aceptación de una intervención, el Municipio debió haber inferido que su solicitud había sido acogida. Enfatiza la ARPE que las disposiciones legales y reglamentarias aplicables solamente le exigen que notifique la denegatoria de una solicitud de intervención.

No tiene razón la ARPE, ni las recurridas, en su planteamiento. En primer lugar, surge claramente del expediente de autos que la ARPE conocía que el Municipio interesaba una contestación y que esperaba por ella para proceder a participar en los procedimientos referidos. En tales circunstancias, el proceder más razonable de la ARPE era notificarle al Municipio que aceptaba su intervención. Nótese que, tratándose de un asunto complejo, el Municipio no tenía por qué arriesgarse a invertir grandes esfuerzos y recursos en la preparación de su intervención, sin tener la certeza de que ésta sería admitida por la ARPE.

En segundo lugar, y más importante aún, no es correcta la interpretación que hacen la ARPE y las recurridas de lo dispuesto en la sección 3.6 de la LPAU. Allí sólo se señala que si una agencia decide denegar la solicitud de intervención de una parte interesada en participar en un procedimiento administrativo, la agencia *"notificará su determinación por escrito al peticionario, los fundamentos para la misma y el recurso de revisión disponible."* El sentido propio de esta disposición **no es** pautar que la agencia sólo está obligada a notificar la denegatoria de la solicitud de intervención. **Mas bien, lo que esta disposición persigue es facilitar la revisión judicial de tal denegatoria**. La médula de lo que ahí se dispone es que la denegatoria exprese los fundamentos en que se apoya, para que ésta pueda revisarse judicialmente.

En cambio, la sección 3.5 de la LPAU[5], 3 L.P.R.A. sec. 2155, que es la disposición principal relativa a la solicitud de intervención, claramente intima la obligación de la agencia de **responder** a tal solicitud, ya sea admitiéndola o denegándola. Allí se establece, _inter alia_, que cuando se presenta una solicitud de intervención, la agencia tomará en cuenta varios factores para decidir si ha de **"conceder o denegar la solicitud"**. Más aun, se señala también que la

---

[5] Dicha sección dispone: Cualquier persona que tenga un interés legítimo en un procedimiento adjudicativo ante una agencia podrá someter una solicitud por escrito y debidamente fundamentada para que se le permita intervenir o participar en dicho procedimiento. La agencia podrá conceder o denegar la solicitud, a su discreción, tomando en consideración entre otros los siguientes factores:

(a) Que el interés del peticionario pueda ser afectado adversamente por el procedimiento adjudicativo.

(b) Que no existan otros medios en derecho para que el peticionado pueda proteger adecuadamente su interés.

(c) Que el interés del peticionario ya esté representado adecuadamente por las partes en el procedimiento.

(d) Que la participación del peticionario pueda ayudar razonablemente a preparar un expediente más completo del procedimiento.

(e) Que la participación del peticionario pueda extender o dilatar excesivamente el procedimiento.

(f) Que el peticionario represente o sea portavoz de otros grupos o entidades de la comunidad.

(g) Que el peticionario pueda aportar información, pericia, conocimientos especializados o asesoramiento técnico que no estaría disponible de otro modo en el procedimiento.

La agencia deberá aplicar los criterios que anteceden de manera liberal y podrá requerir que se le someta evidencia

agencia podrá requerir del peticionario que someta evidencia adicional a la que contenga la solicitud de intervención, **"para poder emitir la determinación correspondiente con respecto a la solicitud de intervención**."

Nótese, además, que la falta de notificación por ARPE de que ha accedido a la intervención que se le ha solicitado afecta adversamente también a la otra parte en el caso. Esta otra parte, la que está solicitando el permiso ante ARPE, le interesa conocer si la agencia ha accedido a la intervención referida. Sólo así estaría en posición de procurar la reconsideración correspondiente si así lo estima pertinente.

Nada, pues, en el tenor o sentido propio de las disposiciones de la LPAU sobre la solicitud de intervención permite la inusitada interpretación que las recurridas pretenden darle de que una agencia no tiene que notificar la concesión de la solicitud, y de que el silencio de la agencia frente a tal solicitud significa que ésta fue acogida. Se trata de una interpretación acomodaticia que la ARPE hace de lo dispuesto en la LPAU, para justificar su conducta impropia; y que, además, es inconsistente con el hecho de que la ARPE eventual y tardíamente sí contestó al Municipio accediendo a su intervención, cuando ésta ya no podía tener ningún efecto práctico.

Todo este proceder de la ARPE, tan contrario a lo que es razonable, al sentido propio de las disposiciones pertinentes de la LPAU, y a lo que es procedente en un buen proceso

---

adicional para poder emitir la determinación correspondiente con respecto a la solicitud de intervención.

administrativo, nos lleva a concluir que la conducta de la ARPE no fue _bona fide_ y que en efecto le impidió al Municipio ejercer su derecho a participar efectivamente en el procedimiento en cuestión. Resolvemos que la aprobación que le extendió la ARPE al anteproyecto ante su consideración estuvo viciada por esta conducta administrativa impropia.

C.    La necesidad de una vista pública antes de la aprobación del anteproyecto.

En su tercer señalamiento de error, el Municipio alega que la ARPE tenía que celebrar una vista pública antes de autorizar el anteproyecto que nos concierne aquí. El Tribunal de Circuito resolvió que la celebración de dicha vista era discrecional y que la ARPE no abusó de su discreción al no celebrarla.

El Municipio fundamenta su alegación en lo dispuesto en el Art. 7 de la Ley Orgánica de la ARPE, Ley Núm. 76 de 24 de junio de 1975, 23 L.P.R.A. sec. 71f. En lo pertinente, esta sección dispone que:

> [e]l Administrador, previo a cualquier actuación, decisión o resolución en su función adjudicativa discrecional en los casos que se disponga mediante reglamento, sobre consultas de Ubicación, Concesiones y Autorizaciones Directas, Proyectos Públicos **o casos que revista un gran interés social**, entre otros, **deberá seguir el procedimiento de vista pública** y notificación dispuesto en este Capítulo. (Enfasis suplido.)

Alega el Municipio que el caso de autos es uno de gran interés social por tratarse de una propiedad del gobierno de Puerto Rico de considerable valor, que colinda con la zona marítimo terrestre y la playa, que será desarrollado en parte

en terrenos que eran de dominio público y en una playa que es un importante recurso natural que el pueblo de Puerto Rico tiene derecho a disfrutar. Aduce también el Municipio como razones para que este proyecto se considere de gran interés social que en el mismo se encuentra el histórico edificio Condado Vanderbilt, protegido por ley, y que por la magnitud del proyecto, éste va a impactar sustancialmente el tránsito, la infraestructura y la economía de la zona del Condado.

Como puede observarse, el citado Art. 7 de la Ley Orgánica de la ARPE **requiere mandatoriamente** que el Administrador de Reglamentos y Permisos celebre vistas públicas en determinadas situaciones. Ello surge de modo claro del diáfano lenguaje de dicha sección, que expresamente dispone que el Administrador **"deberá seguir el procedimiento de vista pública..."**.

En lo pertinente al asunto de autos, el mandato de vistas públicas del citado Art. 7 aplica a situaciones que tengan las siguientes dos características: (1) que se trate de casos que involucran la "función adjudicativa discrecional" del Administrador, y (2) que sean casos que "revistan un gran interés social." ¿Tiene el proyecto en cuestión estas dos características, de modo que fuese obligatoria la celebración de vistas públicas?

No cabe duda alguna de que el proyecto "Condado Beach Resort" involucra la función adjudicativa discrecional del Administrador. Esa función abarca las medulares tareas que discutimos en Quevedo Segarra v. J.A.C.L., 102 D.P.R. 87 (1974), de conceder variaciones a los usos prohibidos por las

normas de zonificación y de otorgar excepciones a los usos previstos en los reglamentos de zonificación. Expresamente hemos reconocido que tales tareas forman parte de la función adjudicativa discrecional del Administrador. Asoc. Residentes Baldrich, Inc. v. Junta de Planificación, 118 D.P.R. 759, 767 (1987). La consulta presentada por la recurrida DMG a la ARPE incluía evidentemente la concesión de variaciones.

Es igualmente claro que el proyecto en cuestión reviste un gran interés social. Se trata de un proyecto de gran envergadura que ha de afectar la economía, la seguridad, la tranquilidad, el tránsito peatonal y vehicular, la integridad y el carácter del corazón de una de las zonas más importantes del área metropolitana. Los vecinos de esa zona, tanto residentes como comerciantes, y otras personas y entidades con interés legítimo en los cambios que introducirá en la zona del Condado un proyecto como el que aquí nos concierne, deben tener la oportunidad de expresarse sobre tales cambios y sus impactos.

No cabe duda, pues, que era mandatoria aquí la celebración de vistas públicas, como lo requiere la Ley Orgánica de la ARPE. La omisión de esa agencia en cumplir con su propia ley sobre este particular tan vital, constituye una violación ilícita que vicia la aprobación que la ARPE le extendió al proyecto referido.

D.   Determinaciones de hechos en la resolución de la ARPE.

El Municipio alega en su cuarto señalamiento de error que el Tribunal de Circuito erró al concluir que la ARPE hizo

determinaciones de hechos suficientes y adecuadas con respecto al proyecto en cuestión. Alega el Municipio que la ARPE debió explicar por qué decidió utilizar el estudio de tránsito que utilizó; por qué la metodología de éste era correcta y confiable; y, sobretodo, por qué las múltiples variaciones concedidas satisfacían los criterios reglamentarios. Por su parte, la ARPE alega que al emitir la resolución se expresaron los hechos pertinentes, se identificaron las disposiciones reglamentarias aplicables al caso, y se hizo referencia a la evidencia que constaba en el expediente, en especial la relacionada a las variaciones otorgadas. Con relación a este asunto, el Tribunal de Circuito resolvió que se habían hecho las determinaciones de hechos que eran necesarias a los fines de la aprobación del anteproyecto.

Sobre la necesidad de determinaciones de hechos administrativas, hemos resuelto que "para que los tribunales puedan revisar una decisión administrativa, es vital que las agencias expresen claramente sus determinaciones de hecho y las razones para su dictamen, incluyendo los hechos básicos de los cuales, a través de un proceso de razonamiento e inferencia, se derivan aquéllas. Las decisiones deben reflejar que el organismo ha considerado y resuelto los conflictos de pruebas, y sus determinaciones de hechos deben describir tanto los hechos probados como los que fueron rechazados." Municipio de San Juan v. Junta de Calidad Ambiental, supra.

La resolución emitida por la ARPE aprobando el anteproyecto contiene doce determinaciones de hechos que explican a grandes rasgos el procedimiento administrativo ante la agencia y ante la JCA, las variaciones solicitadas y las razones para solicitarlas. **La referida resolución no discute a cabalidad los hechos que fueron rechazados ni las razones para rechazarlos, lo que dificulta nuestra función revisora.** No empece a esto, dicha resolución contiene suficientes determinaciones de hechos para permitirnos descargar nuestra responsabilidad de examinar y adjudicar los méritos de los planteamientos mediante un análisis concienzudo de éstos en conjunto con la totalidad del expediente administrativo. Aunque nuestra labor de realizar una revisión judicial adecuada pudo facilitarse si hubiese habido una discusión más a fondo en la resolución referida sobre los hechos rechazados, tal omisión no ha impedido que realicemos nuestra labor como corresponde. Municipio de San Juan v. Junta de Calidad Ambiental, supra; Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265 (1987); Godreau & Co. v. Com. Servicio Público, supra. Concluimos, por lo tanto, que no erró de modo perjudicial el Tribunal de Circuito al determinar que la ARPE emitió suficientes determinaciones de hechos.

E.    La necesidad de una DIA-F antes de aprobar un anteproyecto.

El Municipio alega en su quinto señalamiento de error que la ARPE no podía aprobar el anteproyecto sobre el

"Condado Beach Resort" sin contar con una DIA-F. El peticionario alega que al 30 de julio de 1999, fecha cuando la ARPE aprobó el anteproyecto, aún no se había autorizado la DIA-F definitivamente porque dicha DIA estaba siendo impugnada en los tribunales. Las recurridas alegan, por su parte, que la DIA ya era final en vista de que el Aviso de Declaración de Impacto Ambiental Final ya había sido publicado el 3 de marzo de 1999. Además, alegan las recurridas que no hay ninguna disposición legal o reglamentaria que obligue a la ARPE a posponer la aprobación de un plano de anteproyecto de construcción hasta que la DIA de dicho proyecto sea final y firme. El Tribunal de Circuito coincidió con las recurridas. Determinó, también que la DIA-F que fue convalidada luego del proceso de revisión judicial es la misma que la aprobada anteriormente, por lo que los derechos del Municipio no fueron afectados.

La DIA-P en el caso de autos fue presentada por la ARPE ante la JCA el 31 de julio de 1998. Luego del procedimiento de rigor, el 2 de marzo de 1999, la JCA emitió una resolución aprobando la DIA-F. Esta resolución fue objeto de nuestra decisión del 5 de octubre de 1999, en <u>Municipio de San Juan v. Junta de Calidad Ambiental</u>, <u>supra</u>. En dicha opinión y sentencia remitimos el asunto a la JCA para que emitiera una nueva resolución que tuviese determinaciones de hechos y conclusiones de derecho de modo tal que nos permitiera llevar a cabo una revisión judicial adecuada. La JCA entonces emitió una nueva resolución aprobando la DIA-F el 19 de noviembre de

1999, es decir, **tres meses y medio después de que la ARPE emitiese su dictamen aprobando el anteproyecto en cuestión**. No cabe duda, pues, de que la ARPE aprobó el proyecto sin tener ante sí una DIA-F definitiva.

Para poder resolver la cuestión ahora ante nos, es necesario en primera instancia examinar la naturaleza y el propósito de una declaración de impacto ambiental. Es harto conocido que en Puerto Rico la normativa jurídica sobre los recursos naturales y el medio ambiente tiene una insoslayable dimensión constitucional. Misión Industrial v. Junta de Calidad Ambiental, supra. El Art. VI, Sección 19, de nuestra Constitución dispone que será política pública del Estado Libre Asociado la más eficaz conservación de los recursos naturales. Hemos resuelto que esta disposición "no es meramente la expresión de un insigne afán, ni constituye tampoco sólo la declaración de un principio general de carácter exhortativo. Se trata, mas bien, de un **mandato** que debe observarse rigurosamente, y que prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste." Misión Industrial v. Junta de Calidad Ambiental, supra.

La Ley de Política Pública Ambiental, 12 L.P.R.A. sec. 1121, se creó en consonancia con el mandato constitucional, con el propósito de hacerlo valer. T-JAC Inc. v. Caguas Centrum Limited, supra; Misión Industrial v. Junta de Planificación de PR, res. el 30 de junio de 1998, 146 D.P.R. ____ (1998), 98 TSPR 86, 99 JTS 79. Esta importante ley

requiere en su artículo 4(c) que **"antes de efectuar cualquier**
**acción**, o promulgar cualquier decisión gubernamental que
afecte significativamente la calidad del medio ambiente", se
debe preparar una declaración de impacto ambiental por la
instrumentalidad pública con jurisdicción sobre la propuesta.
Art. 4(c), 12 L.P.R.A. 1124(c); Misión Industrial v. Junta de
Calidad Ambiental, supra; García Oyola v. JCA, res. el 21 de
febrero de 1997, 142 D.P.R. ___ (1997), 97 JTS 25; Salas
Soler v. Srio. de Agricultura, 102 D.P.R. 716 (1974). En la
DIA el promovente tiene la obligación de discutir todas las
consecuencias ambientales significativas vinculadas a la
acción propuesta. Se procura con ello que la propia agencia
proponente considere a fondo las consecuencias ambientales
significativas de la acción que contempla. También se
persigue que se informe a las partes concernidas, al Gobierno
y al público en general las consecuencias ambientales
aludidas, para que todos ellos puedan tomar la acción que
estimen procedente sobre el proyecto propuesto. Misión
Industrial v. JCA, supra.

Sobre la frase "cualquier acción" del citado Art. 4(c)
hemos resuelto que ésta refleja la intención legislativa de
incluir un sinnúmero de actuaciones gubernamentales que
pueden causar impacto sobre el medio ambiente. Federación de
Pescadores de Playa Picúa v. Junta de Planificación, res. el
27 de mayo de 1999, 148 D.P.R. ____ (1999), 99 TSPR 82, 99
JTS 87. La sección 2.1 del Reglamento sobre Declaraciones de

Impacto Ambiental enumera varias actividades que se han de considerar "acciones" para los efectos de la Ley de Política Pública Ambiental. Se considera "acción"

> [l]a toma de decisiones o cualquier otro tipo de actividad que auspicie, fomente o proponga una agencia del Estado Libre Asociado de Puerto Rico, tales como, **actividades de expedir licencias, concesiones o permisos**, reglamentar o formular normas, asignar o liberar fondos, realizar cambios sustanciales en la política pública de las agencias y sus programas, aprobar proyectos a través de permisos o cualquier otra decisión reguladora, zonificar, rezonificar y presentar propuestas de legislación. (Énfasis suplido.)

En resumen, pues, una DIA es el instrumento que provee nuestro ordenamiento jurídico para asegurar que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de hacer planes y de **tomar las primeras decisiones gubernamentales sobre una propuesta** que pueda tener un impacto en el medio ambiente. Dicha declaración es un instrumento de planificación, la primera etapa de un largo camino de autorizaciones oficiales en el desarrollo de un proyecto. <u>Misión Industrial v. JCA</u>, <u>supra</u>.

A la luz de lo anterior, es necesario contar con una DIA adecuada y definitiva **antes** de que se efectúe cualquier acción gubernamental que pueda impactar el medio ambiente. En efecto, sobre este particular, el Tribunal Supremo de Estados Unidos ha resuelto que "la entidad gubernamental no puede tomar acciones ni decisiones respecto a la legislación, hasta que prepare la declaración de impacto ambiental y **se termine**

**el proceso que dispone el reglamento para ello**." Kleppe v. Sierra Club, 427 U.S. 390 (1976)(traducción nuestra).[6]

DMG alega que como la ARPE sólo tenía ante sí un anteproyecto, que no constituye una autorización para iniciar la construcción propuesta, no era necesario que la agencia contase con una DIA final y firme antes de aprobar dicho anteproyecto.[7] No tiene razón. El Reglamento Núm. 4 define anteproyecto como una "forma preliminar de un plano de construcción de obras así como de estructuras, que se somete a la ARPE para determinar si cumple con las leyes y reglamentos aplicables." 23 R.P.R. sec. 650.1648. Se exige un anteproyecto para algunos tipos de proyectos y, una vez aprobado, se permite la presentación de planos certificados de construcción. La certificación de los planos de construcción acelera grandemente la expedición de los permisos de construcción correspondientes. Véase Reglamento para la Certificación de Proyectos de Construcción de la ARPE. El anteproyecto es, en conclusión, un permiso preliminar que aunque de por sí no autoriza la construcción propuesta, sirve para acelerar el trámite de expedición de los permisos de construcción correspondientes. Se trata propiamente de un permiso con el que se inicia un proceso que conduce expeditamente a los permisos definitivos de

---

[6] La Ley de Política Pública Ambiental tomó como modelo la ley federal National Environmental Policy Act de 1969, 42 USCA sec. 4321 et seq., por lo que dicha legislación y su jurisprudencia interpretativa son fuentes persuasivas para la interpretación de nuestra ley. Misión Industrial v. JCA, supra.

construcción. Constituye, pues, una "acción gubernamental" para la cual se necesita la preparación de una DIA definitiva, según lo exige la Ley de Política Pública Ambiental.

La noción de que la aprobación del anteproyecto por la ARPE no constituye una "acción gubernamental" que requiere una DIA-F previa es realmente inaudita. Es como decir que acudir a la ARPE para solicitar tal aprobación es un paso inconsecuente que los desarrolladores de proyectos de gran envergadura toman en balde. Dicha noción choca estrepitosamente contra la realidad de que la consulta referida es parte integral del complejo proceso de permisos que ocurre de ordinario en el país en relación a numerosos proyectos de construcción, sin el cual tales proyectos no podrían desarrollarse. Es precisamente por su carácter de "luz verde gubernamental inicial" que tanto los desarrolladores como la ARPE invierten incontables esfuerzos y recursos en la presentación y consideración de los anteproyectos.

No cabe duda, pues, que la aprobación de anteproyectos por la ARPE requiere que esta agencia tenga previamente una DIA-F si la calidad del medio ambiente está involucrada de un modo significativo. Ello significa que el proceso de la preparación de la DIA debió haber culminado **antes** de que la ARPE aprobara el anteproyecto. Ello incluye el proceso de revisión judicial de la DIA. Resolvemos, pues, que la ARPE

---

[7] La ausencia de una DIA debidamente aprobada impide iniciar la construcción de un proyecto. Colón y Otros v. J.C.A., res.

estaba impedida de aprobar el anteproyecto en cuestión por carecer de una DIA-F para ello, por lo que erró el Tribunal de Circuito al resolver lo contrario. La aprobación por la ARPE del anteproyecto en cuestión, sin tener ante sí una DIA-F, también vició esa aprobación.

F.    Razonabilidad de las variaciones concedidas.

El Municipio, en su sexto señalamiento de error, alega que las variaciones a los requisitos reglamentarios concedidas por la ARPE en este caso son arbitrarias e irrazonables, por lo que constituyen un abuso de discreción. Antes de discutir esta cuestión, debemos examinar la figura de la variación.

1.    Variaciones a los requisitos reglamentarios

La figura de la variación es una "válvula de escape dentro del rígido marco" de la zonificación en Puerto Rico. Asoc. de Residentes de Parkside v. Junta de Planificación I, res. el 6 noviembre 1995, 139 D.P.R. ___ (1995), 95 JTS 149. El Reglamento Núm. 4 establece dos tipos de variación: variación en el uso de propiedad, sec. 98.05; y otras variaciones, que consisten en solicitudes para cambiar los requisitos reglamentarios, sec. 98.06. La variación en uso es una autorización para utilizar una propiedad de una manera prohibida y que sólo se concede, vía excepción, para evitar perjuicios a una propiedad cuando se pruebe que, debido a circunstancias extraordinarias, la aplicación rígida de los requisitos reglamentarios equivaldría a una confiscación de

---

2 de junio de 1999, 148 D.P.R. ___, 99 TSPR 85, 99 JTS 91.

la propiedad. T-JAC v. Caguas Centrum Limited, supra; Asoc. de Residentes de Baldrich v. Junta de Planificación, supra; Asoc. C.D. Octubre v. JACL, 116 D.P.R. 326, 332 (1985). El otro tipo de variación no va dirigido a alterar el uso sino a eximir al propietario de alguno de los requisitos de zonificación para asegurar la viabilidad del uso permitido. Asoc. de Residentes de Parkside v. Junta de Planificación I, supra. Las variaciones concedidas en el caso de autos son de este segundo tipo.

Reiteradamente hemos resuelto que solamente se deben conferir variaciones en circunstancias extraordinarias y para evitar perjuicios a la propiedad. T-Jac v. Caguas Centrum Limited, supra; Asoc. de Residentes de Parkside v. Junta de Planificación II, res. el 7 de octubre de 1999, 149 D.P.R. ___, 99 TSPR 149, 99 JTS 155; Asoc. de Residentes de Parkside v. Junta de Planificación I, supra; Fuertes v. ARPE II, supra; Fuertes v. ARPE I, 130 D.P.R. 971 (1992); ARPE v. JACL, 124 D.P.R. 858 (1989). De lo contrario se destruiría el propósito de la planificación urbana y se trastocarían eventualmente las características propias de un distrito. Asoc. de Residentes de Parkside v. Junta de Planificación II, supra. Fuertes v. ARPE I, supra; ARPE v. JACL, supra. Sobre este asunto, expresamos en ARPE v. JACL, supra:

> Por la naturaleza del interés público implicado, las variaciones a los requisitos de zonificación no se favorecen y deben utilizarse selectivamente en aquellas circunstancias en que un propietario demuestre que las restricciones le causaron un daño particular que no comparte con otros. "Por eso se descartará una variación cuando no haya prueba de que la situación del dueño sea

singular y distinta a la de sus colindantes."
(Citas omitidas.)

En la discusión del primer error señalamos los criterios establecidos por la sección 6.04 del Reglamento del Condado para la autorización de una variación. Nos toca ahora examinar si, a la luz de dichos criterios, las variaciones concedidas por la ARPE para el proyecto propuesto son razonables.

Al aprobar el anteproyecto, la ARPE concedió variaciones a múltiples disposiciones reglamentarias. Estas variaciones se pueden dividir en tres categorías: 1) variaciones a los requisitos de estacionamiento, 2) variaciones a los requisitos que aplican a proyectos que colindan con la zona marítimo-terrestre, y 3) variaciones sobre vistas al mar. Examinemos cada una de ellas.

2.   Variaciones a los requisitos de estacionamiento.

Como explicáramos antes, al aplicar las disposiciones pertinentes al proyecto propuesto, la ARPE determinó que eran necesarios 1,962 espacios de estacionamiento. El proyecto fue aprobado con 1,507 espacios, lo que constituye una deficiencia de 455 espacios. Esta variación fue concedida utilizando la resolución de la Junta de Planificación la cual, como vimos en la discusión del primer error, es nula. La ARPE debió evaluar la solicitud de variación utilizando los parámetros exigidos en la sección 6.04 del Reglamento del Condado.[8] No surge ni de la resolución de la ARPE ni del expediente administrativo que la ARPE utilizara otros

criterios que no fueran los establecidos en la resolución nula de la Junta de Planificación.

La ARPE también concedió variaciones en el número de estacionamientos de carga y descarga. Según la reglamentación aplicable eran necesarios 73 espacios de carga y descarga. **El proyecto provee únicamente para 9 espacios, lo que constituye sólo el 8.6% del número requerido**. La justificación ofrecida para esta variación es que los espacios provistos estarán en un área protegida y que su uso estaría sujeto a un itinerario mediante el cual los interesados en utilizarlos tendrían que reservar sus espacios con tiempo, y se llevaría un control de la entrada y salida de los camiones, de manera que no hubiere más de ocho de ellos estacionados al mismo tiempo.

Realmente no entendemos cómo 9 espacios de carga y descarga pueden ser suficientes para atender las necesidades aludidas en un proyecto de tal magnitud como el que nos concierne aquí. Este proyecto consiste de un centro urbano de entretenimiento de 122,000 pies cuadrados de tiendas y restaurantes, 125 unidades "time share", 72 unidades de vivienda y dos hoteles con 470 habitaciones en conjunto. No surge del expediente administrativo que se haya demostrado que la concesión de esta variación alivie un perjuicio claramente demostrable (sec. 6.04(c) del Reglamento del Condado), que ha de redundar en los mejores intereses de la comunidad (sec. 6.04(e)), que no afectará adversamente el disfrute y valor de las pertenencias cercanas (sec. 6.04(f)), que no afectará ni encarecerá adversamente la idoneidad, la

---

[8] Estos están señalados en la nota al calce número 3.

seguridad y el funcionamiento de las facilidades públicas existentes o planeadas, incluyendo vías, escuelas...(sec. 6.04(g)). Todo lo contrario. La concesión de esta variación afectará adversamente el disfrute de las propiedades ubicadas en las angostas calles Seaview y Vendig, que son las que han de utilizarse por los camiones de carga referidos. En su comparecencia ante nos, DMG niega que ello haya de ocurrir al indicar que no hay evidencia que sustente este problema. Pero resulta que no se necesita prueba especial para anticipar el efecto adverso a la comunidad de la falta de espacios significativos para los camiones de carga. Son de conocimiento general no solamente los graves problemas de tránsito que afectan de ordinario al sector del Condado en general sino también la seria congestión vehicular que actualmente ocurre en las calles referidas al accesar los negocios y propiedades existentes en el área. Debemos recordar que "[l]os jueces no viven en un vacío. Sabemos lo que el resto de la comunidad sabe." Pueblo v. Marrero, 79 D.P.R. 649, 658 (1956). Lo que sí es especulativo es concluir que un supuesto itinerario de carga y descarga habrá de aliviar un perjuicio demostrable a la comunidad, o que redunda en los mejores intereses de la comunidad, **cuando la propia recurrida DMG admite que la documentación sobre el referido itinerario no se puede compilar hasta saber qué tipo de comercios y restaurantes se ubicarán en el proyecto**. La concesión de una variación, según hemos indicado antes, es de carácter excepcional, no se favorece, y sólo procede cuando hay razones extraordinarias que lo justifiquen. La

posibilidad de un supuesto esquema gerencial para atender los evidentes problemas que crearía la variación propuesta no cumple con los requisitos referidos para ésta.

3. Variaciones a los requisitos de propiedades que colindan con la zona marítimo-terrestre.

El Reglamento del Condado, en su sección 3.08, establece que en el área de playa entre el Hotel Condado Beach y la Calle Cervantes, toda edificación a construirse:

> observará un retiro de la más próxima línea de colindancia con la playa, el cual medido desde su base o pared más próxima a la colindancia con la playa será no menor que una y cuarta (1¼) vez su altura medida desde el nivel del terreno en tal base o pared.

23 R.P.R. sec. 650.1818

A base de esto, la ARPE concluyó con respecto a las distintas estructuras del propuesto "Condado Beach Resort" que el requisito de retiro mínimo es de 67.0 metros para el "time share", 63.3 metros para el Hotel, y 71.65 metros para el Condominio. No obstante, el retiro mínimo de la colindancia de la playa propuesto para el proyecto fue de **3.2 metros**. La ARPE aceptó esta enorme variación por entender que el cumplimiento con las distancias reglamentarias requeridas no permitiría el desarrollo del proyecto.

La zona marítimo-terrestre, según definida por la Ley de Muelles y Puertos de 1968, es "el espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde las mareas no son sensibles, e incluye los terrenos ganados al mar y las márgenes de los ríos hasta el sitio en que sean navegables...". Ley Núm. 151 de 28 de

junio de 1968, 23 L.P.R.A. sec. 2103. Véase también, Reglamento Núm. 4, sec. 2.01(214). Dadas las características naturales de Puerto Rico es evidente que esta zona ha sido motivo de grave consideración al formularse la reglamentación sobre planificación y zonificación en nuestra isla. Ello ha sido así particularmente en el área del Condado ubicada en el litoral norte.

Antes de adoptar el Reglamento del Condado se realizó un estudio sobre las particularidades de esa zona con el propósito de formular recomendaciones para el desarrollo físico del área y servir de insumo y base a la nueva reglamentación. Condado: Inventario, Diagnóstico y Recomendaciones, Junta de Planificación de Puerto Rico, 1986, a la pág. 3; Reglamento del Condado, sec. 1.02. Dicho estudio identificó los siguientes problemas en el área de la playa del Condado: (1) discontinuidad entre las playas y el centro del Condado; (2) negación del frente hacia la playa; (3) incidencia de sombra sobre las playas; y (4) descarga de alcantarillados pluviales en los arenales de las playas. En cuanto al problema de las sombras la recomendación formulada fue la implantación de reglamentos de planificación más severos y terminantes que los existentes.

La construcción de edificios en las áreas colindantes con la costa en el sector del Condado crea otro problema, según la Administración Nacional Oceánica y Atmosférica (NOAA, por sus siglas en inglés). La NOAA, en la declaración de impacto ambiental final sobre el Programa de Manejo Costanero de Puerto Rico, identifica, además del problema de

sombras sobre la playa, el problema de la dominación visual de los edificios altos que restan el atractivo natural de las playas.

Conscientes de estos problemas, la Junta de Planificación exige, en el Reglamento Núm. 4, que "[a] los fines de proteger el potencial de los recursos existentes en la zona costanera, especialmente de los que colindan con la zona marítimo-terrestre, para la recreación, contemplación y solaz espiritual, **se deberá evitar al máximo el desarrollo intenso paralelo a la costa, promoviéndose y estimulándose el que los terrenos se mantengan en su estado natural**...". Reglamento Núm. 4, sec. 100.11, 23 R.P.R. sec. 650.1747. (Enfasis suplido.)

Como puede observarse, las edificaciones propuestas en el proyecto de autos confligen en extremo con las distintas normas de zonificación que protegen la costa y playas del Condado. Frente a este evidente y hondo conflicto, se intenta justificar la variación a los requisitos de altura y retiro alegando que el cumplimiento con los importantes requisitos reglamentarios impediría la construcción de cualquier proyecto de magnitud en la zona. Se aduce, además, que el proyecto propone respetar las distancias actuales de los edificios existentes, y que las sombras que afectarán la playa de las edificaciones propuestas serán menores que las creadas por los edificios existentes.

Las "justificaciones" referidas son claramente inaceptables. No cumplen de modo alguno con los requisitos enumerados anteriormente exigidos por el Reglamento del

Condado para permitir una variación. Como hemos visto ya, para que pueda efectuarse una variación como la que aquí nos concierne, es menester que dicha variación persiga aliviar un perjuicio claramente demostrable (Reglamento del Condado, sec. 6.04(C)), que ha de redundar en los mejores intereses de la comunidad, municipio o del pueblo de Puerto Rico (6.04(E)), y que ha de ser consistente con la conservación de recursos naturales e históricos (sec. 6.04(I)). Las justificaciones aludidas nada tienen que ver con estos criterios reglamentarios.

La construcción de edificios colindantes a la zona marítimo-terrestre del Condado, según hemos señalado ya, ha creado un problema ecológico grave, que ha sido identificado por diferentes agencias, tanto estatales como federales. Permitir ahora la construcción de un proyecto con esencialmente las mismas características de las edificaciones ya existentes, que forman parte del problema referido, no es de ninguna manera consistente con el claro propósito de la reglamentación vigente, **que procura corregir el problema aludido**. Toda nueva construcción, ampliación o mejora sustancial debe cumplir cabalmente con la reglamentación vigente, independientemente de cuál era la situación de las edificaciones existentes. De otro modo, la reglamentación referida no tendría sentido alguno. Su propósito es precisamente corregir la situación adversa creada por las edificaciones existentes. Se procura con dicha reglamentación lograr los objetivos deseados precisamente cuando las edificaciones existentes sean sustituidas por otras nuevas,

que deberán ajustarse cabalmente al requisito reglamentario que ya no puede exigírsele a las existentes previo a la promulgación del Reglamento. Todo el entramado reglamentario, pues, descansa en la premisa de que los requisitos fijados se harán cumplir precisamente en las nuevas edificaciones, por lo que el argumento de que el proyecto propuesto no es peor que lo existente no tiene validez jurídica alguna.

Por otro lado, el Municipio alega que los proponentes del proyecto no han demostrado de modo alguno que el cumplimiento con las distancias reglamentarias requeridas impediría la construcción de cualquier nuevo proyecto en la zona, como alega la recurrida DMG. Esta, en su comparencencia ante nos, **acepta que ello en efecto no se ha demostrado** pero aduce que "resulta claro que cualquier proyecto de magnitud hoy día conllevaría la construcción de edificios de mayor altura que la permitida por los reglamentos aplicables." Alega, además, que el anteproyecto ha tratado de crear el mayor número posible de áreas libres de edificación.

El argumento principal del Municipio sobre esta variación descansa en un informe pericial suyo sobre el particular. Según el informe del Municipio, el predio donde se ubicará el proyecto posee suficiente profundidad para permitir la construcción de edificaciones de alturas como las propuestas sin requerir las variaciones aprobadas por la ARPE. Alega el Municipio que su análisis pericial también muestra que las características y la forma del solar no son impedimento para lograr volúmenes edificados aun mayores que

los propuestos sin requerir variaciones sobre retiro y altura.

Frente al informe pericial aludido, los proponentes del proyecto se han limitado a formular unas meras aseveraciones a *contrario sensu*, que ellos estiman "resultan claras". La grave controversia que ahora atendemos no puede resolverse sobre la base de meras afirmaciones conclusorias de una parte a quien le conviene lo afirmado. Por ello, además de resolver que las justificaciones ofrecidas para autorizar las variaciones no tienen apoyo alguno en las disposiciones reglamentarias sobre tales variaciones, debemos resolver también que las determinaciones de hechos que subyacen la concesión de dichas variaciones no están sostenidas por evidencia sustancial.

Finalmente, alega DMG que su proyecto contempla más áreas libres que el proyecto propuesto por el Municipio, el cual DMG considera que sería una aberración de urbanismo y diseño urbano. Con respecto a este planteamiento, es importante recordar que el único proyecto que está ante nuestra consideración es el presentado por DMG en la solicitud de anteproyecto aprobada por la ARPE. No podemos pasar juicio sobre cuál de las múltiples propuestas para la propiedad en donde ubica el Condado Trío es la mejor o la peor. Solamente podemos evaluar si la propuesta que está ante nos cumplió con los requisitos legales y reglamentarios pertinentes y si las agencias administrativas cumplieron con sus deberes legales. Misión Industrial v. Junta de Calidad Ambiental, supra.

En resumen, pues, luego de estudiar detenidamente el expediente administrativo, concluimos que éste carece de fundamentos suficientes para conceder una variación de la magnitud de la que aquí nos concierne en un área que por tanto tiempo ha sido motivo de preocupación para las agencias a cargo del desarrollo de Puerto Rico. Erró otra vez la ARPE al conceder tal variación.

4.    Variaciones a los requisitos sobre vistas al mar.

El Municipio plantea que la ARPE erró al aprobar el anteproyecto sin cumplir con los requisitos sobre vistas al mar establecidos en el Reglamento Núm. 4 y el Reglamento de Zonificación de la Zona Costanera. Estos reglamentos requieren que los edificios ubicados frente a la zona costanera sean orientados de modo tal que el lado más largo de su proyección horizontal quede perpendicular a la costa o a un ángulo aproximado, para obstruir lo menos posible la visibilidad al mar. Reglamento Núm. 4, sec. 100.15, 23 R.P.R. sec. 1747. Véase también Reglamento de Zonificación de la Zona Costanera, sec. 6.06. Alega el Municipio aunque la resolución de la ARPE indica que el proyecto proveerá amplias áreas abiertas que permitirán una mayor visibilidad a la playa por tres ejes visuales, estos ejes son en realidad paseos peatonales del centro comercial propuesto y conducen a una plaza interior privada. Expresa el Municipio que de los tres paseos, dos culminan en la zona de rocas, muros y el rompeolas. DMG, por su parte, alega que las disposiciones reglamentarias referidas no son de aplicación al proyecto de

autos porque el reglamento aplicable es el Reglamento del Condado.

Según hemos indicado antes, el Reglamento del Condado, por ser de carácter especial, prevalece sobre las disposiciones de carácter general. Sin embargo, el propio Reglamento del Condado establece, en la sección 1.07, que sus disposiciones quedarán complementadas por las de cualquier otro reglamento en vigor, hasta donde éstas no sean incompatibles con la materia específicamente regulada por el Reglamento del Condado. No cabe duda, pues, que los referidos requisitos sobre vistas al mar del Reglamento Núm. 4 y del Reglamento de Zonificación de la Zona Costanera son aplicables a las costas del sector del Condado, por estar específicamente incorporados por referencia en el Reglamento del Condado. No empece lo anterior, los recurridos insisten en que el proyecto sí cumple con las disposiciones referidas. En esencia, alegan que las edificaciones propuestas han de obstruir la vista al mar lo menos posible, mucho menos que las estructuras existentes, y menos que las del proyecto propuesto por el Municipio.

La postura de DMG y de la ARPE sobre el asunto de las vistas al mar es verdaderamente insostenible. Esta, en esencia, consiste de dos argumentos falaces. El primero es que el proyecto en cuestión cumple con los requisitos reglamentarios porque las edificaciones propuestas han de obstruir la vista al mar "lo menos posible". Aparte del hecho de que esta aseveración de los recurridos no pasa de ser una

mera alegación conclusoria mediante la cual se afirma precisamente lo que hay que demostrar, nada en las normas sobre variaciones permite que éstas se concedan sólo porque lo propuesto cumple con el requisito reglamentario "lo más posible." Dicho de otra forma, los requisitos reglamentarios en cuestión **son normas jurídicas vinculantes**. Obligan a la ARPE en sus decisiones y a los desarrolladores en sus propuestas, y tienen que cumplirse **a cabalidad** y no meramente en "lo más posible". Sólo pueden obviarse estos requisitos por excepción, en circunstancias extraordinarias, cuando existe alguna de las justificaciones especiales señaladas en los propios reglamentos referidos. Ninguna de ellas alude a que se cumpla con lo requerido "lo más posible". Aceptar la postura de los recurridos sería equivalente a permitir que el cumplimiento de las normas jurídicas que obligan a unas personas quede a la discreción de éstas, que intentarán obedecerlas "en lo más posible". No hay ordenamiento jurídico que pueda mantenerse de ese modo.

El otro argumento sobre el particular es que lo propuesto es mejor que lo existente y mejor que lo que propone el Municipio en su propio proyecto. Ya antes encaramos este argumento falaz. Lo volvemos a rechazar, por las mismas razones que lo hicimos antes.

Erró la ARPE al aprobar el proyecto ante nuestra consideración en violación de las disposiciones reglamentarias sobre vistas al mar.

G.    Adecuacidad de la DIA-F.

Finalmente, el Municipio impugna la DIA-F presentada por la ARPE ante la Junta de Calidad Ambiental. Alega que la JCA no cumplió con nuestro mandato en Municipio de San Juan v. Junta de Calidad Ambiental, supra, que requería considerar y resolver las controversias de hechos del caso. En particular, expresa que la JCA meramente se limitó a describir el proyecto propuesto por DMG, a enumerar las objeciones presentadas en la vista pública, a identificar las interrogantes que la proponente debía contestar y a detallar los comentarios principales que presentó la ARPE en respuesta a los comentarios de los deponentes y de la JCA. Según el Municipio, lo anterior no cumple con lo que le habíamos ordenado a la JCA en la decisión referida.

Como explicáramos anteriormente, en nuestra opinión del 5 de octubre de 1999, ordenamos a la JCA que emitiera una nueva resolución que tuviera determinaciones de hechos y conclusiones de derecho. Expresamos entonces que la JCA venía obligada a emitir una decisión fundamentada: "[e]s decir con aquella evidencia que una mente razonable puede aceptar como adecuada para sostener una conclusión. Evidencia que, a su vez, sirva de base para que los tribunales puedan ejercer su función revisora." Municipio de San Juan v. Junta de Calidad Ambiental, supra.

En su resolución posterior a nuestro dictamen, en que la JCA aprueba nuevamente la DIA-F referida, la JCA invoca la Ley Núm. 323 de 6 de noviembre de 1999 (Ley Núm. 323), que enmendó la Ley de Procedimiento Administrativo Uniforme para

establecer que los trámites de los documentos ambientales serán procedimientos informales no cuasijudiciales, por lo que no se requerirá a la agencia que fundamente sus resoluciones con determinaciones de hechos y conclusiones de derecho. No empece a expresar en la resolución aludida que no puede realizar determinaciones de hechos ya que el trámite de documentos ambientales no es un procedimiento adjudicativo conforme a la citada enmienda legislativa, la JCA en efecto procede a formular unas determinaciones de hechos en atención a nuestro mandato.

En vista, pues, de que la JCA intentó cumplir con nuestro mandato anterior, no obstante la nueva enmienda a la ley, ello hace innecesario que examinemos la constitucionalidad de la ley referida en el contexto de este caso. Ya antes hemos resuelto que es inconstitucional cualquier intento de la Asamblea Legislativa por dejar sin efecto una orden judicial nuestra en un caso pendiente ante nuestra consideración. Es doctrina firmemente establecida que la Legislatura no tiene la facultad para intervenir con el ejercicio de la función judicial, por lo que no puede dejar sin efecto, modificar, o menoscabar una sentencia final emitida por un tribunal que tenga jurisdicción para dictarla. P.R. Tobacco Corp. v. Buscaglia, Tes., 62 D.P.R. 811 (1944); Misión Industrial v. Junta de Planificación, supra. Recientemente, en Colón Cortés v. Pesquera, res. el 19 de abril de 2000, 2000 JTS 72, expresamos que "[e]ste Tribunal, como custodio e intérprete final de nuestra Constitución, la va a proteger y no va a permitir que acciones como la que hoy nos ocupa opaquen o

disminuyan su valor, avalando que la parte que resulte o pudiera resultar perdidosa en un proceso judicial procure legislación de encargo que le permita continuar con una acción declarada ilegal por la Rama Judicial." A la luz de esta conocida jurisprudencia, resulta evidente que cualquier intento de la Asamblea Legislativa de intervenir indebidamente con el ejercicio de la función judicial es inconstitucional, por violentar el principio de separación de poderes. No obstante lo anterior, no hemos de pasar juicio sobre la constitucionalidad de la disposición referida de la Ley Núm. 323 por la razón expresada antes. Es doctrina reiterada de este Tribunal que no entraremos a considerar la constitucionalidad o inconstitucionalidad de una ley o de una actuación gubernamental a menos que ello sea imprescindible y no podamos resolver la controversia ante nos por otras razones. Pueblo v. Cortés Rivera, res. el 23 de enero de 1997, 142 D.P.R. ___, 97 JTS 4; Pueblo v. Ramos Santos, res. el 30 de junio de 1995, 138 D.P.R. ____, 95 JTS 94; Caquías Mendoza v. Asoc. de Residentes de Mansiones de Río Piedras, 134 D.P.R. 181 (1993); Facultad para las Ciencias Sociales Aplicadas v. Consejo de Educación Superior, 133 D.P.R. 521 (1993).

Aclarado lo anterior, sin embargo, sí debemos concluir que las determinaciones de hechos formuladas por la JCA en la resolución en cuestión son insuficientes e inadecuadas para dilucidar dos asuntos centrales de este proyecto: el impacto del proyecto con respecto al edificio Vanderbilt y el impacto del proyecto con respecto al tránsito del Condado.

La nueva resolución, emitida por la JCA el 19 de noviembre de 1999, consta de 38 páginas en las que recoge los comentarios vertidos en las vistas, las recomendaciones hechas por el Oficial Examinador respecto a la DIA-P y las respuestas a los comentarios ofrecidas por el proponente del proyecto. Finalmente, la resolución detalla lo que fue incluido en la DIA-F como respuesta a la solicitud de la JCA respecto a la DIA-P y concluye que la DIA-F cumple con los requisitos legales y reglamentarios. Sobre los dos asuntos referidos, **la JCA se limitó a señalar lo que había aducido cada parte en este caso, sin resolver los graves conflictos que existían entre las posturas respectivas de dichas partes, y sin formular determinaciones de hechos ni recomendaciones sobre el particular**, como debió haberlo hecho conforme a su propia reglamentación. La propia JCA reconoce en su resolución que no es un mero observador de las controversias ambientales sino que hay asuntos medulares con respecto a los cuales debe emitir una recomendación. Sin embargo, con respecto a los dos asuntos referidos, la JCA no actuó como ella misma admite que debió haber actuado.

Examinemos este asunto detenidamente.

1.  Impacto del proyecto en el edificio Condado Vanderbilt.

El Municipio impugna la discusión en la DIA-F sobre la protección y tratamiento que se le dará al edificio del Condado Vanderbilt (antiguo Hotel Condado Beach). En particular, alega que la DIA-F no es adecuada porque no presenta información suficiente para poder determinar si la

estructura se ha de conservar para las próximas generaciones, y si se está respetando su diseño original y su contexto histórico, según lo requiere el Reglamento de Zonificación Especial del Condado.

El edificio Vanderbilt[9] es una de las estructuras que el Reglamento del Condado expresamente exige que se conserve para las próximas generaciones. A estos efectos, el Reglamento dispone en su sección 4.03 lo siguiente:

> En el área aledaña al Hotel Caribe Hilton y en El Condado existen estructuras que merecen conservarse por su diseño arquitectónico, por su estilo representativo de una época y/o por su escala tradicional. Con la excepción de una, todas estas estructuras son construcciones de este siglo y se deben conservar para las próximas generaciones. **No se permitirá la destrucción de ninguna de estas estructuras y en cualquier acto de mejorarlas se deberá respetar su diseño original y su contexto histórico**. (Enfasis suplido.)

23 R.P.R. sec. 650.1834.

El Municipio alega que en el Informe del Oficial Examinador sobre la DIA-P se requirió que en la DIA-F se discutiera de forma clara en qué consistirán las obras de restauración del edificio en cuestión, ya que la DIA-P solamente mencionaba que dicho edificio se restauraría dentro de lo posible. Aduce el Municipio que la ARPE no cumplió con este señalamiento. En vista de lo anterior, debemos examinar

---

[9] El Hotel Condado Vanderbilt fue inaugurado a fines de septiembre de 1919. Según la Evaluación Arqueológica incluida como parte de la DIA-F, desde sus comienzos el Hotel se convirtió en un lugar importante para la sociedad puertorriqueña pues en él se celebraban banquetes cívicos, actividades político-sociales y recibimientos de dignatarios visitantes. Fue por mucho tiempo la única facilidad recreativa de lujo en toda el área.

si en la DIA-F se cumplió con el requerimiento de discutir las obras de restauración de una manera que permita a las agencias pertinentes cerciorarse de que el requisito de conservación impuesto por el Reglamento del Condado se está cumpliendo.

La DIA-F discute el edificio Vanderbilt en las siguientes instancias[10]:

1. Página 7: "antes de proceder a la demolición del Hotel Condado Beach se tomarán las medidas de seguridad necesarias para la protección del Condado Vanderbilt. Entre otras medidas se demolerá por métodos convencionales la estructura que une o enlaza el Vanderbilt y su anexo. Esta estructura contiene la infraestructura de elevadores que provee servicio a ambos edificios. Se sellará la parte del Vanderbilt que queda expuesta una vez se demuela la estructura. Al momento de la implosión, el Condado Vanderbilt estará totalmente desconectado de cualquier estructura a ser demolida. Además, se cubrirán con lonas geotextiles los cristales y áreas susceptibles a daños del Vanderbilt." También se detalla la técnica de implosión que será utilizada para demoler parcialmente el Hotel La Concha, el Anexo Oeste del Hotel Condado Beach y el Centro de Convenciones.

2. Página 16: "La estructura exterior del Condado Vanderbilt que se aprecia desde la Avenida Ashford será renovada a su diseño original. En la cara del edificio que da hacia la playa se instalarán ventanas más grandes que proporcionen mayor vista al mar desde cada habitación. En el

---

[10] Además se menciona el edificio Vanderbilt en el Apéndice 6, que consiste de una carta de la Oficina Estatal de Preservación Histórica (OEHP), en la cual se indica que el Hotel Condado Beach no ha sido nominado ni incluido en el Registro Nacional de Lugares Históricos. Se incluye también otra carta de la misma oficina en la que solicita al proponente cierta información sobre el proyecto para poder comentar sobre el impacto del mismo en el Vanderbilt y una carta de los consultores que prepararon la DIA en la que indican que la OEHP no tiene jurisdicción sobre el asunto. Por otro lado, el edificio también se menciona como parte de la Evaluación Arqueológica Fase IA incluida en el Apéndice 12 de la DIA-F.

interior, el edificio será remodelado para acomodar 71 habitaciones tipo `time share´ en lugar de las habitaciones existentes. Tendrá su propia piscina y acceso a la playa y estará conectado por su lado oeste al nuevo edificio de apartamentos."

3. Página 39-40: "El Reglamento de Zonificación Especial del Condado [...] lista varios edificios que merecen conservarse. Según dicho Reglamento no se permitirá la destrucción de ninguna de las estructuras incluidas en dicha lista. En la lista se encuentra el edificio del Condado Vanderbilt, hoy día parte del hotel Condado Beach. Este edificio había sido modificado anteriormente en dos ocasiones para añadirle anejos que no eran compatibles con su diseño original. [...] Este proyecto respetará el diseño original de la fachada sur del edificio. [...] A la misma vez, se estará integrando esta estructura a un moderno complejo de edificios orientados hacia usos mixtos, desde residencial hasta comercial."

4. Página 46: "El único elemento de valor histórico es el antiguo edificio Condado Vanderbilt. Se propone renovar el edificio y mantenerlo en su uso original de hotel."

5. Página 82: "Las obras a llevarse a cabo en el Condado Vanderbilt consisten de la renovación del edificio para regresar a su diseño original. La [página 16] explica con detalle en qué consistirá la renovación."

DMG alega que lo anterior es lo único que se requiere incluir en una DIA, puesto que la DIA es sólo un instrumento para asegurar que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de tomar decisiones gubernamentales. Es decir, según DMG sólo es necesario afirmar en la DIA, en esencia, que el proyecto ha de mantener el diseño original del edificio histórico. No tiene razón.

Para poder tener en cuenta el uso y la conservación de los recursos naturales y culturales es necesario que las

agencias gubernamentales pertinentes tengan cabal conocimiento del tipo de obras que se llevarán a cabo en un proyecto. En una declaración de impacto ambiental, "la agencia gubernamental proponente tiene la obligación de considerar y detallar por escrito todas las consecuencias ambientales significativas vinculadas a la acción propuesta." Misión Industrial v. JCA, supra. Hemos dicho que este requisito tiene un propósito dual.

> Por un lado, se procura con ello que la propia agencia proponente considere a fondo las consecuencias ambientales significativas de la acción o proyecto que contempla. [...] Por otro lado, con la declaración de impacto ambiental también se persigue que se informe a las partes concernidas, al propio Gobierno y al público en general de las consecuencias ambientales aludidas, para que todos ellos puedan tomar la acción que estimen procedente sobre el proyecto propuesto. (Citas omitidas.)

Misión Industrial v. JCA, supra.

La información incluida en la DIA-F (que citamos arriba) sobre las obras a llevarse a cabo en el Condado Vanderbilt no es suficiente para cumplir con el propósito referido, toda vez que impide que las agencias gubernamentales y otras partes concernidas puedan examinar concretamente si se está cumpliendo con el mandato del Reglamento del Condado. Por ejemplo, no se explicó en la DIA en qué consiste el diseño original del edificio. Solamente se menciona allí que se habían añadido anejos al edificio en dos ocasiones anteriores, sin explicar cómo éstos alteraron el diseño original de la estructura. Más importante aun, tampoco se explicó en qué consistirá la renovación de la estructura

exterior del hotel y de su fachada sur para conservar el diseño original ni cómo será la remodelación del edificio para convertirlo en un hotel "time share". En fin, la escasa información incluida imposibilita examinar si en efecto se ha de respetar el diseño original del edificio y su contexto histórico, tal y como exige el Reglamento del Condado. No se proveen datos concretos, sino meras aseveraciones sobre un propósito. A pesar de que el Tribunal de Circuito de Apelaciones entendió que las secciones citadas antes demuestran que existe en la DIA-F "reconocimiento del valor histórico y cultura[l] del edificio Condado Vanderbilt y compromiso del proponente de respetar ese valor", nos resulta imposible llegar a la misma conclusión con la escasa información incluida en la DIA-F. Lo que se incluye en ésta no pasan de ser alegaciones conclusorias generales, sin contenido concreto que permitan verificar lo afirmado. Erró, por lo tanto, el foro recurrido al concluir que la JCA cumplió con las normas reglamentarias aplicables a este asunto.

2.    Impacto del proyecto en el tránsito del sector del Condado.

El Municipio alega también que la DIA-F es deficiente porque no atiende adecuadamente el impacto del proyecto con respecto al tránsito vehicular del sector del Condado. En particular, alega que la DIA-F no atiende "las graves deficiencias que le fueron señaladas de forma específica en el informe presentado por el Municipio de San Juan" en relación a la DIA-P. Impugna también el Municipio la

metodología utilizada por el proponente en su estudio de tránsito y las conclusiones a las que llega el mismo según estudios periciales encargados por el Municipio.[11]

**El impacto del proyecto con respecto al tránsito en el área del Condado es uno de los aspectos más neurálgicos de toda esta controversia**. La JCA reconoció la importancia del problema del tránsito al tomar conocimiento oficial de éste en su informe sobre la DIA-P. Era, por lo tanto, necesario que la JCA emitiera determinaciones de hechos suficientes y adecuadas en la DIA-F sobre la manera en que se habría de atender este grave problema.

En una de las vistas públicas celebrada ante la JCA, el Municipio hizo varios señalamientos sobre las deficiencias en la DIA en cuanto a este asunto. El proponente "contestó" estos comentarios críticos. La JCA, en su resolución aprobando la DIA-F, recogió tanto los comentarios del Municipio como las contestaciones del proponente. **Sin embargo, esto fue lo único que hizo**. La JCA no formuló determinaciones de hechos que resuelvan si en efecto las

---

[11] La recurrida DMG expresa en su comparecencia ante nos que el Municipio "[e]n esencia, arguye que la evaluación del tránsito que aparece en la DIA-F no sirve porque así lo dictaminaron los peritos del Municipio. Suponemos que estos peritos del Municipio son los mismos que aprobaron la famosa escultura denominada `La Paloma´ en al Avenida Ashford (frente a los colegios St. John y Robinson) que tanto ha dado de qué hablar últimamente debido al monumental tapón que ha creado en este sector." La recurrida aneja a su escrito un recorte de periódico sobre la referida estatua. Sobre estas y otras expresiones incluidas por **todas las partes** en sus comparecencias en el caso de autos, les recordamos que "[e]l abogado debe evitar, en todos los casos, la inconveniencia y la grosería de los términos, el empleo de imputaciones y de hechos extraños o inútiles al asunto...." (Enfasis suplido.

deficiencias señaladas fueron corregidas, por lo que no podemos avalar la conclusión de la JCA de que la DIA-F era adecuada. Tal conclusión no está sostenida por evidencia sustancial. Un estudio de la DIA-F, de los comentarios presentados y las contestaciones provistas, así como de la totalidad del expediente administrativo nos obliga a concluir que los asuntos planteados no fueron atendidos adecuadamente. Veamos.

El Municipio señaló que la DIA no discutía adecuadamente el impacto sobre el tránsito de los accesos de servicio por las calles Seaview y Vendig. Como ya hemos expresado, éstas son calles angostas de carácter principalmente residencial que actualmente sufren de una seria congestión vehicular. Ante este señalamiento, el proponente se limitó meramente a afirmar que como la operación de carga y descarga va a ser fácil y rápida, no se anticipa que haya un impacto significativo con respecto al tránsito de peatones que se dirijan hacia la playa, y que los camiones que serán utilizados serán pequeños. Explicó además que el impacto de los camiones que servirán al proyecto será menor que el del uso anterior.

En cuanto al flujo vehicular creado por el proyecto, el Municipio indicó que la DIA no tenía detalles de la metodología que fue utilizada para estimar el volumen de tránsito ni tomó en consideración el tránsito en el sector, su capacidad y el nivel de servicio de las vías de acceso y

---

Citas omitidas.) In re Cardona Alvarez, 116 D.P.R. 895 (1986).

sus intersecciones. El estudio de tránsito presentado por el

proponente, para atender este aspecto del asunto, compara la

generación de viajes vehiculares hacia y desde el proyecto

con la generación de viajes del uso anterior. Se llega a la

conclusión en dicho estudio de que el proyecto:

> "no generará más tránsito al sitio durante las
> horas pico AM y PM de días de semana, cuando se
> compara al uso de terrenos previo, cuando el Centro
> de Convenciones tenía un evento que trajera más de
> 130 viajes vehiculares al sitio durante las horas
> pico. Sin embargo, el Condado Beach Resort
> propuesto generará más tránsito al sitio durante
> las horas pico AM y PM de días de semana, en
> comparación al uso previo del terreno, cuando el
> Centro de Convenciones tenía un evento que
> produjera menos de 130 viajes vehiculares al sitio
> durante las horas pico."

De igual modo, al evaluar la generación de tráfico del

proyecto en el sector, el proponente se limitó en su

"estudio" a comparar ambiguamente el proyecto propuesto con

la cantidad de tránsito que generaba el uso anterior de la

parcela. Por ejemplo, en cuanto a la generación de tránsito

durante las noches en fines de semana, el proponente expresa

que "se podría concluir que el Condado Trío generaba más

tránsito durante el fin de semana debido a los eventos de

gran escala que se llevaban a cabo en el Centro de

Convenciones." La JCA no hizo ningún comentario ni tomó

ninguna determinación sobre este aspecto de la evaluación de

tránsito, la cual evidentemente es insuficiente para precisar

cuál ha de ser el impacto ambiental del proyecto en el

tránsito del sector.

El Municipio también señaló la necesidad de hacer un

estudio extra muros ("off-site") para cuantificar el impacto

que un desarrollo como el propuesto tendría en una zona como la del Condado, tomando en consideración los cambios en los patrones de uso y movibilidad del sector en relación con los nuevos desarrollos en el sector, tales como el Hotel Marriot y los nuevos establecimientos comerciales y residenciales así como el nuevo estacionamiento del Hospital Presbiteriano. Ante este señalamiento, el proponente respondió que debido a que se espera que los impactos al tránsito del proyecto sean similares a los del uso anterior, no se llevó a cabo un estudio extra muros. Nuevamente, la JCA no hizo determinación alguna sobre este asunto.

Además de estos señalamientos, el Municipio hizo otros sobre el impacto del tránsito de las intersecciones no semaforizadas, sobre los accesos y la circulación, la transportación pública y sobre el impacto de los espacios de estacionamiento en el tránsito. La JCA no formuló ninguna determinación sobre estos asuntos tampoco. En su resolución solamente indica que la DIA-F incluyó "el impacto en tránsito de la operación de las instalaciones propuestas (Apéndices 8 y 23 de la DIA-F)."

En resumen, pues, la resolución de la JCA aprobando la DIA-F no incluyó determinaciones de hechos suficientes y adecuadas sobre el medular asunto del tránsito que el proyecto generaría, por lo que la agencia incumplió con el mandato en nuestra decisión anterior. Erró, por lo tanto, el Tribunal de Circuito al concluir que las determinaciones de la agencia "están ampliamente fundamentadas en el expediente administrativo".

Según hemos demostrado, no hay determinaciones de la JCA que sean adecuadas con respecto a los dos importantes aspectos del proyecto aludidos antes. No obstante, aun asumiendo que estas determinaciones de la JCA fuesen suficientes, por ser la DIA sólo un instrumento de planificación, la ARPE entonces debió atender y tomar una postura sobre estos asuntos al momento de aprobar el anteproyecto, el cual recibió su visto bueno sin haberse resuelto de manera fehaciente el problema de la protección del edificio Vanderbilt y del gravísimo problema de su impacto sobre el tránsito. Si se considerase que los dos problemas aludidos quedaban al menos identificados en la Declaración de Impacto Ambiental, la ARPE entonces tenía el deber de asegurarse de que dichos problemas fueran atendidos adecuadamente por los proponentes del anteproyecto, **antes de extenderle su aprobación a éste**. Cuando señalamos en Misión Industrial v. J.C.A., supra, que una DIA era sólo un instrumento de planificación, también indicamos que superada la etapa de la aprobación de la DIA, al momento precisamente de obtener los permisos particulares que eran necesarios para continuar adelante con el proyecto propuesto, las agencias a cargo de emitir dichos permisos tenían el deber y la responsabilidad de velar concretamente porque se cumpliese de modo riguroso con la política ambiental del país. Identificado el problema en la DIA, la ARPE tenía la obligación de resolverlo. Precisamente para ello existe la DIA. No podía ser, pues, que en la DIA sólo se identificase el problema ambiental, sin resolverlo, y que luego la agencia

a emitir el primer permiso importante ignorase el problema ambiental totalmente, descansando en la DIA. No es ese el proceso previsto en Misión Industrial v. JCA, supra. En este caso, la ARPE aprobó indebidamente el anteproyecto en cuestión, en vista de que en la DIA dos aspectos de suma importancia no fueron examinados con el cuidado que ameritaban. En consecuencia, no se cumplió con lo que exige la política pública ambiental del país.

3.    La consideración de alternativas en la DIA-F.

Finalmente, el Municipio alega que la DIA-F no cumplió con los requisitos reglamentarios en cuanto a la discusión de alternativas. Según el Municipio, en el Informe del Panel Examinador sobre la DIA-P se señaló la necesidad de que se discutieran de forma extensa alternativas adicionales al proyecto propuesto. La DIA-P discutía las alternativas de no construir, la de remodelar y restaurar las estructuras existentes, y la del proyecto del Condado Beach Resort. Alega el Municipio que en la DIA-F solamente se añadió una alternativa y se amplió superficialmente la discusión de las tres alternativas discutidas en la DIA-P, incumpliendo de esta manera con lo requerido por el Panel Examinador y por la reglamentación aplicable.

La sección 5.3.7 del Reglamento de Declaraciones de Impacto Ambiental (R-DIA) dispone que "[d]eberá presentarse, a manera de comparación, el impacto ambiental de la acción propuesta y de sus alternativas, de manera que se precisen las cuestiones bajo evaluación y se provean alternativas de

selección para los funcionarios y el público." Esta sección

también establece que las agencias deberán:

a. Objetivamente considerar y evaluar **toda alternativa razonable, y exponer en forma concisa las razones para excluir aquellas alternativas que sean eliminadas de evaluación detallada**.

b. Dar consideración substancial **a cada alternativa evaluada en forma detallada**, incluyendo la acción propuesta, de manera que las personas que utilicen la DIA puedan evaluar y comparar los méritos de cada alternativa.

c. Incluir alternativas razonables que no estén dentro de la programación de la agencia proponente, a tenor con los planes de desarrollo de la región.

ch. Incluir la alternativa de no llevar a cabo la acción propuesta.

d. Identificar la alternativa preferida por la agencia proponente en la DIA Preliminar.

e. Incluir las medidas de mitigación de efectos adversos al ambiente no discutidas en la acción o en las alternativas propuestas.

Sobre el requisito de la discusión de alternativas,

hemos señalado que "no se pretende que la agencia proponente

examine todo tipo de proyecto alterno que pueda concebirse.

Lo esencial es que quede demostrado que el curso de acción

propuesto es, en balance, el de menor impacto ambiental, a la

luz de todos los factores legítimos que son pertinentes."

Misión Industrial v. JCA, supra. La jurisprudencia de Estados

Unidos explica que este requisito sirve varios objetivos.

> The detailed statement aids a reviewing court to ascertain whether the agency has given the good faith consideration to environmental concerns discussed above, provides environmental information to the public and to interested departments of government, and prevents stubborn problems or

> significant criticism from being shielded from internal and external scrutiny.

Grazing Fields v. Goldschmidt, 626 F. 2d 1068, 1072 (1<sup>er</sup> Cir. 1980).

Se ha resuelto, además, que el proceso de la consideración de alternativas es absolutamente necesario. A esos efectos, se ha dicho que

> It is absolutely essential [...] that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, a requirement that we have characterized as the "linchpin of the entire impact statement". Natural Resources Defense Council v. Callaway, 524 F. 2d 79 (2do Cir. 1975).

El criterio para determinar cuáles alternativas deben ser discutidas y con cuánta profundidad es el de razonabilidad. Grazing Fields v. Goldschmidt, supra; Natural Resources Defense Council v. Callaway, supra; Fayatteville Area Chamber of Commerce v. Volpe, 515 F. 2d 1021 (4to Cir. 1975); Iowa Citizens for Environmental Quality v. Volpe, 487 F. 2d 849, 853 (8vo Cir. 1973). Véase, Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 551 ("Courts cannot force agencies to include within an [Environmental Impact Statement] alternatives too fanciful or hypothetical.") Por lo tanto, aunque no es necesario discutir toda alternativa imaginable, Misión Industrial v. JCA, supra, la DIA debe considerar aquellas alternativas que cumplan con las metas del proyecto parcial o completamente, Natural Resources Defense Council v. Callaway, supra.

Con estos principios normativos en mente, nos corresponde examinar si la discusión de alternativas en la DIA-F en el caso de autos fue adecuada.

La DIA-P preparada por la agencia proponente en el caso de autos consideraba y discutía tres alternativas: (a) alternativa de no construir; (b) alternativa de remodelar y restaurar las estructuras existentes; (c) alternativa de remodelación del Hotel Condado Vanderbilt y la construcción de estructuras nuevas. El 7 de diciembre de 1998, el Panel Examinador rindió un informe concluyendo que

> (5) Las alternativas discutidas en la DIA-P son bien someras y solamente se discute la opción de no construir, la opción del proyecto y una tercera opción que es restaurar el complejo en la forma presente. La discusión de las alternativas debe ser más extensa e incluir más alternativas.

La DIA-F describe cuatro alternativas: las tres alternativas descritas en la DIA-P y la alternativa de ubicar el proyecto en otra propiedad. El Municipio alega que se debió considerar el desarrollo del proyecto en menor intensidad o con modificaciones tal que "provea un mayor acceso peatonal a la playa y visual al mar, que favorezca el flujo peatonal, que contribuya positivamente a aliviar los problemas de tráfico e infraestructura del sector y que proteja al máximo las edificaciones de valor histórico mientras ayuda a revitalizar económicamente el área." Por su parte, la recurrida DMG alega que se cumplió con el mandato de la Ley 9 y el R-DIA pero "lo que pasa, claro está, es que la determinación de la JCA avalando la DIA-F representa una decisión que no es del agrado del Municipio."

Al evaluar la discusión de alternativas en la DIA-F del proyecto en cuestión a la luz de la normativa antes señalada, es evidente que la JCA no cumplió con los requisitos pertinentes, que requieren considerar y evaluar objetivamente **toda alternativa razonable** de manera que las personas que utilicen la DIA puedan evaluar y comparar los méritos de cada alternativa. Las alternativas discutidas no son suficientes para cumplir con el mandato constitucional ni con el propósito de las declaraciones de impacto ambiental. La discusión de alternativas en el caso de autos no demuestra que se haya dado seria consideración a conocidas soluciones alternas para el logro de sus objetivos. Del propio récord administrativo surge la necesidad de considerar otras alternativas. Como hemos visto a lo largo de esta opinión, para poder construir el proyecto de autos tal y como se diseñó se han tenido que solicitar múltiples variaciones a los requisitos reglamentarios. La gran mayoría de las variaciones solicitadas afectan cuestiones ambientales de importancia. En vista de esto, era razonable considerar como alternativa la construcción del proyecto propuesto, con las modificaciones necesarias para cumplir cabalmente con los requisitos reglamentarios. La JCA no consideró esta alternativa lógica, prefiriendo avalar un proyecto que sólo podía aceptarse si se concedían las múltiples variaciones que no cumplían con las disposiciones reglamentarias. No era ni

hipotético ni especulativo considerar como alternativa un proyecto con modificaciones que permitiesen la consecución de las metas propuestas para el proyecto con el menor impacto ambiental posible. La JCA no consideró esta crucial alternativa, lo que vició la aprobación que le extendió a la DIA-F.

**IV.**

Es menester, para concluir, que expresemos nuestra honda preocupación con la actuación de la ARPE y de la JCA en el caso de autos. Dichos organismos abdicaron sus funciones fiscalizadoras e incumplieron con sus obligaciones jurídicas al impartirle aquí su aprobación administrativa a un proyecto plagado de violaciones a las leyes y reglamentos aplicables. El referido proyecto:

1. no cumplía con los requisitos de espacios de estacionamiento para automóviles;

2. no cumplía con los requisitos de estacionamiento de carga y descarga;

3. no cumplía con los requisitos sobre construcciones en la zona marítimo-terrestre;

4.  no cumplía con los requisitos sobre vistas al mar.

Además, el proyecto se aprobó de un modo viciado procesalmente, ya que se incurrió en las siguientes otras violaciones:

5. no se autorizó a tiempo la intervención del Municipio de San Juan en los procedimientos ante la ARPE;

6. no se celebraron unas vistas públicas que requiere la Ley Orgánica de la ARPE;

7. no se preparó una DIA-F adecuada, antes de aprobar el proyecto;

8. no se atendió adecuadamente el problema de la conservación del histórico edificio Vanderbilt;

9. no se atendió adecuadamente la consideración del impacto del proyecto sobre el grave problema de tránsito del área del Condado;

10. no se consideraron alternativas razonables al proyecto propuesto que cumpliesen con todos los requisitos reglamentarios;

11. se concedieron variaciones invalidas a múltiples disposiciones reglamentarias;

12. se utilizó en la decisión de ARPE un reglamento nulo de la Junta de Planificación.

En vista de estas doce (12) violaciones serias a las leyes y reglamentos aplicables, es evidente que las agencias gubernamentales que tenían jurisdicción sobre este proyecto sencillamente **no cumplieron con los importantes deberes que el ordenamiento jurídico les impone**. Rindieron su responsabilidad de un modo alarmante, para aprobar de manera festinada e infundada un proyecto inadecuado. Se trata de una conducta altamente reprochable, que defrauda la confianza pública en los procesos administrativos y que hace burla de las normas jurídicas que todos estamos llamados a cumplir. Todo el entramado de ley que existe en el país para ordenar

racionalmente el desarrollo urbano y para proteger el ambiente y los recursos naturales se socava seriamente cuando los organismos administrativos que lo tienen a su cargo actúan ilícitamente como lo hicieron las agencias referidas aquí.

Erró seriamente también el foro apelativo, al no realizar debidamente su función revisora y convertirse en un mero sello de goma de la autoridad administrativa.

Finalmente, debemos volver a señalar algo que hemos expresado en reiteradas ocasiones:

> "[...] al evaluar estos reclamos no intervenimos indebidamente con el funcionamiento de la Rama Ejecutiva. **No se pretende paralizar una obra, sino asegurar que se cumplan los requisitos estatutarios de estirpe constitucional**, garantizar la conservación del ambiente y la salud de los ciudadanos afectados." García Oyola v. JCA, res. el 21 de febrero de 1997, 142 D.P.R. ___ (1997), 97 JTS 25, pág. 662. Cuando el escrutinio de la JCA ha sido responsable e independiente y la agencia proponente ha cumplido cabalmente con sus deberes ministeriales, le hemos dado la merecida deferencia tanto a las determinaciones de la JCA, como a las actuaciones de la agencia proponente. Misión Industrial v. Junta de Planificación, supra.

En este caso, no se cumplieron los deberes ministeriales referidos, por lo que no merecen deferencia las determinaciones administrativas en cuestión.

## V.

Por los fundamentos antes expuestos, procede que se expida el recurso y se dicte sentencia para revocar la dictada por el Tribunal de Circuito de Apelaciones así como las resoluciones emitidas por la Administración de

Reglamentos y Permisos y la Junta de Calidad Ambiental que han sido impugnadas en este recurso.


                                    JAIME B. FUSTER BERLINGERI
                                          JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de San Juan

    Demandante-Peticionario


      vs.                    CC-1999-969        Certiorari

Junta de Calidad Ambiental,
Etc.

    Demandados-Recurridos


SENTENCIA


San Juan, Puerto Rico, a 14 de diciembre de 2000.


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente, se dicta sentencia revocando la dictada por el Tribunal de Circuito de Apelaciones así como las resoluciones emitidas por la Administración de Reglamentos y Permisos y la Junta de Calidad Ambiental que han sido impugnadas en este recurso.

Lo pronunció, manda el Tribunal y certifica la Secretaria General. El Juez Asociado señor Hernández Denton emitió Opinión de Conformidad. El Juez Asociado señor Corrada del Río emitió Opinión Disidente, a la que se unen los Jueces Asociados señores Rebollo López y Rivera Pérez.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de San Juan

  Demandante-Peticionario

  v.                              CC-1999-969    Certiorari

Junta de Calidad Ambiental,
etc.

Demandados-Recurridos

Opinión de Conformidad emitida por el Juez Asociado Señor Hernández Denton.

San Juan, Puerto Rico, a 14 de diciembre de 2000.

Coincidimos con el criterio mayoritario de este Tribunal al revocar la sentencia dictada por el Tribunal de Circuito de Apelaciones, así como las resoluciones emitidas por la Junta de Calidad Ambiental y la Administración de Reglamentos y Permisos en el caso del proyecto conocido como el "Condado Trío".

En particular, nos complace mucho que esta Curia finalmente adopte un criterio especialmente riguroso para revisar las decisiones de las agencias administrativas en asuntos ambientales. Como bien expresa la mayoría "[l]os Tribunales tenemos el deber de fiscalizar rigurosamente las

decisiones de dichas agencias gubernamentales, para asegurar que desempeñen cabalmente sus importantísimas funciones, y para que el país no pierda la fe en dichas instituciones." En efecto, el análisis mayoritario parte de la premisa que los tribunales tienen que asegurar que las agencias administrativas cumplan con su obligación de examinar cuidadosamente las implicaciones ambientales de las decisiones en proyectos como el del Condado Trío.

Entendemos que mediante esta decisión, el Tribunal en efecto ha abandonado la óptica en extremo laxa de revisión judicial que en otras ocasiones hemos criticado. *Véase* Misión Industrial v. Junta de Calidad Ambiental, res. el 29 de junio de 1998, 98 TSPR 85, (Op. Dis. del Juez Asociado señor Hernández Denton).

I

En mayo de 1998, Development Management Group (en adelante "DMG") presentó ante la Administración de Reglamentos y Permisos (en adelante "ARPE") una consulta sobre la conformidad del proyecto "Condado Beach Resort" con el Reglamento de Zonificación. El proyecto propone la demolición de todas las estructuras del área (excepto el Hotel Condado Vanderbilt) y la construcción de un complejo hotelero e industrial.

En julio de 1999, ARPE aprobó el anteproyecto propuesto por DMG y otorgó diversas variaciones, entre las que se encontraba la reducción de los requisitos de estacionamiento.
En el ínterin —y como parte de la mencionada consulta— DMG y ARPE presentaron una Declaración de Impacto Ambiental Preliminar (en adelante "DIA-P") ante la Junta de Calidad Ambiental (en adelante "JCA"). Luego de un proceso de vistas públicas, evaluaciones y enmiendas, el 2 de marzo de 1999 la JCA aprobó una Declaración de Impacto Ambiental Final (en adelante "DIA-F"). En su resolución, la JCA no emitió determinaciones de hechos ni conclusiones de derecho por lo que el Municipio de San Juan impugnó la misma ante los foros pertinentes. Luego de que el Tribunal de Circuito de Apelaciones confirmara la resolución de la JCA y de que el Municipio acudiera ante

nos, el 5 de octubre de 1999 paralizamos las obras de demolición y dejamos sin efecto la resolución de la JCA sobre la DIA-F por no contener determinaciones de hechos y conclusiones de derecho. Municipio de San Juan v. Junta de Calidad Ambiental, res. el 5 de octubre de 1999, 99 TSPR 147.

El 19 de noviembre de 1999, la JCA emitió otra resolución esta vez con determinaciones de hechos aprobando la DIA-F.

Posteriormente el Municipio impugnó ante el Tribunal de Circuito de Apelaciones las dos (2) resoluciones emitidas: 1) la de la JCA aprobando la DIA-F presentada por ARPE y DMG, y 2) la de ARPE sobre la aprobación en los méritos del anteproyecto propuesto por DMG y sobre la concesión de las variaciones. El Municipio cuestionó ante dicho foro la adecuacidad de la DIA-F presentada y la razonabilidad o arbitrariedad de las variaciones concedidas por ARPE. Impugnó además la validez de la resolución de la Junta de Planificación en la que se basó ARPE para aprobar el anteproyecto del Condado Beach Resort; así como la actuación de ARPE al ampararse en ella para tales fines; la privación de su derecho a intervenir y participar efectivamente ante ARPE; y la aprobación del referido anteproyecto sin la celebración de una vista pública según requiere la ley, entre otras cosas. El foro apelativo denegó la expedición de ambos recursos, razón por la cual el Municipio recurre ante nos.

II

La correcta adjudicación de las controversias planteadas requiere una delimitación previa de los criterios con los que este Tribunal ha de revisar las referidas determinaciones administrativas. Esto es, ante los hechos de este caso debemos determinar, como cuestión de umbral, cuál es el criterio de revisión judicial aplicable. Veamos.

A

El ámbito de la revisión judicial de las determinaciones de las agencias administrativas comprende: (1) la concesión del remedio

apropiado; (2) la revisión de las determinaciones de hecho de acuerdo al criterio de evidencia sustancial; y (3) la revisión completa y absoluta de las conclusiones de derecho. <u>Municipio de San Juan</u> v. <u>Junta de Calidad Ambiental</u>, res. el 5 de octubre de 1998, 99 TSPR 147; <u>Miranda</u> v. <u>C.E.E.</u>, res. el 25 de octubre de 1996, 141 D.P.R. ___ (1996). *Véase además* Demetrio Fernández Quiñones, <u>Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme</u>, sec. 9.3, pág. 521 (1993).

El propósito principal de tal revisión es delimitar la discreción de las agencias y asegurarse que cumplan sus funciones conforme a la ley. <u>Municipio de San Juan</u> v. <u>Junta de Calidad Ambiental</u>, *supra*; <u>Misión Industrial</u> v. <u>Junta de Planificación</u>, res. el 30 de junio de 1998, 98 TSPR 86, 146 D.P.R. ___ (1998). Tiene, además, como función cardinal asegurar que los organismos administrativos actúen dentro del marco del poder delegado y en forma consistente con la política pública legislativa. <u>Misión Industrial</u> v. <u>Junta de Planificación</u>, *Id.*; <u>Miranda</u> v. <u>C.E.E.</u>, *supra*.

En cuanto a las determinaciones de hecho, es norma conocida que el alcance de la revisión judicial se circunscribe al criterio de evidencia sustancial. Conforme a éste, las determinaciones que una agencia administrativa haga de los hechos serán respetadas por un tribunal en revisión si las mismas están apoyadas en evidencia sustancial obrante en el expediente administrativo. Así pues, un tribunal debe considerar la totalidad del expediente y examinar si existe evidencia contradictoria que menoscabe el punto de vista de la agencia. <u>Hilton Hotels</u> v. <u>Junta de Salario Mínimo</u>, 74 D.P.R. 670, 686 (1953). De haberla, debe examinarse si la determinación de la agencia es razonable, es decir "que una mente razonable podría aceptar [la] como adecuada para sostener una conclusión". <u>Hilton Hotels</u>, *supra.*

A tenor con lo anterior, los tribunales tradicionalmente se limitan a evaluar si la decisión de la agencia es razonable o arbitraria y no si hizo una determinación correcta de los hechos ante

su consideración. Si la interpretación de los hechos es razonable, los tribunales, de ordinario, deben sostener el criterio de la agencia y no sustituirlo por el suyo. Associated Insurance Agencies, Inc. v. Comisionado de Seguros, res. el 26 de noviembre de 1997, 144 D.P.R. ____ (1997); Junta de Relaciones del Trabajo v. Línea Suprema, 89 D.P.R. 846 (1964). De ahí que las determinaciones de hecho de las agencias administrativas gocen de un alto grado de deferencia por parte de los tribunales revisores.

Este sin dudas es el criterio de revisión judicial que la Ley sobre Política Pública Ambiental ha provisto para escrutar las determinaciones de hechos realizadas por la Junta de Calidad Ambiental pues, según establece, las mismas "serán concluyentes si están sostenidas por evidencia sustancial". 12 L.P.R.A. sec. 1134(g).

De otra parte, en cuanto a las conclusiones de derecho, la Ley sobre Política Pública Ambiental nada dispone, por lo que de modo supletorio aplica el criterio estatuido por la Ley de Procedimiento Administrativo Uniforme. De esta forma, las conclusiones de derecho "serán revisables en todos sus aspectos por el tribunal." 3 L.P.R.A. sec. 2175. No obstante, y en virtud del reconocimiento de su pericia y experiencia especializada, se concede cierta deferencia a las interpretaciones que hagan las agencias del estatuto que instrumentan. Esto, sin perjuicio de que tal deferencia no sea considerada como un "dogma inflexible que impide la revisión judicial si no existen las condiciones que sostienen la deferencia. Cuando la interpretación que del estatuto hace la agencia produce resultados inconsistentes o contrarios al propósito de la ley, o afecta sustancialmente derechos fundamentales, el criterio administrativo claramente no puede prevalecer." Associated Insurance Agencies, Inc. v. Comisionado de Seguros, res. el 26 de noviembre de 1997, 144 D.P.R. ___ (1997).

Por otro lado, cuando los asuntos sujetos a revisión judicial son cuestiones mixtas, de hechos y de derecho, la norma es que las mismas han de ser consideradas como de derecho, por lo que serán revisadas por

los tribunales en todos sus aspectos y no bajo el prisma del criterio deferente de evidencia sustancial. Garriga v. Comisión Indstrial, 87 D.P.R. 715 (1963); *véase* Misión Industrial v. Junta de Calidad Ambiental, res. el 29 de junio de 1998, 98 TSPR 85, (Op. Dis. del Juez Asociado señor Hernández Denton); Fernández Quiñónez, *supra*, sec. 9.4, pág. 548.

Son éstas las normas que rigen nuestro actual ordenamiento administrativo. No obstante, para tener un cuadro completo, debe matizarse el ámbito de la revisión judicial de las agencias administrativas en casos de índole ambiental.

B

Las agencias involucradas en actividades que puedan impactar adversamente al ambiente tienen el ineludible deber constitucional de conducirse conforme a la más eficaz conservación de los recursos naturales y al mayor desarrollo y aprovechamiento de los mismos. Const. E.L.A. Art. VI, sec. 19.

Sin dudas, la inclusión de esta máxima en nuestro texto constitucional representó algo más que una mera aspiración. Se trata más bien de un deber, de un mandato, que tienen todas las ramas políticas puertorriqueñas de cumplir con esta clara política pública cuya génesis es de rango constitucional. Paoli Méndez v. Rodríguez, 138 D.P.R. 49 (1995); Misión Industrial v. Junta de Calidad Ambiental, res. el 29 de junio de 1998, 98 TSPR 85; Federación de Pescadores de Playa Picúa v. Junta de Planificación, res. el 27 de mayo de 1999, 99 TSPR 82.

**Se trata, también, de una norma sustantiva que fija un criterio jurídico para medir la validez de las actuaciones del Estado cuando las mismas tienen el potencial de afectar el ambiente**. Misión Industrial v. Junta de Calidad Ambiental, res. el 29 de junio de 1998, 98 TSPR 85. La conservación de nuestros recursos naturales es, en fin, un principio jurídico y social que debe primar sobre toda actividad gubernamental.

Por otra parte, la Ley Sobre Política Pública Ambiental, 12 L.P.R.A. secs. 1121-1142, se estableció por la Asamblea Legislativa puertorriqueña con el propósito de cumplir con el mandato que impone el Art. VI, sec. 19 de nuestra Constitución. A tales efectos, instruye a todas las agencias y organismos del Gobierno a que "al máximo grado posible [ ] interpreten, implementen y administren todas las leyes y cuerpos reglamentarios vigentes en estricta conformidad" con la política pública que allí se establece. 12 L.P.R.A. sec. 1124. Además, las disposiciones de dicha Ley "constituyen un mandato legislativo deliberado, que está en sustancial armonía con el de la Constitución." Misión Industrial v. Junta de Calidad Ambiental, res. el 29 de junio de 1998, 98 TSPR 85.

Ahora bien, aunque en general la revisión judicial de las determinaciones de las agencias administrativas debe realizarse bajo los parámetros de la normativa administrativa imperante, la función revisora de este Tribunal debe enmarcarse dentro de esta política pública de tan trascendental importancia.

Por ende, al determinar cuál será el criterio de revisión judicial aplicable a los casos de naturaleza ambiental, debemos considerar la importante presencia de la ya mencionada política pública constitucional sobre la conservación de los recursos naturales. *Véase*, Misión Industrial v. Junta de Calidad Ambiental, res. el 29 de junio de 1998, 98 TSPR 85 (1998) n. 33. ("[D]ebemos destacar que toda interpretación sustantiva y procesal que le debemos adscribir al esquema estatutario en materia ambiental debe estar permeada [sic] por el hecho de que la protección a los recursos naturales y nuestro medio ambiente en nuestra jurisdicción es de rango constitucional"). Para ello podemos utilizar, a modo de guía, la experiencia de otras jurisdicciones ante similares situaciones.

C

En la jurisdicción federal, donde no existe un mandato constitucional para la conservación de los recursos naturales, los

tribunales han desarrollado una doctrina de escrutinio para la revisión judicial de decisiones administrativas relacionadas con asuntos ambientales. Así, bajo la *National Environmental Policy Act*, 42 USCA sec. 4321 *et seq.*, cuyo esquema procesal adoptamos en nuestra Ley sobre Política Pública Ambiental, *supra*, se ha resuelto que las agencias tienen el deber de examinar cuidadosamente las consecuencias ambientales de las acciones que tengan el potencial de impactar significativamente el ambiente ("a 'hard look' at environmental consequences"). Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718; Robertson v. Methow Valley, 490 U.S. 331, 109 S.Ct. 1835).

Esta doctrina, llamada la de "hard look" o escrutinio riguroso, propone que, como parte de todo proceso administrativo, una agencia incluya los riesgos significativos al ambiente entre sus criterios al tomar una decisión sobre un proyecto. Como acertadamente ha concluido el Tribunal Supremo de los Estados Unidos "an agency must allow all significant environmental risks to be factored into the decision whether to undertake a proposed action". Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 103 S.Ct. 2246 (1983). Misión Industrial v. Junta de Calidad Ambiental, res. el 29 de junio de 1998, 98 TSPR 85 (Op. Dis. del Juez Asociado señor Hernández Denton). Véanse además los pronunciamientos que sobre esta materia emitiera el Tribunal de Circuito de Apelaciones en Misión Industrial v. Junta de Planificación, KLRA9600284, Sentencia del 20 de mayo de 1997 (Panel Integrado por la Jueza Fiol Matta -ponente-, la Jueza Rodríguez de Oronoz y el Juez Gierbolini).[12]

---

[12] *Véanse además*, Neighbours of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372 (9no Cir. 1998); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208 (9no Cir. 1998); Mucleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800 (9no Cir. 1999); Maryland-National Capital Park & Planning Comm. v. United States Postal Service, 487 F.2d 1029 (DC Cir. 1973); Citizen's Comm. for Environmental Protection v. United States Coast Guard, 456 F.Supp. 101, 117 (N.J. 1978) ("substantial inquiry"); Chatauqua County Environmental Defense Council v. EPA, 452 F.Supp. 69, 78 (N.J. 1978) ("thorough review"); Greater Boston Television Corp. v. F.C.C. 444 F.2d 841 (D.C. Cir. 1970).

Según esta doctrina, los tribunales deben asegurarse que la agencia identifique las áreas relevantes de preocupación ambiental. Además, se faculta a los tribunales para exigir a la agencia que demuestre que la acción propuesta, en efecto, tiene un impacto ambiental poco significativo. Daniel R. Mandelken, NEPA Law and Litigation sec. 8.02[10], pág. 8-22 (1992).

Dicha doctrina, por tanto, tiene el efecto de requerir que el Poder Judicial tenga una visión más rigurosa de las determinaciones administrativas con impacto ambiental. Daniel R. Mandelken, NEPA Law and Litigation sec. 8.02[10], pág. 8-21 (1992). A pesar de que la obligación de considerar seria y cuidadosamente las implicaciones ambientales la ostentan principalmente las agencias, es a los tribunales a quienes consiguientemente, les corresponde asegurar que éstas han actuado conforme a esa responsabilidad. De esta forma, la única manera de llevar a cabo una revisión judicial adecuada que dé fe del cumplimiento de dicha obligación es evaluando la determinación de la agencia con el mismo prisma que ésta utilizó o que debió haber utilizado. Misión Industrial v. Junta de Calidad Ambiental, res. el 29 de junio de 1998, 98 TSPR 85 ((Op. Dis. del Juez Asociado señor Hernández Denton).

El nivel de escrutinio con el cual los tribunales puertorriqueños deben asumir la revisión de las determinaciones ambientales tiene que estar determinado por el carácter constitucional de nuestra política pública en esta materia. La doctrina del escrutinio riguroso ("hard look") es, por ende, un criterio de revisión judicial particular para los casos en que se atente contra la estabilidad de nuestros recursos naturales. Es además, en nuestro contexto, un estándar de revisión judicial a tono con nuestra realidad constitucional.

Sobre este asunto el Profesor Carlos Díaz Olivo ha dicho que:

> "Al incluir en la Constitución un mandato expreso de protección al ambiente, los constituyentes hicieron una determinación, a nombre de futuras generaciones, de que lo relativo a los recursos naturales se conceptualizara y considerara como un derecho de rango constitucional y, por

consiguiente, un asunto eminentemente jurídico dentro del ámbito principal de los tribunales. Esto significa que, al ser un asunto legal y, sobre todo, de índole constitucional, no existe razón por la que los tribunales deben observar una deferencia especial para con las determinaciones administrativas, pues el 'expertise' sobre asuntos constitucionales es de los tribunales." Carlos E. Díaz Olivo, La Posibilidad de la Creación de un Derecho Puertorriqueño Dentro del Esquema Actual de Relaciones Entre Puerto Rico y los Estados Unidos, 60 Rev. Jur. Col. Abo. Núm. 3, 66, en la pág. 71.

Con esto, no pretendemos atribuirnos una facultad revisora desmedida e inusitada. Recordemos que nuestro esquema estatutario ambiental establece que las determinaciones de hechos serán escrutadas según el criterio de evidencia sustancial. No obstante, si bien es cierto que un tribunal, al revisar una determinación administrativa, debe actuar con deferencia y no puede sustituir el juicio de la agencia por el suyo en cuanto a la corrección de una acción propuesta o realizada, no es menos cierto que el fiel cumplimiento de los organismos gubernamentales con nuestra política pública constitucional y estatutaria es de nuestra total incumbencia.[13]

Toda vez que el Gobierno de Puerto Rico tiene la obligación legal y constitucional de actuar conforme a determinadas metas ambientales, le corresponde a este Tribunal, como cuestión de derecho, utilizar una revisión cuidadosa que fiscalice y asegure el cumplimiento de los organismos estatales con esa política pública.

Así pues, mediante la decisión de hoy, nos aseguramos que las agencias pertinentes den una consideración seria y profunda a las implicaciones ambientales de todo proyecto ante sí. Esto es, que las agencias hayan empleado un escrutinio riguroso de las consecuencias ambientales de sus decisiones.

III

---

[13] "Under this standard, review consists only of insuring that the agency took a 'hard look'". Neighbors of Cuddy Mountain v. U.S. Forest Service, supra, en la pág, 1376. "We must defer to agency's decision that is 'fully informed and well-considered'". Blue Mountains Biodiversity Project v. Blackwood, supra, en la pág. 1211.

Es precisamente este enfoque el que una mayoría de este Tribunal ha demostrado tener en el caso de autos. A tenor con esta doctrina de revisión judicial, la Opinión mayoritaria examina cuidadosamente la resolución mediante la cual la Junta de Calidad Ambiental avaló la Declaración de Impacto Ambiental presentada por ARPE y DMG.

Según el riguroso criterio empleado por esta Curia, aunque la aprobación que la JCA dio a dicha DIA fue sustentada por las determinaciones de hecho y conclusiones de derecho contenidas en la resolución, las mismas no fueron suficientes para que pudiéramos realizar una verdadera y profunda evaluación sobre el cumplimiento de dicha agencia con su deber primordial de propulsar adecuadamente nuestra política pública ambiental. Así, por ejemplo, al evaluar el impacto del proyecto con respecto al tránsito en el área del Condado y el impacto del proyecto sobre el edificio Condado Vanderbilt, rechazamos el que la JCA no expresara claramente su postura sobre si estos asuntos fueron verdaderamente atendidos en la DIA, aunque sí los discutió en su resolución. En fin, la JCA no demostró que en efecto haya considerado y ponderado seriamente el impacto ambiental de dichos problemas.

Además, este Tribunal correctamente y con firmeza rechaza enérgicamente la intolerable práctica en que incurrieron las agencias mencionadas al promover y aprobar un proyecto plagado de las irregularidades discutidas en la Opinión del Tribunal y al ignorar crasamente los requisitos legales y reglamentarios pertinentes.

Sin lugar a dudas, durante las diferentes etapas del proceso de aprobación de este proyecto, la Administración de Reglamentos y Permisos y la Junta de Calidad Ambiental demostraron un total menosprecio e indiferencia para con el fiel cumplimiento de sus funciones legales. El cúmulo de anomalías que estas agencias dejaron pasar por alto y que ellas mismas propiciaron no puede llevar sino a la conclusión de que a estos organismos, encargados de instrumentar nuestra política pública ambiental, les corroe una despreocupada e

inescrupulosa actitud que representa verdaderamente una abdicación de su deber principal de fomentar el mayor bienestar de la comunidad puertorriqueña.

Resulta inexplicable, por ejemplo, la omisión que ARPE hizo de los claros requisitos del Reglamento del Condado sobre la autorización de variaciones para esa área. Más insólito, sin embargo, resulta el que esa agencia fundamente su aprobación de tales variaciones en una resolución de la Junta de Planificación diseñada precisamente para evadir dichas restricciones sin cumplir con el trámite legal correspondiente. Todo esto, a sabiendas de que el proyecto no cumplía con los requisitos de estacionamiento; con las distancias mínimas requeridas para proyectos que colindan con la zona marítimo-terrestre; y con los requisitos sobre vistas al mar.

Por otra parte, la aprobación a destiempo que ARPE impartió a la solicitud de intervención del Municipio de San Juan, así como el no celebrar una vista pública antes de la aprobación del anteproyecto, es fuente de suma preocupación. Ambas actuaciones, a todas luces ilegales, opacaron indebidamente la pureza y cabal participación ciudadana que debe imperar en procedimientos de esta naturaleza e importancia. El negligente y abandonado comportamiento exhibido por la referida agencia en estas instancias le presta un flaco servicio a la ciudadanía, pues pone en tela de juicio la seriedad con la que asume la importante responsabilidad social que ostenta.

Por entender que las mencionadas actuaciones de las agencias administrativas merecen nuestra más enérgica desaprobación, estamos conformes con la Opinión de la mayoría de este Tribunal. Es también el alcance de la revisión judicial utilizada en el día de hoy lo que ha motivado esta expresión de conformidad.


                            Federico Hernández Denton
                            Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de San Juan          *
                               *
  Peticionario                 *
                               *
     v.                        *
                               *
Junta de Calidad Ambiental;    *
Administración de Reglamentos  *
y    Permisos;    Development   *   CC-1999-969
Management Group, Inc.         *
                               *
  Recurridos                   *
***************************     *
Municipio de San Juan          *
                               *
  Peticionario                 *
                               *
     v.                        *
                               *
Administración de Reglamentos  *
y    Permisos;     Development  *
Management Group, Inc.         *
                               *
  Recurridos                   *
***************************** *

Opinión Disidente emitida por el Juez Asociado señor Corrada del Río a la cual se unen los Jueces Asociados señores Rebollo López y Rivera Pérez.

San Juan, Puerto Rico, a 14 de diciembre de 2000.

Nuevamente tenemos ante nuestra consideración un asunto relacionado con el proyecto conocido como el *Condado Beach Resort* (en adelante CBR), antiguo *Condado Beach Trío*.[14] En esta ocasión, el Municipio de San Juan (en lo sucesivo Municipio) recurre ante nos impugnando una resolución del Tribunal de Circuito de Apelaciones (en adelante TCA), la cual denegó la expedición de dos (2) recursos de revisión presentados por el Municipio, a saber: (1) uno solicitando la revocación de la resolución de la Junta de Calidad Ambiental (en adelante JCA) que aprobó la Declaración de Impacto Ambiental Final (en adelante DIA-F) sobre el referido proyecto; y, (2) otro solicitando la revocación de la resolución de la Administración de Reglamentos y Permisos (en lo sucesivo ARPE) que aprobó el anteproyecto del CBR.

---

[14] Véase, *Mun. de San Juan v. J.C.A.*, res. el 5 de octubre de 1999, 99 TSPR 147, 149 D.P.R. ___ (1999), 99 JTS 152.

Contrario a la mayoría de esta Curia, entendemos que tanto la resolución de la JCA como la resolución de ARPE están sostenidas por la evidencia sustancial que obra en el expediente administrativo. Igualmente, a diferencia de la mayoría, bajo un crisol objetivo, concluimos que las actuaciones de dichas agencias no fueron irrazonables. Por tales razones, conforme a nuestra doctrina firmemente establecida, dichas resoluciones merecen la deferencia de este Tribunal. En vista de ello, denegaríamos la expedición del recurso y, por ende, disentimos.

I

En mayo de 1998, Development Management Group (en adelante DMG) sometió ante ARPE una Consulta sobre Conformidad con el Reglamento de Zonificación con relación al proyecto CBR.[15] Posteriormente, el 31 de julio de 1998, ARPE, en su capacidad de agencia proponente, presentó ante la JCA una Declaración de Impacto Ambiental Preliminar (en adelante DIA-P) preparada por DMG. La DIA-P, además de circularse entre las agencias pertinentes, estuvo a la disponibilidad del público en general, para su inspección.

Nombrado un Oficial Examinador por la JCA para recoger los comentarios y emitir las recomendaciones correspondientes, el 17 de septiembre de 1998 se llevó a cabo una vista pública.[16] A ésta, comparecieron varias personas con interés -entre otros, el Municipio, representado por el Ing. Jorge Rivera Jiménez, y la comunidad de San Juan, representada por el Sr. Jorge Fernández Porto-, quienes presentaron sus comentarios sobre la DIA-P.

---

[15] Cabe señalar que DMG no es la propietaria del predio donde está presto a ubicarse el CBR sino que posee la opción para comprar y desarrollar el mismo. Dicha propiedad pertenece a la Corporación de Desarrollo Hotelero (en lo sucesivo CDH).

[16] Previo a la vista, la JCA publicó un aviso en un periódico de circulación general, mediante el cual identificó el proyecto y la documentación a tomarse en consideración. De igual forma, precisó los propósitos de la vista e indicó los sitios donde estaría disponible copia de la DIA-P para el examen de la misma. Además, exhortó a la ciudadanía a concurrir y participar de dicha vista.

Tras concederles un término adicional para presentar sus comentarios por escrito a los que así lo solicitaron, el 7 de diciembre de 1998, el Oficial Examinador sometió a la Junta de Gobierno de la JCA su *Informe del Panel Examinador*.[17] En dicho informe, el Oficial Examinador agrupó de forma detallada todos los comentarios vertidos. Así también, **luego de señalar que la función de la JCA se circunscribe a comprobar "si el trámite de evaluación y consulta" se ajusta**

---

[17] Apéndice del recurso de *certiorari*, Volumen I, Anejo 6, págs. 142-179. Este informe también aparece en el Apéndice del recurso de *certiorari*, Volumen II, Anejo 7 -Volumen 2, Apéndice 22-, págs. 899-936. En lo sucesivo, sólo haremos referencia a la primera cita.

**a lo preceptuado por la ley y su reglamento** —

**independientemente de hallarse en desacuerdo o no—,**[18] presentó sus

recomendaciones.[19] Finalmente, concluyó que, en su etapa preliminar, el

documento sometido acataba "el propósito principal de servir de

instrumento de planificación para lograr que en el proceso decisional

[sic] gubernamental se incorpore la política pública ambiental enunciada

en la ley."[20] El 8 de diciembre de 1998, mediante resolución, la JCA

acogió íntegramente el referido informe.[21]

---

[18] *Íd.*, pág. 177.

[19] A los fines de considerar el documento sometido como una DIA-F, el Oficial Examinador entendió que el documento final debía:

   (a)  integrar y proveer las respuestas a los comentarios expuestos sobre la adecuacidad de la DIA-P;

   (b)  incluir carta del Municipio accediendo a "la disposición final de los desperdicios sólidos no peligrosos" o analizar diferentes alternativas;

   (c)  sustituir el Mapa de Suelos por una copia más clara;

   (d)  discutir los posibles impactos del proyecto sobre la zona marítimo terrestre;

   (e)  considerar las alternativas propuestas más a fondo e incorporar más alternativas;

   (f)  ampliar el análisis del impacto de las emisiones del polvo fugitivo y el ruido;

   (g)  anejar "[l]as cartas con las recomendaciones u observaciones de las Agencias gubernamentales consultadas...";

   (h)  "discutir el impacto en el tránsito de la operación de las facilidades propuestas";

   (i)  someter y explicar las precauciones a seguirse "para evitar que se afecte el edificio Condado Vandervilt [sic] en su estructura y simientos [sic]" con la implosión de los edificios aledaños;

   (j)  discutir en qué consiste la restauración del Condado Vanderbilt;

   (k)  incluir "una comparación de los efectos de los edificios existentes y los propuestos respecto a la sombra que imparten a la zona de la playa." *Íd.*, págs. 177-178.

[20] *Íd.*, págs. 178-179.

[21] El 9 de diciembre de 1998 la JCA le notificó la resolución a las partes, entre otras, a la Hon. Sila M. Calderón, Alcaldesa del Municipio.

Así las cosas, el 3 de febrero de 1999, ARPE y DMG sometieron la DIA-F ante la JCA.[22] El 19 de febrero de 1999 el Oficial Examinador presentó *Informe Suplementario del Panel Examinador,* en el que, luego de examinar minuciosamente la DIA-F y sus anejos, concluyó que el documento era adecuado.[23] Es decir, la DIA-F cumplía con el Art. 4(c) de la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (en lo sucesivo Ley Núm. 9), según enmendada, 12 L.P.R.A. sec. 1124(c) (Supl. 1999).[24] En vista de ello, mediante resolución de 2 de marzo de 2000, la JCA aprobó el informe en su totalidad y, tras señalar que la DIA-F discutía "adecuadamente los posibles efectos ambientales de la actividad propuesta", emitió recomendaciones referentes a la obtención de permisos con antelación a la construcción.[25]

Disconforme con tal dictamen, el 23 de marzo de 1999, el Municipio presentó *Moción de Reconsideración*, la cual acompañó de un Informe

---

[22] El 9 de febrero de 1999 el Municipio recibió por correo copia de la DIA-F.

[23] Apéndice del recurso de *certiorari*, Volumen I, Anejo 4, págs. 106-111.

[24] Dicho artículo dispone que las agencias gubernamentales tienen que "[i]ncluir en toda recomendación o informe propuesta de legislación y emitir, antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente, una declaración escrita y detallada sobre:

    (1)   [e]l impacto ambiental de la legislación propuesta, de la acción a efectuarse o de la decisión a promulgarse;

continúa...

[11] ...continuación

    (2)   cualesquiera efectos adversos al medio ambiente que no podrán evitarse si se implementare la propuesta legislación, si se efectuare la acción o promulgare la decisión gubernamental;

    (3)   alternativas a la legislación propuesta, o a la acción o decisión gubernamental en cuestión;

    (4)   la relación entre usos locales a corto plazo del medio ambiente del hombre y la conservación y mejoramiento de la productividad a largo plazo, y

    (5)   cualquier compromiso irrevocable o irreparable de los recursos que estarían envueltos en la legislación propuesta si la misma se implementara, en la acción gubernamental si se efectuara o en la decisión si se promulgara." *Íd.*

    (6)

[25] Apéndice del recurso de *certiorari*, Volumen I, Anejo 4, pág. 102.

Suplementario sobre la DIA-F, un informe pericial sobre el tránsito impugnando el informe de los proponentes, y copia del contrato entre CDH y los compradores. Ese mismo día, la JCA declaró no ha lugar a la reconsideración.

Ante esa situación, a través de un recurso de revisión, el Municipio acudió ante el TCA solicitando la revocación de la antedicha resolución.[26] El 30 de junio de 1999 el TCA denegó la expedición del auto de revisión y confirmó la resolución de la JCA. Por lo que, el Municipio presentó ante nos recurso de *certiorari* impugnando la resolución de la JCA, en síntesis, por carecer de determinaciones de hecho y conclusiones de derecho.

El 5 de octubre de 1999 este Tribunal, aplicando la Ley de Procedimiento Administrativo Uniforme (en adelante LPAU) *in extenso*, concluyó que, para ejercer su función revisora, en los procedimientos de declaración de impacto ambiental, la JCA tenía la obligación de emitir una resolución fundamentada. Bajo dicho razonamiento, revocó la sentencia del TCA y devolvió el caso a la JCA para que expresase las determinaciones de hecho y conclusiones de derecho correspondientes. A tales fines, el 19 de noviembre de 1999, conforme al mandato de este Tribunal, la JCA emitió una nueva resolución de 38 páginas aprobando la DIA-F, la cual el Municipio nuevamente impugnó ante el TCA.

Por otra parte, al mismo tiempo, en ARPE continuaban los procedimientos relacionados con la consulta de conformidad. Luego de varios trámites, el 24 de noviembre de 1998, el Municipio presentó ante ARPE *Solicitud de Intervención y Oposición*, acogida por dicha agencia el 26 de agosto de 1999.

---

[26] Luego de presentado el recurso, el Municipio solicitó del TCA la paralización de las obras de demolición del *Condado Beach Trío*, la cual el foro apelativo intermedio denegó. En vista de ello, el Municipio recurrió ante nos mediante recurso de *certiorari*, unido a una moción en auxilio de jurisdicción. El 25 de junio de 1999 este Tribunal expidió el recurso y, por ende, paralizó la demolición de los edificios en cuestión, hasta tanto el TCA resolviese la cuestión.

El 30 de julio de 1999, mediante resolución, ARPE concedió algunas variaciones,[27] aprobó el anteproyecto y autorizó la preparación de las siguientes partes del proyecto de acuerdo al plano aprobado.[28] Dicha resolución estaba condicionada a varias recomendaciones y requisitos. El 19 de agosto de 1999 el Municipio, no conforme con la resolución, presentó *Moción de Reconsideración*, la cual ARPE acogió el 3 de septiembre de 1999.[29]

Armonizando lo antes expresado, transcurrido el término prescrito por la LPAU sin que ARPE actuase sobre la reconsideración presentada e inconforme con la resolución de la JCA –de 19 de noviembre– que aprobó la DIA-F, el 17 de diciembre de 1999, el Municipio sometió ante el TCA sendos recursos de *certiorari* impugnado ambas resoluciones. Mediante resolución fundamentada de 22 de diciembre del mismo año, tras consolidar los recursos, el TCA denegó la expedición de los mismos.

Inmediatamente, el 23 de diciembre de 1999, el Municipio acudió ante nos, mediante recurso de *certiorari*, solicitando la revocación de la resolución del foro apelativo intermedio, así como la paralización de las obras relacionadas con el proyecto. El Municipio recurrió ante nos imputando la comisión de los siguientes errores:[30]

   A. Recurso Núm. KLRA-9900792 (Revisión de la Resolución de la JCA)

      1. Erró el Tribunal de Circuito de Apelaciones al resolver que la JCA había cumplido con la sentencia y mandato de

---

[27] CMA Architects & Engineers, como representante de DMG, solicitó la concesión de variaciones ante ARPE. Véase, entre otros, Apéndice del recurso de *certiorari*, Volumen IV, Anejo 28, págs. 155-161. Por tal motivo, a los fines de determinar la viabilidad de algunas de las variaciones, ARPE solicitó de la Junta de Planificación una interpretación de la Sección 84.00 del Reglamento de Zonificación de Puerto Rico, conocido como Reglamento de Planificación Núm. 4 (en adelante Reglamento Núm. 4), 23 R.P.R. sec. 650.1731.

El 1 de julio de 1999 la Junta de Planificación emitió su resolución interpretativa, Resolución Núm. JPI-4-15-99. Véase, Apéndice del recurso de *certiorari*, Volumen IV, Anejo 29, págs. 162-164.

[28] La referida resolución le fue notificada al Municipio, a través de la Hon. Sila M. Calderón. Apéndice del recurso de *certiorari*, Volumen IV, Anejo 1, pág. 1.

[29] Apéndice del recurso de *certiorari*, Volumen IV, Anejo 8, pág. 70.

[30] El Municipio discutió los recursos sometidos ante el TCA en la misma petición de *certiorari* ya que dicho tribunal los consolidó.

esta Alta Curia en el caso *Municipio de San Juan v. Junta de Calidad Ambiental*, 99 TSPR 147, que le requería considerar y resolver las controversias de hechos del caso. (Bastardillas en el original.)

2. Erró el Tribunal de Circuito de Apelaciones al confirmar la Resolución de la Junta de Calidad Ambiental donde se concluye que la DIA presentada por la Administración de Reglamentos y Permisos era adecuada, aun cuando en el expediente administrativo no existe evidencia sustancial que apoye dicha conclusión de derecho.

B. Recurso Núm. KLRA-9900793 (Revisión de la Resolución de la ARPE)

1. Erró el Tribunal de Circuito de Apelaciones al confirmar la decisión de ARPE, mediante la cual se aprobó el anteproyecto del Condado Beach Resort, basándose en una resolución nula de la Junta de Planificación.

2. Erró el Tribunal de Circuito de Apelaciones al concluir que el Municipio no fue privado de su derecho a intervenir y participar efectivamente ante ARPE.

3. La Resolución es errónea al concluir que ARPE no tenía que celebrar una vista pública para autorizar el anteproyecto.

4. La Resolución es errónea al concluir que ARPE hizo determinaciones de hechos suficientes.

5. La Resolución es errónea al concluir que ARPE podía probar [sic] el anteproyecto sin una Declaración de Impacto Ambiental Final.

6. Erró el Tribunal de Circuito al concluir que la aprobación por ARPE de múltiples variaciones a los requisitos reglamentarios no es arbitraria ni irrazonable y no constituye un abuso de discreción.

Sin dilación alguna, el mismo 23 de diciembre, este Tribunal paralizó las obras de demolición del *Condado Beach Trío*, con el propósito de enjuiciar reflexivamente los planteamientos. Posteriormente, le concedió término a las partes para que expresasen sus posiciones.

Tras contar con dichas comparecencias, en conjunto con la totalidad del expediente administrativo, estamos en posición de resolver.

II

En nuestra obligación de analizar la juridicidad de las cuestiones planteadas desde su justa perspectiva, de entrada, debemos esbozar

varios principios que constituyen el marco conceptual de la revisión judicial de las decisiones administrativas.

El propósito primordial de dicha revisión consiste en demarcar el ámbito de discreción de las agencias administrativas y cerciorarse que las mismas ejecuten sus funciones acorde con la ley. *L.P.C. & D v. A.C.*, res. el 27 de diciembre de 1999, 99 TSPR 185, 149 D.P.R. ___ (1999), 2000 JTS 9, pág. 477; *Mun. de San Juan v. J.C.A.*, supra, pág. 125; *Misión Ind. P.R. v. J.P.*, res. el 30 de junio de 1998, 98 TSPR 86, 146 D.P.R. ___ (1998), 98 JTS 79, pág. 1159.

Es precepto comúnmente sabido que, bajo el crisol judicial, las decisiones o resoluciones, al igual que las interpretaciones de las agencias y/o organismos administrativos especializados merecen gran consideración y respeto. *Rivera Concepción v. A.R.Pe.*, res. el 29 de septiembre de 2000, 2000 TSPR 143, 152 D.P.R. ___ (2000), 2000 JTS 155, pág. 160; *Castillo v. Depto. del Trabajo*, res. el 29 de septiembre de 2000, 2000 TSPR 142, 152 D.P.R. ___ (2000), 2000 JTS 154, pág. 146; *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, res. el 19 de enero de 2000, 2000 TSPR 7, 150 D.P.R. ___ (2000), 2000 JTS 21, pág. 560.

Correlativo con ello, hemos señalado que los procedimientos y decisiones de las agencias administrativas están cobijados por una presunción de regularidad y corrección. *Ramírez v. Depto. de Salud*, res. el 26 de marzo de 1999, 99 TSPR 42, 147 D.P.R. ___ (1999), 99 JTS 47, pág. 817; *Com. Vec. Pro-Mej., Inc. v. J.P.*, res. el 19 de marzo de 1999, 99 TSPR 28, 147 D.P.R. ___ (1999), 99 JTS 32, pág. 732; *Misión Ind. P.R. v. J.P.*, supra; *Maisonet v. F.S.E.*, res. el 30 de diciembre de 1996, 142 D.P.R. ___ (1996), 96 JTS 169, pág. 454. Por lo que, aquél que aduzca lo contrario tiene que presentar prueba suficiente que derrote dicha presunción. *Ramírez v. Depto. de Salud*, supra; *Com. Vec. Pro-Mej., Inc. v. J.P.*, supra; *Misión Ind. P.R. v. J.P.*, supra.

En vista de ello, cabe señalar que las determinaciones de hechos suscritas por las agencias administrativas superan el cedazo judicial "si se basan en evidencia sustancial que obr[e] en el expediente

administrativo." Sec. 4.5 de la LPAU, 3 L.P.R.A. sec. 2175.[31] Es decir, los tribunales apelativos están constreñidos a dichas determinaciones si de la totalidad del expediente administrativo surge prueba suficiente en apoyo. Por evidencia sustancial, entendemos "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión." (Bastardillas omitidas.) *Asoc. Vec. H. San Jorge v. U. Med. Corp*, supra, pág. 561; *Misión Ind. P.R. v J.P.*, supra, pág. 1160; *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670, 687 (1953). El fin primordial de la doctrina de la evidencia sustancial es *"**evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor**."* (Bastardillas en el original, énfasis y subrayado nuestro.) *P.R.T.C. v. R. Reg. Tel. de P.R.*, supra; *Misión Ind. P.R. v J.P.*, supra; *Reyes Salcedo v. Policía de P.R.*, res. el 13 de mayo de 1997, 143 D.P.R. ___ (1997), 97 JTS 58, pág. 959. De igual forma, no les corresponde a los tribunales pasar juicio sobre los conflictos de prueba entre opiniones especializadas o científicas. *Misión Ind. P.R. v. J.C.A.*, res. el 29 de junio de 1998, 98 TSPR 85, 145 D.P.R, ___ (1998), 98 JTS 77, pág. 1106.

Por otra parte, las conclusiones de derecho emitidas por las agencias administrativas son revisables en su totalidad. Sec. 4.5 de la LPAU, *supra*. No obstante, ello no implica que los tribunales, sin razón alguna, rechacen las conclusiones de derecho de las agencias administrativas e impongan su criterio. De ordinario, los tribunales conceden gran peso y deferencia a las interpretaciones que dichos organismos realizan de las leyes que les corresponde administrar. Pues, las agencias administrativas, contrario a los tribunales, "cuentan con experiencias y conocimientos altamente especializados sobre los asuntos

---

[31] Véase también, *Rivera Concepción v. A.R.Pe.*, supra; *P.R.T.C. v. R. Reg. Tel. de P.R.*, res. el 12 de junio de 2000, 2000 TSPR 83, 151 D.P.R. ___ (2000), 2000 JTS 98, pág. 1266; *Asoc. Vec. H. San Jorge v. U. Med. Corp*, supra, págs. 560-561; *Costa, Piovanetti v. Caguas Expressway*, res. el 29 de diciembre de 1999, 99 TSPR 187, 149 D.P.R. ___ (1999), 2000 JTS 11, pág. 489.

que se le encomiendan." *Rivera Concepción v. A.R.Pe.*, supra.[32] Además, *"las agencias administrativas son instrumentos necesarios para la interpretación de la ley."* (Bastardillas en el original.) *P.R.T.C. v. R. Reg. Tel. de P.R.*, supra; *Misión Ind. P.R. v. J.P.*, supra, pág. 1160.

Así también, es meritorio precisar que la interpretación de una ley por la agencia comisionada en velar por su cumplimiento no tiene que ser la única razonable. Sin embargo, incluso en casos dudosos, la interpretación de la agencia merece la referida deferencia. *P.R.T.C. v. R. Reg. Tel. de P.R.*, supra, págs. 1266-1267; *Misión Ind. P.R. v. J.P.*, supra, pág. 1161.

No obstante, los tribunales se abstendrán de avalar una decisión administrativa si la agencia: (1) "err[ó] al aplicar la ley" –*Castillo v. Depto. del Trabajo*, supra–; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos "constitucionales fundamentales" –*Rivera Concepción v. A.R.Pe.*, supra.

En síntesis, "[e]l criterio a aplicarse no es si la decisión administrativa es la más razonable o la mejor al arbitrio del foro judicial; es, repetimos, si la determinación administrativa, en interpretación de los reglamentos y las leyes que le incumbe implementar, es una razonable." *Rivera Concepción v. A.R.Pe.*, supra, págs. 160-161. Por lo tanto, carente de irrazonabilidad o ilegalidad, no nos compete imponer nuestro criterio motivado por razones foráneas,[33] ni

---

[32] Véase, *Castillo v. Depto. del Trabajo*, supra, pág. 147; *Misión Ind. P.R. v J.P.*, supra, pág. 1159.

[33] Véase, *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978). Sobre la revisión judicial bajo la *National Enviromental Policy Act* (en adelante NEPA), 42 U.S.C. sec. 4321 *et seq.*, ley modelo en la que se basa la Ley Núm. 9, el Tribunal Supremo de los Estados Unidos expresó:

> NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is esentially procedural. It is to insure a fully informed and well-considered decision, **not necesarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency.** Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, **not simply**

pasar juicio sobre la sabiduría de una determinación de política pública que le corresponde a otra rama gubernamental.[34]

### III

A los fines de atender los errores señalados respecto a la resolución de la JCA, es conveniente tener en mente los preceptos generales atinentes a una declaración de impacto ambiental, comúnmente conocida como DIA.

La Asamblea Legislativa, en virtud del mandato constitucional,[35] aprobó la Ley Núm. 9 de 18 de junio de 1970, Ley sobre Política Pública Ambiental, según enmendada, 12 L.P.R.A. sec. 1121 *et seq.*, la cual procede sustancialmente de la *National Environmental Policy Act*, 43 U.S.C. sec. 4321 *et seq.*[36]

A los fines de velar por nuestros recursos naturales e implantar la política pública ambiental, la Ley Núm. 9 estableció la Junta de Calidad Ambiental. 12 L.P.R.A. sec. 1122(d). Entre las responsabilidades a su cargo, la JCA tiene la obligación de evaluar las acciones gubernamentales que impacten el medio ambiente, mediante un procedimiento de consultas u opiniones, en el cual participa activamente. 12 L.P.R.A. sec. 1124.

En vista de ello, la Ley Núm. 9, en su art. 4(c), exige que la agencia proponente presente ante la JCA una DIA, escrita y detallada, "antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio

---

**because the court is unhappy with the result reached.** (Citas omitidas y énfasis nuestro.) *Íd.*, pág. 558.

[34] Véase, *Misión Ind. P.R. v. J.P.*, supra, nota al calce núm. 39, pág. 1184; *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1108.

[35] La Constitución del Estado Libre Asociado de Puerto Rico, en su art. IV, sec. 19, dispone que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad...." 1 L.P.R.A. Const. E.L.A., Art. IV, Sec. 19.

[36] La jurisprudencia interpretativa de la NEPA constituye una fuente persuasiva de gran peso al momento de interpretar nuestra ley. *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1102.

ambiente...." 12 L.P.R.A. sec. 1124(c); *Mun. de San Juan v. J.C.A.*, supra, pág. 124; *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1103; *García Oyola v. J.C.A.*, res. el 21 de febrero de 1997, 142 D.P.R. ___ (1997), 97 JTS 25, pág. 663. Por tanto, la "fiscalización no sólo queda en manos de una entidad **distinta** a la que propone el proyecto en cuestión, sino [que] además...queda en manos de una entidad **especializada en asuntos ambientales**, cuya función principal es precisamente velar por el fiel cumplimiento de la política pública ambiental de Puerto Rico." *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1105.[37]

El objetivo de la preparación de la DIA es dual, a saber: (1) que la agencia proponente haya estudiado concienzudamente las consecuencias ambientales significativas del proyecto contemplado; y, (2) que las partes concernidas estén informadas de dichas consecuencias ambientales. Sin embargo, ello no obliga a la agencia proponente a discutir impactos insignificantes, improbables o especulativos, sino aquellos que un perito en la materia estime deben señalarse. *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1103. Por lo que, "la agencia proponente debe realizar un esfuerzo serio y escrupuloso por identificar y discutir todas las consecuencias ambientales de importancia que sean previsibles." (Énfasis y subrayado suprimido.) *Misión Ind. P.R. v. J.C.A.*, supra.

Al evaluar la adecuacidad de una DIA, la JCA no tiene que llevar a cabo "un análisis matemático preciso o perfecto, que garantice que el proyecto no ha de tener impacto ambiental adverso alguno. Lo que se persigue es que la declaración de impacto ambiental provea información suficiente que ponga en perspectiva las consecuencias, tanto favorables como desfavorables, de la acción gubernamental propuesta." (Cita omitida.) *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1109.[38]

---

[37] Véase, *T. JAC, Inc. v. Caguas Centrum Limited*, res. el 12 de abril de 1999, 99 TSPR 54, 148 D.P.R. ___ (1999), 99 JTS 60, pág. 889.

[38] Véase también, *Columbia Basin Land Protection Ass´n v. Schlesinger*, 643 F. 2d 585, 594 (1981); *Matsumoto v. Brinegar*, 568 F. 2d 1289 (1978); *Trout Unlimited v. Morton*, 509 F. 2d 1276, 1286 (1974).

En fin, antes de plasmar su aprobación, la JCA, como custodio del medio ambiente, tiene la responsabilidad de velar por que la DIA presentada cumpla con los requisitos  -sustantivos y procesales- impuestos por el Art. 4(c) de la Ley Núm. 9, supra, y sus reglamentos. 12 L.P.R.A. 1124(c); *Mun. de San Juan v. J.C.A.*, supra, pág. 125; *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1105. Cabe aclarar que la  función de la JCA no es autorizar o desautorizar el proyecto a desarrollarse, sino determinar si la DIA es apta para la acción a realizarse. *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1112.

La preparación y aprobación de una DIA es una etapa preliminar donde se garantiza "que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de hacer planes y tomar las primeras decisiones gubernamentales sobre una propuesta que pueda tener un impacto en el medio ambiente." *Misión Ind. P.R. v. J.C.A.*, supra, págs. 1103-1104. En fin, la DIA es un mecanismo de planificación, el primer escalón en el largo proceso de la obtención de permisos y autorizaciones oficiales del proyecto propuesto. *Misión Ind. P.R. v. J.C.A.*, pág. 1104.

No obstante, dicha aprobación no conlleva que no se tomen otras medidas ulteriores para la protección del ambiente. Incluso, posterior a la aprobación de la DIA o luego de comenzado el proyecto, si el mismo no se lleva conforme a la DIA, o si las consecuencias ambientales son mayores que las previstas, o si surgen efectos adversos no anticipados, la JCA puede y debe tomar las medidas necesarias para evitar cualquier daño adicional al ambiente. *Íd.*[39]

Tomando en consideración lo aquí expuesto, pasemos a analizar los errores señalados en relación con la resolución de la JCA del 19 de noviembre de 1999.

IV

---

[39] La aprobación de la DIA "[n]o representa una carta blanca sobre  lo ambiental  respecto  a  la  acción  o  decisión gubernamental que ocasionó la declaración referida." (Énfasis suprimido.) *Íd*.

En su primer señalamiento de error, el Municipio arguye que la JCA no resolvió ni consideró las controversias de hechos del caso, incumpliendo así el mandato de este Tribunal en el caso *Mun. de San Juan v. J.C.A.,* supra. En síntesis, vaga y escuetamente alega que dicha agencia se circunscribió a reseñar el proyecto propuesto, a enumerar las objeciones del Municipio y los demás comparecientes a la vista pública, a identificar las interrogantes que debía contestar el proponente, y a detallar las respuestas a los señalamientos de los deponentes y de la JCA.

La resolución emitida por la JCA, la cual consta de 38 páginas, recoge todos los hechos sustantivos como procesales relacionados con el trámite de aprobación de la DIA. En la primera parte de la resolución, la JCA expuso todos los hechos procesales ocurridos desde la presentación de la DIA-P, el 31 de julio de 1998, hasta la notificación de la denegación de la moción de reconsideración del Municipio, el 5 de abril de 1999.[40] Mientras que en la segunda parte, la JCA expresó las determinaciones de hecho con relación: (1) a la descripción del proyecto;[41] (2) a los comentarios de los deponentes, incluyendo el Municipio;[42] y, (3) a las recomendaciones finales de la agencia.[43]

A pesar de los muchos comparecientes a la vista pública, el Oficial Examinador hizo un esfuerzo extraordinario y recogió los comentarios expuestos por los deponentes en su *Informe del Panel Examinador,*[44] los cuales la JCA incorporó en la resolución impugnada. Veamos la especificidad de las objeciones presentadas por el Municipio,[45] las cuales reflejan su posición acerca la adecuacidad de la DIA-P:

---

[40] Apéndice del recurso de *certiorari*, Volumen IV, Anejo 43, págs. 215-217.

[41] *Íd.*, págs. 217-219.

[42] *Íd.*, págs. 219-238.

[43] *Íd.*, págs. 238-241.

[44] Véase, nota al calce núm. 4, *ante.*

[45] Es necesario puntualizar que la JCA también incluyó en su resolución los comentarios vertidos por los otros deponentes.

a.   [l]a Declaración de Impacto Ambiental Preliminar (DIA-P) no cumple con los objetivos de la Ley de Política Pública Ambiental ni con los requerimientos establecidos en el Reglamento sobre Declaraciones de Impacto Ambiental de la Junta de Calidad Ambiental del 4 de junio de 1984 para su preparación.

b.   El desarrollo propuesto no cumple con la política pública y reglamentación vigente establecida para regular el uso y desarrollo de terrenos en Puerto Rico, incluyendo el Reglamento de Zonificación Especial del Condado, el Reglamento de Zonificación de la Zona Costanera y de Accesos a las Playas y Costas de Puerto Rico, Reglamento de Zonificación de Puerto Rico, los Objetivos y Políticas Públicas del Plan de Uso de Terreno de la Junta de Planificación y el Plan de Usos de Terrenos de la Región Metropolitana de San Juan.

c.   La DIA-P no identifica los efectos adversos del desarrollo propuesto, ni discute cómo aminorar o minimizar los mismos, ni cómo restaurar y mejorar la calidad del ambiente urbano. La DIA-P comete el grave error de no considerar los recursos actualmente comprometidos o afectados.

d.   La DIA-P no incluye una evaluación razonable y objetiva de las alternativas a la acción propuesta.

e.   El desarrollo propuesto menoscaba los recursos naturales existentes, afectando los recursos de playa, brisa y vistas que se están comprometiendo con esta acción. El desarrollo propuesto mantiene un frente de edificación paralelo a toda la costa, coartando cualquier posibilidad de abrir vistas y accesos desde la Avenida Ashford a la playa.

f.   Las torres propuestas para el nuevo hotel, los apartamentos residenciales y los de tipo "time-share" invaden la zona de separación requerida por la reglamentación vigente para evitar que se arrojen sombras adicionales sobre la playa. El desarrollo propuesto contiene estructuras de 30 a 44 metros de altura a tan sólo 3 metros de la colindancia de la playa, cuando el reglamento exigiría retiros mínimos de 41 y 52 metros respectivamente. Esta condición provocaría que el desarrollo propuesto proyecte 20 veces más sombra que el actual Hotel La Concha.

g.   El desarrollo propuesto es contrario a las recomendaciones del estudio "Las Orillas de la Ciudad" en el cual se propone el desarrollo de un paseo en el Litoral Atlántico (Plan de Usos de Terreno de la Región Metropolitana de San Juan, Junta de Planificación, 1982).

h.   El desarrollo propuesto ubica el edificio de estacionamiento y los carriles de autobuses y taxis frente a la Avenida Ashford. La reglamentación vigente para este sector del Condado identifica a esta zona como una íntimamente ligada a flujos peatonales y prohíbe la ubicación de estacionamiento en el frente de la edificación hacia la Avenida Ashford.

i.   El desarrollo propuesto propone nueve accesos vehiculares interrumpiendo los flujos peatonales en las aceras, todo ello contrario a lo que dispone el reglamento (Artículos 1.02 y 3.10 del Reglamento de Zonificación Especial del Condado).

j.   El desarrollo propuesto excede la densidad máxima permitida para el Distrito CT del Reglamento de Zonificación Especial del Condado por el equivalente a 102 unidades de vivienda básica y 122,000 pies cuadrados de uso comercial (Artículo 3.03 Reglamento de Zonificación Especial del Condado).

k.   Los accesos de servicio se proponen a través de las Calles Vendig y Seaview, las cuales tienen características de calles locales donde ubican residencias y edificios de apartamentos en solares pequeños, afectándose adversamente el carácter de la vecindad.

l.   La intensidad del desarrollo propuesto es tal que puede sobrecargar los sistemas de alcantarillado sanitario del Condado. La DIA-P señala que se deberán hacer mejoras al sistema pero no identifica cuáles, ni cómo se evitará la sobrecarga del sistema y el desbordamiento de aguas negras.

m.   El estudio de tránsito sometido no cumple con los parámetros establecidos en el Manual del Instituto de Ingenieros de Transporte y la guía conocida como TAISSD. El mismo se concentra principalmente en comparar el desarrollo propuesto con el uso existente del Condado Trío, por alegar que el desarrollo propuesto será "del mismo orden de magnitud" que el existente. Los estudios de los ingenieros de tránsito del Municipio estiman que el desarrollo propuesto generará un flujo vehicular tres veces mayor que los generados por el Condado Trío. El estudio de tránsito sometido tampoco toma en consideración las condiciones de la afluencia vehicular durante las noches, los fines de semana, y domingo, que es cuando existe mayor congestión en la zona.

n.   Los documentos sometidos no evalúan ni proponen medidas de mitigación para minimizar el impacto durante el período de construcción en el sector, el cual afectará en términos de tránsito pesado, ruido y polvo fugitivo, a los residentes, comerciantes, turistas y visitantes del área.

o.   El proceso seguido para la selección del desarrollo propuesto viola las disposiciones de la Ley de Política Pública Ambiental, Ley Núm. 9 del 18 de junio de 1970, según enmendada, ya que se tomó una determinación sin considerar los aspectos ambientales de la acción propuesta.

p.   Las declaraciones de impacto ambiental preliminares deben proveer la información que el funcionario necesita para evaluar el efecto que tendría la acción propuesta sobre el ambiente y si podría ser de mayor beneficio alguna otra.

q. Durante el proceso de selección no se requirió la preparación de una Declaración de Impacto Ambiental y [,] por lo tanto [,] la peticionaria no tomó en consideración los efectos ambientales de las propuestas requeridas por ley. Esta omisión no sólo privó al gobierno municipal de una participación efectiva, sino que privó a sus ciudadanos de participar en un proceso decisivo, que tendrá un efecto adverso sobre los más preciados recursos naturales del Condado y más importante aún, en la calidad de vida de sus habitantes. Apéndice del recurso de *certiorari*, Volumen IV, Anejo 43, págs. 220-223.

Luego, en la Determinación Núm. 22, la JCA expresó que "[m]uchos de los comentarios de los deponentes y de la Junta de Calidad Ambiental fueron atendidos directamente por el proponente, quien tuvo la oportunidad de hacer una extensa presentación del proyecto durante la audiencia pública y de acentuar los aspectos positivos del mismo." *Íd.*, pág. 226. A renglón seguido, la JCA expuso las siguientes determinaciones de hechos relacionadas con las respuestas de los proponentes a las preocupaciones de los deponentes:

a. La ubicación de los accesos de servicio en calles laterales es beneficiosa ya que minimiza los impactos del tránsito de camiones en la Avenida Ashford. Según el diseño del proyecto propuesto, los camiones podrán entrar y salir rápidamente del sótano del estacionamiento proyectado, dentro del cual están los andenes de carga y descarga. Como esta operación va a ser fácil y rápida, no se anticipa que haya un impacto significativo al tránsito de peatones que se dirijan hacia la playa por la calle Vendig. Además, durante el funcionamiento del proyecto, los camiones que servirán el mismo serán en su mayoría camiones pequeños como los que se utilizan para la entrega de refrescos o alimentos y la recogida de desperdicios. No serán camiones grandes como los de arrastre. Estos camiones pequeños podrán utilizar perfectamente las calles Sea View y Vendig. Más aún, se anticipa que el impacto de camiones que servirán

al CBR no será similar al del uso previo, será mucho menor. Un centro de convenciones atrae camiones de gran tamaño dependiendo del evento o exhibición particular que el camión esté sirviendo. Dado el uso propuesto para el desarrollo, no se anticipa que éste atraiga igual número de camiones de gran tamaño.

b. Según se demuestra en el estudio de tránsito, los viajes vehiculares generados por el Condado Trío variaban dependiendo de si había un evento, y del tamaño de este [sic], en el Centro de Convenciones. Basado en las premisas utilizadas en el estudio de tránsito (véase Apéndice A de estudio), el CBR generará menos tránsito en el sector durante las horas pico de la mañana y la tarde en días de semana en comparación con el uso anterior cuando en el Centro de Convenciones había un evento que produjera más de 130 viajes vehiculares al predio durante las horas pico. La generación de viajes se estimó utilizando prácticas aceptadas en la ingeniería de transportación que aparecen en la sexta edición de la publicación "Trip Generation" del Instituto de Ingenieros de Transportación. El CBR tendrá nueve entradas en comparación con las seis que tenía el Condado Trío. Las entradas adicionales permitirán una mejor distribución del tránsito en el predio, debido a que la generación de tránsito es similar a la del uso previo. Por lo tanto, habrá una menor concentración de tránsito en cada entrada.

c. Para los propósitos del estudio de tránsito, se estudió la generación de tránsito durante los días de semana en las horas pico de la mañana y la tarde. Sin embargo, en cuanto al tránsito durante las noches en fines de semana, se podría concluir que el Condado Trío generaba

más tránsito durante el fin de semana debido a los eventos de gran escala que se llevaban a cabo en el Centro de Convenciones. Al no tener un Centro de Convenciones, no se anticipa que el CBR lleve a cabo eventos de gran escala. Ya que el estudio de tránsito se llevó a cabo con posterioridad al cierre del Condado Trío, no fue posible medir el tránsito real generado por el Condado Trío. Estimar la generación de tránsito de un uso anterior de terreno cuando los datos reales no están disponibles es una práctica común y aceptada en la ingeniería de transportación.

d. El año horizonte y la distribución de viajes son factores de tránsito utilizados cuando se lleva a cabo un estudio de tránsito fuera del predio ("off-site"). Debido a que se espera que los impactos al tránsito del CBR sean similares a los del uso anterior, no se ha llevado a cabo un estudio de tránsito fuera del predio ("off-site"). El uso anterior del Condado Trío tenía pobres accesos y circulación, y un espacio inadecuado para la acumulación de vehículos en fila. Para el diseño del CBR, se tomó un enfoque agresivo para solucionar estos problemas. Se diseñaron adecuadamente los accesos, espacios para almacenamiento de vehículos y áreas de circulación en el predio. En específico, el CBR proveerá múltiples puntos de acceso para distribuir el tránsito hacia el predio. Las entradas al estacionamiento tendrán áreas de almacenamiento eficientes ya que permitirán que la circulación hacia y desde el estacionamiento permanezca en el predio, minimizando así los impactos a la Avenida Ashford. Los hoteles Condado Beach y La Concha proveían un espacio para el almacenamiento de vehículos de aproximadamente cinco y ocho vehículos

respectivamente. El espacio propuesto para el almacenamiento de vehículos para el nuevo hotel, el edificio Vanderbilt, y el condominio propuesto sería de 15 vehículos, 12 vehículos y 12 vehículos, respectivamente. Según se puede apreciar en el diseño del proyecto propuesto, el mismo tendrá un efecto positivo sobre el flujo peatonal. Los paseos peatonales al aire libre propuestos, crearán una atmósfera amigable para los peatones y atraerán el flujo peatonal al predio. Por lo tanto, cualquier impacto peatonal a la Avenida Ashford se minimizará. Por otro lado, la entrada circular es una configuración usada por hoteles a través del mundo y no se anticipa que ésta sea un problema para el flujo peatonal.

e. Se estima que el tiempo total para la demolición y la limpieza de escombros sea aproximadamente cuatro meses. Además, se estima que la remoción de escombros se complete en aproximadamente dos meses. El efecto de estas actividades en el tránsito del área será mayormente la entrada y salida de camiones removiendo escombros. Se programará el tránsito de camiones en horas fuera de las horas pico para minimizar el impacto en el tránsito.

f. No se anticipa que se necesiten aperturas adicionales en la isleta de la Avenida Ashford. Debido a la planificación cuidadosa de los asuntos relacionados al tránsito para el CBR, el acceso, la circulación y el estacionamiento en el CBR será más que adecuado y una mejora sobre el uso anterior. Por ejemplo, el proyecto tendrá numerosos puntos de acceso a través de la Avenida Ashford para prevenir las acumulaciones de vehículos y el derrame a las calles fuera del predio. Los accesos

del CBR proveerán para la circulación en dos direcciones desde y hacia el garaje de estacionamiento sin tener que abandonar el predio. La caseta de boletos de estacionamiento se colocará a la máxima distancia posible de la calle para optimizar el almacenamiento de vehículos en las distintas localizaciones. En el uso previo, no se proveía para circulación en el predio por lo que se producían impactos negativos en la Avenida Ashford. Además, el acceso al garaje de estacionamiento era el único punto de acceso a este garaje y la configuración de ese acceso era tan pobre que causaba largas filas en ambas direcciones de la Avenida Ashford durante los eventos. Por todo lo anterior, la isleta de la Avenida Ashford no representará una dificultad de acceso al estacionamiento del CBR.

g.    Debido a que se espera que los impactos de tránsito del CBR sean similares a los del uso previo, no es necesario llevar a cabo un estudio de tránsito fuera del área del CBR ("off-site"). Sin embargo, cabe señalar que se anticipa que el sistema de transportación colectiva será un medio de transportación primario para los empleados del proyecto.

h.    Con el proyecto propuesto, el número de estacionamientos se aumentó de aproximadamente 980 espacios (en el estacionamiento existente) a 1,400 espacios. Bajo el uso anterior, el estacionamiento existente no podía absorber las necesidades de estacionamiento en el predio cuando había un evento grande en el Centro de Convenciones. Se anticipa que el CBR provea estacionamiento sólo para empleados en los niveles administrativos. La transportación colectiva será un medio de transporte primario para muchos empleados. Otros empleados se

estacionarán fuera del predio, tal y como ocurre actualmente con los empleados de otros hoteles en el área.

i. De acuerdo con la información obtenida en el Estudio de Estacionamiento y Tránsito del Condado, llevado a cabo para el Municipio de San Juan en 1994, el volumen de tránsito en ambas direcciones en la Avenida Ashford al este del Puente Dos Hermanos es de aproximadamente 26,000 vehículos por día en días de semana.

j. El frente del estacionamiento propuesto será solamente de 93 metros de largo, lo cual es menos de una quinta parte del largo total del frente del predio. Este largo puede compararse con el existente en el Hotel La Concha, en que el garaje tiene 76 metros, y el frente total del edificio es de 160 metros. Quince (15) metros del frente del predio del CBR incluirán la terraza del Junior Ballroom localizada en el primer nivel sobre el nivel del terreno adyacente a la estructura de estacionamiento. Esta configuración de la terraza quedara frente a un pequeño parque existente y proveerá un gran atractivo para los que caminan por la Avenida Ashford. Además, la fachada de la estructura de estacionamiento que da a la calle se diseñó en cumplimiento con el Artículo 3.10.2 del Reglamento de Zonificación Especial del Condado para que las áreas de estacionamiento en planta baja no sean visibles desde la calle a través del frente de la edificación. La fachada también se dividió en bandas horizontales para reducir la escala y masa de la misma. Al nivel del terreno se incorporarán grandes arcos semicirculares para abrir la pared y ayudar a reducir la escala de la fachada. El proyecto propone establecimientos comerciales con frente

a la Avenida Ashford como parte del componente de entretenimiento urbano. Estas instalaciones serán mucho más atractivas y accesibles que las existentes al nivel del piso inferior a la acera de la Avenida. Las tiendas que existían en el Hotel La Concha no propiciaban actividad en la Avenida Ashford, por su localización y nivel de piso. Los paseos del CBR ofrecerán una oportunidad de gran actividad urbana. El efecto del proyecto será ofrecer un gran espacio urbano para actividades de descanso, entretenimiento, paseo, actividades musicales, y contemplación del mar, que no se ofrece al presente en ninguna zona de la Avenida Ashford. Contrario a las estructuras existentes, el proyecto propuesto proveerá numerosos espacios entre los edificios que permitirán vistas al océano. Como beneficio resultante, existirán muchas oportunidades para que los peatones descubran y paseen entre las plazas internas del proyecto y en la acera de la Avenida Ashford. Este diseño aumenta la apertura que se percibe del proyecto. Se diseñaron grandes plazas abiertas de frente a los condominios, el Condado Vanderbilt y el hotel propuesto. También se diseñaron aperturas de pórticos arqueados opuestas a la calle Joffre y entre las calles Joffre y Delcasse creando dos interrupciones de edificios adicionales a los largo de la Avenida Ashford. La "Gran Plaza de Ashford" al frente del hotel y el parque de la esquina en la Avenida Ashford crearán en conjunto un extenso espacio abierto que rememora las plazas en los pueblos de España. Este diseño está de acuerdo con lo indicado en el Artículo 4.04 del Reglamento de Zonificación Especial del Condado.

k.  El proyecto propuesto se ajusta cabalmente a los usos permitidos por la zonificación y los límites y condiciones de acceso establecidos por ley. Los usos propuestos en el proyecto cumplen los requisitos del Reglamento de Zonificación Especial del Condado para la zonificación CT (usos comerciales y turísticos). Esta zona CT incluye usos turísticos y usos próximos que apoyan, complementan y/o no socavan el uso turístico. La zona CT está íntimamente ligada a flujos peatonales. El proyecto proveerá viviendas permanentes, instalaciones comerciales de distintos tipos, restaurantes, hoteles y apartamentos de tiempo compartido. La zona CT permite el uso ilimitado de todas estas actividades. Además, los paseos y áreas abiertas del proyecto proveerán un gran atractivo para el flujo peatonal.

l.  Los límites del predio del Condado Trío con la zona marítimo-terrestre y el acceso a la playa fueron establecidos en forma específica mediante la Ley Núm. 3 de 22 de agosto de 1990, según enmendada por la Ley Núm. 9 de 27 de noviembre de 1990. Dicha ley estableció una servidumbre legal de paso al área de dominio público a favor del ELA, la cual estaría ubicada al extremo este del Hotel La Concha. El acceso propuesto está en cumplimiento con lo requerido por estas leyes, según se puede confirmar en los planos del proyecto, los cuales demuestran que el acceso al este de La Concha permanecerá inalterado. Más aún, el proyecto creará tres paseos principales privados que abrirán nuevas perspectivas y accesos al área de la playa y conducirán desde la Avenida Ashford hasta la playa. Los paseos serán más anchos que la Avenida Ashford, y tendrán líneas visuales directas desde la Avenida hasta la playa y el mar, mucho más amplias y numerosas que las que provee el Condado Trío, en el cual solamente hay un espacio abierto entre el Centro de Convenciones y el hotel La Concha.

m.  En la vista se sometió el estudio de la sombra que proyectarán los edificios propuestos para los días claves de los equinoccios de primavera y otoño y solsticios de verano e invierno. Este estudio demuestra que la sombra arrojada por el CBR será mucho menor que la que proyectan los edificios existentes, en cumplimiento con el Artículo 3.08.1 del Reglamento de Zonificación del Condado. En cuanto al retiro de la línea de colindancia, se ha solicitado a ARPE una variación para aquellos pocos sitios en que los edificios propuestos estarán a menor distancia que la indicada en dicho artículo.

n.  El proyecto mantendrá y mejorará las aceras en la Avenida Ashford. Además, el proyecto incluirá paseos que ofrecerán nuevas perspectivas al océano y acceso a las instalaciones propuestas. Se espera que por su diseño y amenidades, los paseos constituyan una invitación a los peatones, creando un ambiente festivo. Las mejoras propuestas a las aceras en la Avenida Ashford, en vez de obstaculizar el flujo de peatones a lo largo de la Avenida, lo facilitarán y harán más ameno.

o.  Según se puede apreciar en el plano de acceso del proyecto incluido en el DIA, se han diseñado nueve

entradas y salidas para el CBR con el propósito de mejorar el tránsito vehicular desde y hacia el proyecto y reducir su impacto en la Avenida Ashford. Las aceras no se interrumpirán en las entradas y salidas, manteniendo en ellas la alineación y elevación. Todas estas entradas tendrán espacio para permitir la acumulación de vehículos dentro del predio. De esta manera, se evita que los vehículos que entren al CBR interfieran con el flujo peatonal en las aceras y el tránsito vehicular en la Avenida. En contraste, el Condado Trío tiene seis entradas y salidas: una entrada y una salida en el hotel La Concha, una entrada y salida para el estacionamiento de La Concha y Centro de Convenciones, una entrada y salida de camiones para el Centro de Convenciones y una entrada y una salida para el Condado Beach. Como explicamos anteriormente, estas entradas y salidas tienen menos espacio de acumulación de vehículos que las que tendrá el CBR. Por lo tanto, el uso existente tenía un potencial mayor de afectar adversamente el flujo peatonal que el proyecto propuesto, el cual distribuye mejor el tránsito a través de las distintas entradas. Además, el diseño actual del Condado Trío estimula movimientos de vehículos y personas que entorpecen la circulación peatonal y vehicular en el área. Por ejemplo, un vehículo que dejara pasajeros en el hotel La Concha y fuera a estacionarse en el estacionamiento de dicho hotel, tenía que volver a cruzar la acera, entrar a la Avenida Ashford y volver a cruzar la acera para entrar al estacionamiento. En el caso de un vehículo que estuviera estacionado en el estacionamiento del hotel y fuera a recoger pasajeros al hotel, la situación era mucho peor. En ese caso, el vehículo tenía que cruzar la acera, hacer un viraje a la izquierda en la Avenida Ashford, tomar la Avenida Magdalena para volver a tomar la Avenida Ashford en dirección hacia el hotel y cruzar la acera de nuevo para entrar a La Concha. Luego de recoger los pasajeros este vehículo tenía que volver a cruzar la acera para incorporarse de nuevo a la Avenida. La situación era similar en el Condado Beach. Según diseñado, el CBR eliminará estos movimientos que entorpecen el tránsito de vehículos y personas. Por ejemplo, el proyecto tendrá una vía directa desde la entrada del hotel, donde se recogen y dejan pasajeros, hacia el estacionamiento. Por ende, los vehículos no tendrán que salir a la Avenida Ashford para estacionarse o para recoger pasajeros luego de salir del estacionamiento.

p.  El proyecto proveerá espacios abiertos libres de obstrucción visual que crearán accesos visuales a la playa desde la Avenida Ashford que no existen en el presente. Esto se puede observar claramente en el Plano Conceptual del Desarrollo incluido como figura 2 en la DIA.

q.  El suelo existente en el predio incluye arena, gravas y areniscas. En el diseño de las estructuras propuestas se tendrá en cuenta el tipo de suelo de acuerdo con el Reglamento de Edificación. El nivel freático está por debajo del nivel del piso del garaje existente. Por lo tanto, no se anticipa que la implosión afecte el agua subterránea.

r.   Se están considerando dos métodos de demolición. Se utilizará el método de implosión para el anexo al Condado Vanderbilt, el Centro de Convenciones y el Hotel La Concha. No se implotarán los edificios que contenían tiendas en el Condado Vanderbilt y La Concha, los cuales servirán como una barrera durante la implosión. Esta barrera contendrá cualquier fragmento producido en la implosión y ayudará a controlar el polvo producido. Estos edificios se demolerán posteriormente por métodos convencionales.

s.   El método de implosión que se está diseñando contempla mantener el piso de concreto existente durante la implosión hasta que comience la construcción del proyecto. Además, según la información disponible, la vibración real que se debe esperar utilizando el método de implosión es menos de 1/3" por segundo a 100 pies de distancia del predio. La vibración recomendada por el U.S. Bureau of Mines para una cantera, para la seguridad de estructuras antiguas, es 2" por segundo, o sea, seis veces más que el nivel de vibración esperado por el método de implosión.

t.   No se espera que el efecto de la implosión y las actividades de remoción de escombros tengan un impacto adverso significativo en en el área. Para estas actividades, se obtendrán los permisos de fuente de emisión de la Junta de Calidad Ambiental correspondientes y se tomarán todas las medidas aplicables para cumplir con los requisitos del Reglamento para el Control de Contaminación Atmosférica de la Junta de Calidad Ambiental y los Reglamentos de la Administración de Reglamentos y Permisos. El método de implosión podrá generar polvos fugitivos, pero esto ocurrirá únicamente a corto plazo y se tomarán todas las medidas apropiadas para minimizar el impacto de los mismos. Este impacto será inevitable, pero será de corto plazo y no tendrá consecuencias significativas.

u.   Durante la implosión se formará una nube de polvo y humo mayormente al nivel de la tierra. Esta nube se compondrá mayormente de partículas grandes (de más de 10 micrones), por lo que estas partículas se precipitarán en o cerca de las estructuras demolidas. Las partículas más pequeñas (de menos de 10 micrones) se transportarán a través del aire más allá del predio. No obstante, se tomarán las medidas apropiadas para minimizar el impacto de estas partículas. Por ejemplo, la demolición se programará tan temprano en la mañana como sea posible, cuando el viento estuviera calmado, de manera que la velocidad del viento limitaría parcialmente la difusión del polvo. Además, se instalará una barrera alrededor de los edificios para limitar la cantidad de fragmentos y partículas grandes que se puedan esparcir a nivel del terreno durante la implosión.

v.   Luego de la implosión y durante la limpieza del predio, cuando los escombros se estuvieran removiendo para reciclarse, también podrían generarse polvos fugitivos. El contratista a cargo de estas operaciones de reciclaje tomará las precauciones necesarias para minimizar esas emisiones. Esto incluirá, rociar con agua la porción de

escombros a removerse durante el recogido y tomar cualquier otra medida apropiada según los requisitos de la reglamentación aplicable de la Junta de Calidad Ambiental.

w.  En cuanto al posible efecto de la implosión en los cuerpos de agua cercanos, debemos señalar lo siguiente: Existen dos cuerpos de agua principales cerca del predio – el Océano Atlántico y la Laguna del Condado. Debido a que el efecto inmediato de la implosión es al nivel de la tierra, la barrera a instalarse alrededor de los edificios impedirá que las partículas grandes lleguen a estos cuerpos de agua. En cuanto a las partículas pequeñas de polvo, una gran cantidad de éstas caerán en el área del Condado Beach Trío. Las aguas de escorrentía podrían eventualmente llevar algunas de estas partículas a cuerpos de agua adyacentes. No obstante, se tomarían las medidas necesarias para minimizar el impacto de aguas de escorrentía, incluyendo el cumplimiento con los requisitos de la reglamentación federal y local aplicable.

x.  En cuanto a las partículas de polvo que viajen fuera del predio, no se espera que éstas afecten significativamente los cuerpos de agua cercanos. Como la dirección predominante del viento en el área es de este a nordeste, éste llevará estas partículas en dirección contraria al océano. Además, el viento ayudará a esparcir la nube de polvo. Dado lo anterior, se espera que los cuerpos de agua absorban, sin consecuencias mayores, aquella minoría de las partículas que se depositen allí.

y.  No se esperan mayores efectos de la implosión en los edificios cercanos al predio. Según discutido anteriormente, el nivel de vibración recomendado por el U.S. Bureau of Mines para una cantera, para la seguridad de estructuras contiguas es seis veces mayor que el nivel de vibración esperado por el método de implosión.

z.  Durante la implosión se tomarán las medidas apropiadas para proteger las personas y propiedades en el área del proyecto. La implosión se llevará a cabo un domingo, temprano por la mañana, y se tomarán las medidas para cerrar las calles y accesos del área por un período de aproximadamente seis horas. Durante este período los negocios cercanos del área deberán permanecer cerrados. Además, todos los residentes dentro de un perímetro de 500 pies del predio deberán ser evacuados del área. Estos serán efectos a corto plazo en las actividades del área. A largo plazo, se espera que el impacto de la implosión sea beneficioso por varias razones, tales como: el tiempo de la operación sería mucho más corto que el tiempo que tomaría demoler las estructuras por métodos convencionales; el proyecto le dará un impulso económico y físico al área durante la construcción y operación del mismo; y, aumentará el valor de las propiedades circundantes.

aa. Se estima que el tiempo total para la demolición y limpieza de escombros será aproximadamente cuatro meses. La remoción de escombros se completará en aproximadamente dos meses. El efecto en el tránsito del

área será mayormente la entrada y salida de camiones removiendo escombros. Se programará la operación de estos vehículos para minimizar el impacto en el tránsito en las horas pico.

bb. La DIA-P sometida cumple cabalmente con los requisitos del Reglamento sobre Declaraciones de Impacto Ambiental. La Sección 5.3.7 de este reglamento requiere que se presente, a manera de comparación, el impacto ambiental de la acción propuesta y de sus alternativas, de manera que se precisen las cuestiones bajo evaluación y se provean alternativas de selección para los funcionarios y el público. En la DIA-P se presenta el impacto ambiental de la acción propuesta y se discuten otras alternativas razonables de desarrollo consideradas y las razones para no adoptarlas. En la DIA-P se discuten y evalúan tres alternativas diferentes: No construir; remodelar y restaurar las estructuras existentes; y, la demolición de estructuras existentes, la renovación del Hotel Condado Vanderbilt y la construcción de estructuras nuevas (la acción propuesta). El impacto de estas alternativas se comparó con el de la acción propuesta y se expuso, de manera concisa, las razones para no escoger las alternativas eliminadas, según exige el reglamento. En el caso de la no construcción, esta no produce desarrollo económico y dado el deterioro del área no es atractiva. Mientas que la alternativa de no construir y remodelar y restaurar las estructurales existentes, se descartó porque incidiría sobre el éxito del proyecto dada la experiencia negativa experimentada con el Condado Trío. La operación del Condado Trío generó pérdidas para el pueblo de Puerto Rico a pesar de numerosos esfuerzos para generar ganancias tal como remodelaciones interiores y exteriores y cambios de compañía de administración hotelera. Sin embargo, la alternativa preferida sí incluye renovar el Condado Vanderbilt, de acuerdo con el Artículo 4.03 del Reglamento de Zonificación Especial del Condado.

cc. Según se explica en la DIA-P, la infraestructura existente podrá absorber las necesidades del proyecto con modificaciones mínimas. De hecho, es buena política pública utilizar la infraestructura existente en todo lo posible para de esta manera aprovecharse de los recursos disponibles, sin necesidad de crear nuevas instalaciones en otras áreas. Se han hecho las siguientes determinaciones en cuanto a la infraestructura.

1. Drenaje Pluvial: La necesidad es prácticamente igual a la existente, pues el área de techos y áreas pavimentadas se mantiene casi igual.

2. Acueducto: Para el proyecto propuesto se ha determinado un consumo de 446,600 galones por día ("GPD"), de acuerdo a las normas de la Autoridad de Acueductos y Alcantarillados. En el uso anterior se estimó que para los dos hoteles, la demanda sería de 345,800 GPD. La demanda del Centro de Convenciones puede estimarse en unos 110,000 GPD, para un total de 455,800 GPD, lo cual supera la demanda determinada para el proyecto propuesto.

3.  Alcantarillado sanitario: Para el proyecto propuesto se han determinado 326,535 GPD, de acuerdo a las normas de la Autoridad de Acueductos y Alcantarillados. La descarga de los dos hoteles en el uso anterior se ha estimado en 259,350 GPD, y la del Centro de Convenciones se ha estimado en unos 90,000 GPD, para un total de 349,350 GPD, lo cual supera la demanda para el proyecto propuesto.

4.  Energía Eléctrica: Se ha determinado la demanda en 7,000 kVA. Las subestaciones existentes tienen una capacidad total de 9,400 kVA de acuerdo con la información suministrada por la Autoridad de Energía Eléctrica en su comunicación del 10 de diciembre de 1997, que se incluye en la DIA-P.

5.  Tránsito: En la DIA-P se ha incluido el estudio de generación de tránsito en el cual se compara el tránsito a generarse con el uso propuesto al tránsito generado con el uso anterior, y se determina que para las horas picos de mañana y tarde, en un día de semana, no se generaría mas tránsito que el que se generaba cuando en el Centro de Convenciones había un evento que produjera 130 viajes en las horas pico.

6.  Teléfonos: La demanda telefónica sería similar a la previa y la Compañía de Teléfonos ha expresado que puede servirla. Ver Anejo 5 de la DIA-P.

A continuación, en su Determinación Núm. 26, la JCA señaló sus recomendaciones para considerar la DIA-P como una DIA-F.[46] Por lo que, en cuanto a la DIA-F, la JCA, para no repetir las determinaciones de hecho antes señaladas, sólo indicó que el proponente había incluido como parte de su DIA-F los siguientes: (1) "comentarios vertidos por la ciudadanía"; (2) "[d]isposición final de los desperdicios sólidos no peligrosos"; (3) "copia más clara del Mapa de Suelos"; (4) "impacto en zona marítimo terrestre"; (5) "alternativas"; (6) "impacto de emisiones de polvo fugitivo a la atmósfera y de contaminación por ruido en la etapa de construcción"; (7) "recomendaciones u observaciones de las Agencias gubernamentales consultadas"; (8) "impacto en el tránsito de la operación de las instalaciones propuestas"; (9) "medidas para evitar que se afecte el edificio Condado Vandervilt [sic] en su estructura y cimientos"; (10) "descripción de las obras a realizarse en el Condado

---

[46] Véase, nota al calce núm. 6, ante.

Vandervilt" [sic]; y (11) "comparación de los efectos de los edificios existentes y los propuestos respecto a la sombra que imparten a la zona de playa". *Íd.*, pág. 240. Estos documentos complementaron la DIA-P para convertirla en una final. Así también, a los fines de facilitarle a los tribunales su función revisora y no tener que escudriñar el expediente, la JCA señaló, al lado de cada uno de estos puntos, las páginas de la DIA-F donde se encuentran los documentos que complementaron la misma y que sirven de base para dichas determinaciones. Finalmente, la JCA concluyó que, tras haber evaluado todos los documentos sometidos, la DIA-F presentada por la agencia proponente cumple con los requisitos esbozados por el Art. 4(c) de la Ley Núm. 9, *supra*.

Este Tribunal, en su pronunciamiento en *Mun. de San Juan v. J.C.A.*, supra, pág. 128, devolvió el caso a la Junta, para que ésta emitiese una "determinación fundamentada." Es decir, la JCA, en su resolución, tiene que exponer "claramente sus determinaciones de hecho y las razones para su dictamen, incluyendo los hechos básicos de los cuales, a través de un proceso de razonamiento e inferencia, se derivan aquéllos." *Íd.*, pág. 126. Así también, la resolución tiene que demostrar que la JCA consideró y resolvió los conflictos de prueba, y "describir tanto los hechos probados como los que fueron rechazados." *Íd.*

De lo antes expuesto, apreciamos que la JCA cumplió con su deber. La JCA, quien no estaba obligada a acoger la totalidad del *Informe del Panel Examinador*,[47] aceptó las recomendaciones del Oficial Examinador, quien entendió que la DIA-P necesitaba más información.[48] La JCA, dio seria consideración a los planteamientos esbozados tanto por el Municipio como por los demás deponentes oponiéndose al proyecto, los cuales fueron incluidos por el Oficial Examinador en su informe e incorporados en la resolución impugnada. Sin embargo, la JCA, como custodio de nuestro medio ambiente y dentro de sus conocimientos

---

[47] *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1107; *Henríquez v. Consejo de Educación Superior*, 120 D.P.R. 194, 208 (1984).
[48] Véase, nota al calce núm. 6, *ante*.

especializados, entendió que tales señalamientos fueron debidamente atendidos y, por ende, los rechazó.

Por otra parte, una lectura cuidadosa de la resolución impugnada y de la DIA-F demuestra que, al evaluar los comentarios presentados, la JCA dirimió los conflictos de prueba que tuvo ante sí. Por ejemplo, la JCA rechazó la moción de reconsideración del Municipio,[49] a la cual se anejó, entre otros, un informe pericial sobre el tránsito realizado por una firma pagada por el Municipio. En dicho informe, el Municipio incluyó los planteamientos previamente esbozados. El referido informe al igual que el sometido por los proponentes se refieren a cuestiones periciales o especializadas. Por lo que, no nos corresponde, desde este estrado, pasar juicio sobre los conflictos de prueba entre las opiniones científicas y determinar quién tiene la razón. *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1106, 1109-1110; *Izaak Walton League of America v. Marsh*, 655 F. 2d. 346, 372 (1981).[50]

En vista de lo antes expuesto, es forzoso concluir que la JCA cumplió con el mandato de este Tribunal. Pues, ¿cuáles fueron los hechos rechazados por la JCA? La respuesta es obvia. Tras estudiar y considerar minuciosamente los planteamientos del Municipio, la JCA los descartó. Así también, la Junta observó nuestro mandato al describir los hechos que estimó probados, cuando incluyó las respuestas de los proponentes a las inquietudes de los deponentes, y al expresar los documentos incluidos que respondían a las recomendaciones esbozadas por el Oficial Examinador. En fin, sin perder de perspectiva que la DIA-F es un documento integrado, la especificidad de dichas determinaciones de hecho nos permite ejecer con rigor nuestra función revisora.

Por último, cabe puntualizar que, ante una situación similar, la cual trataba de la revisión de una DIA relacionada con una planta de

---

[49] Apéndice del recurso de *certiorari*, Volumen I, Anejo 2, págs. 3-91.
[50] Sobre ello, en *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1106, expresamos: "no nos corresponde entrar a dilucidar los conflictos que puedan existir entre opiniones científicas sobre alguna cuestión ambiental."

cogeneración de energía, en *Misión Ind. P.R. v. J.C.A.*, supra, págs. 1106-1107, señalamos:

> [l]a Junta de Calidad Ambiental tuvo ante sí los estudios científicos presentados, tanto por los promoventes, como por los opositores al proyecto. Estos abarcaban materias sumamente especializadas. En su resolución, la Junta de Calidad Ambiental hizo constar que había evaluado todos los escritos, que revisó la documentación técnica y que tomó en consideración las recomendaciones de los oficiales examinadores, Examinó todo el contenido de la declaración ambiental, y evaluó si efectivamente se cumplía con los estándares ambientales pertinentes. Discutió, además, los señalamientos esgrimidos en contra del proyecto en las vistas, que fueron reiterados en el informe del panel examinador. La Junta incluso ordenó que se incorporara a la declaración de impacto ambiental preliminar los comentarios críticos sobre ésta relativos a los aspectos ambientales del proyecto que fueron formulados por personas particulares, agencias gubernamentales y otras entidades. **Todo ello nos convence que la evaluación ambiental de la Junta de Calidad Ambiental fue responsable, independiente, razonable y por tanto, merecedora de nuestra deferencia, debido a la especialización en cuestiones ambientales del foro administrativo apelado. Examinado en su totalidad el expediente administrativo de este caso, no podemos concluir que la actuación de la Junta de Calidad Ambiental fue arbitraria o irrazonable, o que fue contraria a las normas jurídicas aplicables. El error no fue cometido.** (Citas omitidas y énfasis nuestro.)

V

Por otra parte, el Municipio también alega que el expediente administrativo carece de evidencia sustancial que sustente la adecuacidad de la DIA-F. Específicamente, el Municipio enfatiza la insuficiencia de prueba en los siguientes tres (3) puntos: (1) impacto del proyecto propuesto sobre el tránsito del Condado; (2) la discusión de las alternativas al proyecto propuesto; y, (3) la protección y tratamiento que se le dará al Hotel Condado Vanderbilt. En síntesis, el Municipio aduce que la decisión de la JCA no está fundamentada en evidencia sustancial y que la misma es arbitraria y caprichosa.

A los fines de pasar juicio sobre tales señalamientos, debemos recordar que evidencia sustancial es "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión." (Bastardillas omitidas.) *Asoc. Vec. H. San Jorge v. U. Med. Corp*, supra; *Misión Ind. P.R. v J.P.*, supra, pág. 1160; *Hilton Hotels v.*

*Junta Salario Mínimo*, supra. Por lo que, para determinar ello, hemos de examinar la totalidad de la prueba que obra en el expediente.

A. Impacto del proyecto propuesto sobre el tránsito del Condado.

El Municipio arguye que la DIA-F es inadecuada ya que no considera con suficiente rigurosidad el impacto del proyecto en el tránsito del Condado. El Municipio alega, *inter alia*, que: (1) "[l]a discusión de la DIA Final se limita a generalidades y comparaciones especulativas con el uso anterior del Condado Trío",[51] (2) la DIA-F no atiende el impacto de la ubicación de los accesos de servicio en el tránsito, (3) la DIA-F no contempla el impacto sobre el tránsito de las intersecciones no semaforizadas, y (4) la DIA-F no considera los accesos y la circulación de los vehículos. En síntesis, la alegación del Municipio se fundamenta en que la JCA no acogió su posición.

En la vista pública, los deponentes, entre ellos el Municipio, expusieron sus preocupaciones sobre la insuficiencia de la DIA-P. Incluso, el Oficial Examinador tomó conocimiento oficial de los considerables problemas de tránsito en la referida área y, por ende, en su *Informe del Panel Examinador*, recomendó que en el documento final se debía discutir el impacto en el tránsito causado por el proyecto propuesto. Debido a la importancia de tal asunto, la JCA acogió dicha recomendación. Luego, al cumplir con incluir las respuestas de los proponentes referentes a la cuestión en la DIA-F, la JCA entendió que dicho documento era uno adecuado, y, por lo tanto, lo aprobó. Como señaláramos anteriormente, al impugnar la resolución que aprobó la DIA-F, el Municipio incluyó un informe pericial realizado por sus peritos señalando las debilidades del estudio de los proponentes. Posteriormente, la JCA denegó tal reconsideración.

La JCA basó su resolución fundamentalmente en el estudio de tránsito sometido por los proponentes,[52] el cual merece nuestra deferencia. En

---

[51] Recurso de *certiorari*, pág. 65.

[52] Apéndice del recurso de *certiorari*, Volumen II, Anejo 7 -Volumen 1, Apéndice 8-, págs. 405-434. Traducción en español de dicho informe,

primer lugar, este informe está fechado mayo de 1998, lo cual es indicativo de que fue realizado cercano a la presentación de la DIA-P, el 31 de julio de 1998. Segundo, el estudio presentado es uno detallado. Tercero, dicho estudio es uno que se explica por sí mismo. Cuarto, recoge la mayoría de los planteamientos del Municipio.

Por otra parte, el documento presentado por el Municipio, el cual no es un estudio *per se*, se limita a traer viejos planteamientos, los cuales habían sido ponderados por la JCA, quien dentro de su conocimiento especializado los rechazó. Si la JCA hubiese entendido que tales deficiencias no habían sido atendidas en la DIA-F -ya fuese en el estudio presentado o en las contestaciones sometidas-,[53] la JCA le hubiese requerido nuevamente a los proponentes contestar dichas preocupaciones. No lo entendió necesario.

El Municipio principalmente concreta sus planteamientos a que el estudio se basa en comparaciones especulativas con el uso anterior. Para tales comparaciones se utilizaron las técnicas adecuadas de generación de tránsito. Además, por razones obvias, hay que recurrir a proyecciones. Por un lado, no es posible calcular el tránsito actual causado por el Condado Trío porque éste **no está funcionando**. Por otro lado, tampoco se puede obtener el número exacto del tránsito que generará el CBR ya que éste **no existe aún**.

Anteriormente indicamos que no nos compete ventilar los conflictos entre estudios científicos, para lo cual carecemos de la pericia necesaria. En vista de lo anterior, concluimos que existe suficiente evidencia sustancial para sostener la adecuacidad de la DIA-F referente al impacto sobre el tránsito. Por tanto, entendemos que el TCA actuó correctamente al no acoger los planteamientos del Municipio sobre el impacto del proyecto en el tránsito.

---

Apéndice del recurso de *certiorari*, Volumen II, Anejo 7 -Volumen 1, Apéndice 9-, págs. 435-454.

[53] Véase, Apéndice del recurso de *certiorari*, Volumen II, Anejo 7, págs. 213-217 (Sección de la DIA-F que trata sobre el impacto del proyecto propuesto sobre el tránsito).

B.  Discusión de las alternativas al proyecto propuesto.

El Municipio afirma que la discusión de las alternativas al proyecto propuesto en la DIA-F es inadecuada ya que "no se da una consideración sustancial a cada alternativa evaluada" y no se examinaron otras alternativas, tal como el proyecto propuesto con modificaciones.[54] En particular, el Municipio arguye que la DIA-F incumple con la Sec. 5.3.7 del Reglamento sobre Declaraciones de Impacto Ambiental (en adelante RDIA). Dicho reglamento fue promulgado por la JCA el 1 de junio de 1984, al amparo de la Ley Núm. 9, *supra*.[55]

En la DIA-P sometida, los proponentes presentaron tres (3) alternativas, a saber: (1) la de no construir; (2) la de remodelar y restaurar las estructuras existentes,[56] y (3) la de demoler las estructuras existentes y restaurar el Condado Vanderbilt (alternativa escogida).[57] Sin embargo, al pasar juicio sobre la DIA-P, la JCA estimó necesario una discusión más extensa de las alternativas y la inclusión de otras alternativas. En vista de ello, en la DIA-F, los proponentes ampliaron su discusión sobre las anteriores opciones e incluyeron la alternativa de ubicar el proyecto en otra propiedad.[58] Esta última, a su vez, consta de la ubicación del proyecto en tres (3) sitios diferentes,

---

[54] Recurso de *certiorari*, pág. 74.

[55] Cabe mencionar que el RDIA fue derogado por el Reglamento de la Junta de Calidad Ambiental para el Proceso de Presentación, Evaluación y Trámite de Documentos Ambientales (Reglamento Núm. 6026), aprobado el 28 de septiembre de 1999. Este reglamento no es de aplicación a la situación de autos ya que fue promulgado con posterioridad a la DIA impugnada. Además, la Regla 227(B) de este reglamento contiene la siguiente salvedad: "[l]os documentos ambientales que sean sometidos a la Junta de Calidad Ambiental previo a la vigencia de este Reglamento, serán evaluados y procesados conforme a las disposiciones del Reglamento y resoluciones vigentes al momento de la radicación del documento ante esta Agencia."

[56] Ésta fue la alternativa propuesta por el Municipio.

[57] Véase, Apéndice del recurso de *certiorari*, Volumen III, Anejo 9, págs. 1060-1062.

[58] Véase, Apéndice del recurso de *certiorari*, Volumen II, Anejo 7, págs. 244-251.

a saber: Isla Verde, Piñones y Mayagüez. Cada una de las opciones dentro de dicha alternativa fue discutida por los proponentes.

La Sec. 5.3.7. del RDIA dispone:

Deberá presentarse, a manera de comparación, el impacto ambiental de la acción propuesta y de sus alternativas, de manera que se precisen las cuestiones bajo evaluación y se provean alternativas de selección para los funcionarios y el público. Las agencias deberán:

a.  Objetivamente considerar y evaluar toda alternativa razonable, y exponer en forma concisa las razones para excluir aquellas alternativas que sean eliminadas de [la] evaluación detallada.

b.  Dar consideración substancial a cada alternativa evaluada en forma detallada, incluyendo la acción propuesta, de manera que las personas que utilicen la DIA puedan evaluar y comparar los méritos de cada alternativa.

c.  Incluir alternativas razonables que no estén dentro de la programación de la agencia proponente, a tenor con los planes de desarrollo de la región.

ch.  Incluir la alternativa de no llevar a cabo la acción propuesta.

d.  Identificar la alternativa preferida por la agencia proponente en la DIA Preliminar.

e.  Incluir las medidas de mitigación de efectos adversos al ambiente no discutidas en la acción o en las alternativas propuestas.

Es decir, la DIA tiene que incorporar una discusión de alternativas a la acción propuesta. No obstante, ello no implica explorar todo proyecto alterno concebible, sino que el proyecto propuesto es, a la luz de todos los elementos legítimos concernientes,[59] el de menos impacto ambiental. *Misión Ind. P.R. v. J.C.A.*, supra, pág. 1103. El barómetro para determinar cuántas alternativas deben ser incluidas es uno de razonabilidad. *Vermont Yankee Nuclear Power Corp. v. NRDC*, supra, pág. 551; *Fayetteville Area Chamber of Commerce v. Volpe*, 515 F. 2d 1021,

---

[59] Sobre el particular, el Tribunal Supremo Federal señaló:

"...it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." (Citas omitidas.) *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

1027 (4th Cir. 1975); *Life of the Land v. Brinegar*, 485 F. 2d 460, 472 (1973) ("NEPA's 'alternatives' discussion is subject to a construction of reasonableness.")

Tras analizar la DIA-F y tomando en consideración el principio de razonabilidad para la inclusión de alternativas, resulta palmario que los proponentes incluyeron las alternativas razonables para la acción a llevarse a cabo. Contrario a la mayoría, que busca cualquier falta,[60] entendemos que el proyecto es razonable y viable en términos ambientales. La alternativa de la construcción del proyecto con las modificaciones necesarias, como pretende la mayoría de este Tribunal, es irrazonable o no viable. Ello implicaría mover de sitio la Avenida Ashford. Por ejemplo, "[p]ara que el proyecto pudiera cumplir con el retiro especificado en el Artículo 3.08.1 del Reglamento de Zonificación Especial del Condado, sería necesario ubicarlo a más de 40 metros de distancia de la colindancia norte, resultando en la ubicación del proyecto en el medio de la Avenida Ashford."[61]

Por otra parte, la discusión de dichas alternativas demuestra que los proponentes consideraron y sopesaron objetivamente varios factores, incluyendo el ambiental. Así también, expresaron los motivos por los cuales descartaron las alternativas no seleccionadas, lo cual facilitó la función de la JCA, para, al final, concluir que la alternativa

---

[60] Nos parece pertinente la siguiente expresión de la Corte de Apelaciones de los Estados Unidos para el Primer Circuito:

*Vermont Yankee* makes it clear that the NEPA requirement of studying alternatives may not be turned into a game to be played by persons who -for whatever reasons and with whatever depth of conviction- are chiefly interested in scuttling a particular project. There would be no end to the alternatives that might be proposed if opponents had no obligation to do more than make a facially plausible suggestion that a particular alternative might be of interest, and could then, after awaiting the results, find reasons why the agency's survey was inadequate. The agency bears the primary responsibility to investigate serious alternatives, but reviewing courts, when weighing objections based on an alleged failure to study alternatives, properly may consider the extent and sincerity of the opponents' participation. (Bastardillas en el original.) *Seacost Anti-Pollution v. Nuclear Regulatory Com'n*, 598 F. 2d 1221, 1230-1231 (1979).

propuesta es, dentro de los objetivos trazados, la de menor impacto ambiental. Por lo que, no erró el TCA al concluir que la discusión de las alternativas es adecuada y que obra en el expediente administrativo evidencia sustancial.

C. Protección y tratamiento que se le dará al Hotel Condado Vanderbilt.

Respecto al Condado Vanderbilt, el Municipio aduce que la DIA-F es insuficiente por las siguientes razones: (1) no expresa específicamente las obras que se llevarán a cabo, lo cual no permite determinar si se está cumpliendo con el Reglamento de Zonificación del Condado, y (2) no explica en qué consiste la renovación del edificio a su diseño original.

En la presente situación, luego de examinar la DIA-P, la JCA, dentro de su pericia, comprendió que en la misma se debía "[e]xplicar en qué consisten las obras de restauración del Edificio Condado Vanderbilt."[62] En la DIA-P se menciona la expresión "dentro de lo posible" sin detallar en qué consistían las obras. Posteriormente, tras la presentación de la DIA-F, en la que los proponentes ampliaron la información sobre el referido edificio, la JCA concluyó que tal documento cumplió con lo requerido.

Antes de atender los planteamientos esgrimidos por el Municipio cabe señalar algunos detalles respecto al Edificio Condado Vanderbilt. El Hotel Condado Vanderbilt, abierto al público en 1919, es un edificio al que se le reconoce valor histórico dentro de nuestro acervo cultural. En vista de ello, el Reglamento de Zonificación Especial de El Condado (en adelante Reglamento del Condado), 23 R.P.R. sec. 650.1791 *et seq.*, en su sec. 4.03, dispone:

> [e]n el área aledaña al Hotel Caribe Hilton y en el Condado existen estructuras que merecen conservarse por su diseño arquitectónico, por su estilo representativo de una época y/o por su escala tradicional. Con la excepción de una, todas estas estructuras son construcciones de este siglo y se deben conservar para las próximas generaciones. No se permitirá la destrucción de ninguna de estas estructuras y en cualquier acto de mejorarlas se deberá respetar su **diseño original y su contexto histórico**. Los edificios recomendados para conservación son los siguientes:

---

[61] Apéndice del recurso de *certiorari*, Volumen II, Anejo 7, pág. 264.

[62] Apéndice del recurso de *certiorari*, Volumen IV, Anejo 43, pág. 226.

1. Hotel Normandie
2. Tribunal Supremo
3. Edificio original, Hotel Caribe Hilton
4. Fuerte San Gerónimo
5. Edificio original, Hotel Condado Vanderbilt (hoy el Hotel Condado Beach)
6. Escuela Luchetti
7. Edificio original, Hospital Presbiteriano
8. Edificio Miami. 23 R.P.R. sec. 650.1833.

Atendiendo tal disposición, permea, a través de la totalidad de la DIA-F, la preocupación de los proponentes de conservar el diseño original y el contexto histórico del Condado Vanderbilt, aun cuando, como reconoce el Municipio, dicho edificio "no ha sido inscrito en el Registro Nacional de Lugares Históricos."[63] Los siguientes ejemplos tomados de la DIA-F demuestran tal inquietud:

a. Pág. v: "[l]a estructura del edificio Condado Vanderbilt, será renovada y se mantendrá el uso para la que fue construida originalmente." Apéndice del recurso de *certiorari*, Volumen II, Anejo 7, pág. 184.

b. Pág. 4: "[e]l edificio original del Hotel Condado Beach, el edificio Vanderbilt, se renovará preservando su apariencia exterior en su fachada sur, creándose una facilidad de hotel 'time share', con 71 unidades exclusivas." *Íd.*, pág. 194.

c. Pág. 6: "[l]as estructuras del Hotel Condado Beach que serán demolidas son el Anejo Oeste, el Patio Fauno (jardín posterior), el porte-cochere, y el área ampliada del primer nivel. Estas estructuras no son parte del edificio original." *Íd.*, pág. 196.

d. Pág. 7: "[a]ntes de proceder a la demolición del Anexo Oeste del Hotel Condado Beach se tomarán las medidas de seguridad necesarias para la protección del Condado Vanderbilt. Entre otras medidas, se demolerá por métodos convencionales la estructura que une o enlaza el Vanderbilt y su anexo. Esta estructura contiene la infraestructura de elevadores que provee servicio a ambos edificios. Se sellará la parte del Vanderbilt que queda expuesta una vez se demuela la estructura. Al momento de la implosión, el Condado Vanderbilt estará totalmente desconectado de cualquier estructura a ser demolida. Además, se cubrirán con lonas geotextiles los cristales y áreas susceptibles a daños del Vanderbilt. Se pondrán en efecto todas las medidas de seguridad que el consultor experto en demoliciones indique." *Íd.*, pág. 197.[64]

---

[63] Recurso de *certiorari*, pág. 61. A pesar de no estar inscrito, el Municipio insiste en la aplicación de "las normas de rehabilitación de propiedades históricas promulgadas por el Departamento del Interior del Gobierno de Estados Unidos." *Íd.*

[64] Esto se repite en la pág. 9 de la DIA-F. *Íd.*, pág. 199.

e.  Pág. 16: "[l]a estructura exterior del Condado Vanderbilt que se aprecia desde la Avenida Ashford será renovada a su diseño original. En la cara del edificio que da hacia la playa se instalarán ventanas más grandes que proporcionen mayor vista al mar desde cada habitación. En el interior, el edificio será remodelado para acomodar 71 habitaciones tipo 'time share' en lugar de las habitaciones existentes. Tendrá su propia piscina y acceso a la playa y estará conectado por su lado oeste al nuevo edificio de apartamentos." *Íd.*, pág. 206.

f.  Págs. 39-40: "[e]l Reglamento de Zonificación Especial del Condado, con vigencia del 7 de junio de 1986, en su sección 4.03 lista varios edificios que merecen conservarse. Según dicho Reglamento no se permitirá la destrucción de ninguna de las estructuras incluidas en dicha lista. En la lista se encuentra el edificio del Condado Vanderbilt, hoy en día parte del Condado Beach. Este edificio había sido modificado anteriormente en dos ocasiones para añadirle anejos que no eran compatibles con su diseño original.

En el apéndice número 12 se incluye la evaluación de los recursos naturales y arqueológicos del área llevada a cabo por el Dr. Argamenon Gus Pantel. El Instituto de Cultura Puertorriqueña determinó que esta evaluación cumple adecuadamente con los requisitos aplicables y emitió su endoso al proyecto en su aspecto arqueológico. En el apéndice 13 se incluye copia de la carta del Instituto de Cultura Puertorriqueña, fechada 17 de junio de 1998 que indica lo anterior.

Este proyecto respetará el diseño original de la fachada sur del edificio. En la Sección de Demolición bajo el Capítulo: Descripción y Propósito de la Acción Propuesta, se especifican las áreas del existente Hotel Condado Beach que serán demolidas. A la misma vez, se estará integrando esta estructura a un moderno complejo de edificios orientados hacia usos mixtos, desde residencial, hasta comercial." *Íd.*, pág. 229-230.

g.  Pág. 51: "[s]e mantendrá y renovará el edificio del Condado Vanderbilt, preservando su uso tradicional de hotel." *Íd.*, pág. 241.

h.  Pág. 56: "[s]e estima que remodelar y restaurar las facilidades existentes no va a producir un proyecto exitoso. Por tanto, esta alternativa fue descartada. Sin embargo, la alternativa recomendada si incluye renovar el edificio Condado Vanderbilt, por considerarse una estructura con un valor histórico que amerita su conservación." *Íd.*, pág. 246.

i.  Pág. 82: "[l]as obras a llevarse a cabo en el Condado Vanderbilt consisten de la renovación del edificio para regresar a su diseño original en la fachada. La Sección Edificio Condado Vanderbilt, bajo el Capítulo: Descripción y Propósito de la Acción Propuesta en el Documento de Impacto Ambiental Final explica con detalle en qué consistirá la renovación." *Íd.*, pág. 272.[65]

---

[65] Se hace referencia al Edificio Condado Vanderbilt en los siguientes documentos: (1) Carta de la Oficina Estatal de Preservación Histórica de

Estos ejemplos proveen suficientes garantías de que los proponentes del proyecto en cuestión preservarán el diseño original de la estructura inicial del Edificio Condado Vanderbilt y continuarán con el uso original del mismo, entiéndase de hotel.

Así también, las antes citadas partes de la DIA-F ponen en relieve las obras de renovación a llevarse a cabo en el Condado Vanderbilt, a saber: se mantendrá la fachada sur del edificio y, en la parte que da hacia la playa, se instalarán ventanas más grandes que proporcionen mayor vista al mar desde cada habitación. Además, el interior del edificio será remodelado para acomodar 71 habitaciones estilo 'time share' en lugar de las habitaciones existentes, tendrá su propia piscina y acceso a la playa. La JCA entendió que dichas descripciones eran suficientes para poner en conocimiento a las partes concernidas el impacto ambiental de la acción propuesta. Por otra parte, no podemos perder de perspectiva que, tras la aprobación de la DIA, la agencia encargada de los permisos de construcción establece unos controles y/o recomendaciones a seguirse. La aprobación de la DIA no ata las manos de la JCA, a los efectos de tomar medidas ulteriores para la protección del ambiente. *Misión Industrial P.R. v. J.C.A.*, supra, pág. 1104.

---

10 de febrero de 1998 (se informa que dicho edificio no forma parte del Registro Nacional de Lugares Históricos, pero que el mismo puede ser elegible). *Íd.*, pág. 386; (2) Carta de la Oficina Estatal de Preservación Histórica de 2 de noviembre de 1998 (se solicita una información, a los fines de determinar el impacto del proyecto sobre el Edificio Condado Vanderbilt y se indica que tal instrumentalidad no emite endosos sino comentarios). *Íd.*, págs. 387-389; (3) Carta de los asesores que prepararon la DIA (se señala que la antes referida instrumentalidad carece de jurisdicción sobre el asunto). *Íd.*, pág. 390-392; (4) Evaluación Arqueológica Fase IA, aprobada por el Instituto de Cultura Puertorriqueña. *Íd.*, págs. 665-828; (5) Declaración de Impacto Económico del CBR ("The project plans to demolish the Convention Center and the La Concha Hotel as well as the additions to the basic

continúa...

[52] ...**continuación**

original Condado Beach Hotel. All that will remain and be integrated into the new project will be the original Condado Beach  Hotel Building."). *Íd.*, pág. 842; (6) Carta de la Compañía de Turismo de 2 de noviembre de 1998. *Íd.*, págs. 888-891; (7) Carta del Área de Asesoramiento Científico de la JCA. *Íd.*, págs. 893-894; y (8) Análisis sobre la DIA-P Sometida para un Proyecto de Demolición, Restauración y Construcción en los Terrenos del Condado Beach Trío. *Íd.*, págs. 956-965.

De otro lado, el Municipio entra en la discusión de que en la DIA-F se sustituyó el vocablo *restaurar* por el término *renovar*, lo cual, a su juicio, implica que los proponentes no reconocen el valor histórico cultural del Condado Vanderbilt. Conforme a lo antes expresado, la DIA-F demuestra que los proponentes sí tomaron en consideración la trascendencia cultural de dicho edificio al conservar su diseño original. Por lo cual, resulta innecesario evaluar tal planteamiento.

Tomando en consideración lo anterior, concluimos que obra suficiente evidencia en el expediente administrativo para determinar que la agencia no actuó irrazonablemente al determinar que la DIA-F era adecuada.

Concluido el análisis de los errores señalados respecto a la resolución de la JCA, procedemos a hacer lo propio con los planteamientos referentes a la resolución de ARPE.

VI

En su primer señalamiento de error referente a la resolución de ARPE, el Municipio alega que dicha agencia aprobó el anteproyecto fundamentándose en una resolución nula de la Junta de Planificación. En síntesis, aduce que la Resolución Núm. JPI-4-15-99 de la Junta de Planificación, interpretando unas secciones relacionadas con la concesión de variaciones, es una enmienda y, por ende, nula por no haberse aprobado conforme al procedimiento de reglamentación establecido por la LPAU, *supra*. Por su parte, los proponentes arguyen que la referida resolución es una regla interpretativa, la cual no requiere un proceso de aprobación.

El procedimiento de reglamentación preceptuado por la LPAU, *supra*, exige que –antes de la adopción, enmienda o derogación de una regla o reglamento– la agencia publique un anuncio en un periódico de circulación general, provea a la ciudadanía la oportunidad de presentar comentarios por escrito y celebre vistas públicas ya sea discrecional o mandatoriamente, conforme a la ley orgánica de la agencia. Secs. 2.1-2.3 de la LPAU, 3 L.P.R.A. secs. 2121-2123. Tras la aprobación por parte de

la agencia, dicha regla o reglamento tiene que ser presentada ante el Departamento de Estado. Posteriormente, si la regla en cuestión es aprobada por el Secretario de Estado se publica un resumen de ésta, la cual tendrá vigencia, como norma general, transcurridos treinta días a partir de su presentación. Sec. 2.8 de la LPAU, 3 L.P.R.A. sec. 2128. Por último, de no cumplirse sustancialmente con este trámite, la regla es nula. Sec. 2.7 de la LPAU, 3 L.P.R.A. sec. 2127 (Supl. 1999).

No obstante, es menester señalar que el procedimiento antes esbozado no es de aplicación a todos los pronunciamientos de las agencias. En vista de ello, es necesario determinar qué reglas no tienen que pasar por este cedazo. La Sec. 1.3 de la LPAU, *supra*, define "regla" como "cualquier norma o conjunto de normas de una agencia que sea de aplicación general que ejecute o interprete la política pública o la ley, o que regule los requisitos de los procedimientos o prácticas de una agencia." 3 L.P.R.A. sec. 2102(l) (Supl. 1999). Una regla también es una "enmienda, revocación o suspensión de una regla existente." *Íd.*

Por otra parte, dicha sección provee las siguientes excepciones a la definición de regla, a saber:

(1) Reglas relacionadas con la administración interna de la agencia que no afectan directa y sustancialmente los derechos o los procedimientos o prácticas disponibles para el público en general.

(2) Formas e instrucciones, declaraciones interpretativas y declaraciones de política general, que son meramente explicativas y no tienen ningún efecto legal.

(3) Decretos mandatorios aprobados por la Junta de Salario Mínimo.

(4) [Ó]rdenes de precios del Departamento de Asuntos del Consumidor.... *Íd.*

Referente a éstas, en particular a las primeras dos, expresamos que "las agencias administrativas aprueban directrices (*guidelines*) u otras reglamentaciones menos formales (*interpretative rules*) que se adoptan para darle uniformidad a sus propios procesos, para pautar la discreción administrativa o para otros fines internos y que, aunque son de aplicación general y vinculan administrativamente, pueden ser

modificadas judicialmente." (Escolio omitido.) *Agosto Serrano v. F.S.E.*, 132 D.P.R. 866, 873 (1993). Igualmente, hemos señalado que tanto las reglamentaciones menos formales (*interpretative rules*) como las directrices (*guidelines*) no tienen que cumplir con el procedimiento de reglamentación establecido. *Íd.*, nota al calce núm. 3.

En la esfera federal, la jurisprudencia se ha encargado de establecer claramente las diferencias entre las reglas interpretativas y las reglas legislativas o substantivas. Una regla substantiva crea derechos, asigna responsabilidades, o impone obligaciones. Mientras que una regla interpretativa es meramente una clarificación o explicación de una ley o regla existente emitida por la agencia para notificarle al público su interpretación sobre dicha ley o regla que le compete administrar. *La Casa del Convaleciente v. Sullivan*, 965 F. 2d 1175, 1178 (1st Cir. 1992). Una regla legislativa no es considerada como una enmienda sólo por el hecho de proveer más detalles que la regla sujeta a interpretación. De otra forma, ninguna regla sería interpretativa a menos que repita literalmente la regla interpretada. *American Min. Congress v. MSHA*, 995 F. 2d 1106, 1112 (D.C. Cir 1993).

En el caso de autos, ARPE solicitó de la Junta de Planificación una interpretación del Reglamento Núm. 4, 23 R.P.R. sec. 650.1638 *et seq.*, a los fines de determinar si procedía una variación presentada por los proponentes, la cual tenía el propósito de reducir el número de espacios de estacionamiento de 1,962 requeridos conforme al cálculo de ARPE a 1,507. Dicha consulta tenía el propósito de interpretar conjuntamente la Secs. 1.07, 84.00-84.03 y 98.00-98.06 del Reglamento Núm. 4, 23 R.P.R. secs. 650.1643, 650.1731, y 650.1745, respectivamente. La Junta de Planificación emitió, al amparo de la Sec. 1.09 del Reglamento Núm. 4, 23 R.P.R. sec. 650.1645,[66] la Resolución Núm. JPI-4-15-99.

---

[66] Esta sección dispone que "[l]a Junta de Planificación podrá, mediante resolución al efecto, clarificar e interpretar las disposiciones de este Capítulo en casos de dudas o conflictos, en armonía con los fines y propósitos generales de la Ley Núm. 75 del 24 de junio de 1975 [23 L.P.R.A. sec. 62 *et seq.*], según enmendada. *Íd.*

El Reglamento del Condado, *supra*, establece que los requisitos de estacionamiento para esta zona conformarán a lo dispuesto en el Reglamento Núm. 4, *supra*, e incluye varios requisitos adicionales, entre otros: (1) que "[t]odas los [sic] casas de apartamentos deberán proveer un (1) estacionamiento para visitantes por cada cinco (5) unidades de vivienda básica (u.v.b.) o fracción de las mismas"; (2) que "[n]o se permitirá ningún estacionamiento en el patio delantero. Todos los estacionamientos quedarán confinados detrás de la línea de edificación, según establecida en el Plano de Frentes de Edificación. Los mismos no serán visibles desde la acera"; y (3) que [n]o se considerará como fundamento para conceder una variación la no-existencia de estacionamiento dentro de una pertenencia construida. Todo requisito de estacionamiento será cumplido a cabalidad." Sec. 3.11 del Reglamento del Condado, 23 R.P.R. sec. 650.1821.

La Sec. 6.01 del Reglamento del Condado permite la autorización de variaciones, en situaciones extraordinarias, cuando: (1) la aplicación literal de los requisitos cause una privación o restricción irrazonable al gozo de la propiedad, y (2) se pruebe a "satisfacción que la variación (concesión) aliviará un perjuicio claramente demostrable, o que la misma habrá de redundar en los mejores intereses de la comunidad y el sector." 23 R.P.R. sec. 650.1851.[67] Tras la aprobación de las

---

[67] En particular, la Sec. 6.04 del Reglamento del Condado establece que no se concederá variación alguna a no ser que existan datos suficientes para establecer:

(A) Que circunstancias excepcionales o extraordinarias, tales como la forma irregular del solar u otras circunstancias impiden el disfrute o la utilización de la propiedad.

(B) Que debido a circunstancias excepcionales o extraordinarias la aplicación literal de ciertos requisitos específicos de este Capítulo resultaría en una dificultad práctica o en un perjuicio innecesario no creado o atribuible al dueño de la propiedad.

(C) Que la variación (concesión) es necesaria para la preservación y el disfrute de un derecho de propiedad y se demuestre que la variación (concesión) aliviará un perjuicio claramente demostrable, cuyo derecho es poseído y disfrutado por otras pertenencias en el mismo distrito, el cual no afecta el bienestar público.

variaciones, la Junta de Planificación o ARPE tienen la responsabilidad de establecer "la naturaleza y extensión de las mismas" y de delinear las condiciones que entienda necesarias para garantizar la observancia de los criterios establecidos para las variaciones. Sec. 6.05 del Reglamento del Condado, 23 R.P.R. sec. 650.1855.

La Sec. 84.01 del Reglamento Núm. 4, 23 R.P.R. sec. 650.1731(1), establece los requisitos de aplicación para los espacios de estacionamiento de vehículos. Por su parte, la Sec. 84.03 del mismo reglamento, 23 R.P.R. sec. 650.1731(3), fija la fórmula para calcular el número de espacios de estacionamiento requeridos.

---

(D)    Que si en la variación (concesión) se solicitara la autorización de un uso no permitido en el distrito de zonificación, el uso solicitado sea compatible con el carácter esencial del distrito.

(E)    Que la variación (concesión) ha de redundar en los mejores intereses de la comunidad, municipio, o del pueblo de Puerto Rico.

**continúa...**

[54] **...continuación**

(F)    Que la autorización de tal variación (concesión) no afectará adversamente el disfrute y valor de las pertenencias cercanas en su uso presente y para cualquier otro futuro permitido.

(G)    Que la autorización de tal variación (concesión) no encarecerá ni afectará adversamente la idoneidad, la seguridad y el funcionamiento conveniente de las facilidades públicas existentes o planeadas, incluyendo vías, escuelas, disposición de desperdicios y otros servicios esenciales.

(H)    Que la variación (concesión) solicitada está en armonía con los propósitos generales de este Capítulo y con cualquier plan de uso de terrenos adoptado para el área.

(I)    Que la autorización de tal variación (concesión) es consistente con el documento de Objetivos y Políticas Públicas del Plan de Terrenos, el Plan de Desarrollo Integral de Puerto Rico, el Programa de Inversiones de Cuatro Años y con la conservación y preservación de recursos naturales e históricos.

(J)    Que el peticionario, a su vez, está en disposición de aceptar las condiciones y requerimientos adicionales a los requisitos reglamentarios que la Junta o la Administración le imponga para beneficio o protección del interés público.

(K)

La Sec. 98.06 del Reglamento Núm. 4, 23 R.P.R. sec. 650.1745(5), enumera algunos de los criterios a tomarse en consideración al momento de conceder variaciones que no sean de uso.[68] Mientras que, la Sec. 98.07 de dicho cuerpo, 23 R.P.R. sec. 650.1745(6), dispone que la Junta de Planificación o ARPE precisarán las particularidades de las variaciones otorgadas y señalarán las restricciones que, a su parecer, sean "necesarias para asegurar el cumplimiento de los criterios que se establecen" para otorgar dichas variaciones.

A los fines de determinar la naturaleza de la resolución –interpretativa o legislativa–, es indispensable acudir a ésta. En síntesis, la Junta expresó que, al evaluar los requisitos de estacionamiento para proyectos con usos combinados pero no simultáneos, ARPE puede considerar estudios apoyados en metodología científica a los fines de eximir del número total de los espacios de estacionamiento cuando el estudio así lo precise. Así también, ARPE puede ponderar "el

---

[68] La Sec. 98.06 del Reglamento Núm. 4, *supra*, preceptúa lo siguiente:

> [l]a Junta o la Administración, cada una en su ámbito jurisdiccional, podrá autorizar variaciones a los requisitos establecidos en este Capítulo para los usos que tolera el distrito. Se tomará en consideración, entre otros, los siguientes factores:
>
> (a) La magnitud de la variación es la necesaria para asegurar la viabilidad del uso permitido y no es viable considerar otras alternativas para salvar el problema presentado.
>
> (b) La variación solicitada no afectará adversamente, entre otros, los siguientes factores:
>
> 1. La disponibilidad de la infraestructura.
> 2. El contexto en el que ubica.
> 3. El ambiente de la calle.
> 4. La seguridad y tranquilidad de los vecinos.
>
> (c) Se logra un desarrollo urbano más compacto.
>
> (d) La densidad o intensidad solicitada no lleva a convertir el distrito en otro.
>
> (e) La variación solicitada es cónsona con los propósitos de la disposición reglamentaria que se solicita sea modificada, así como con la política pública.

continúa...

[55]...continuación

concepto de estacionamiento compartido entre dos (2) o más proyectos o usos cuando así sea justificado por el proponente."[69] Por último, además de prescribir que los requisitos de "las facilidades de estacionamiento deben" cumplirse lo más posible, la Junta dispone que, al momento de evaluar la concesión de variaciones, también pueden ser tomados en consideración los siguientes: (1) la existencia de un sistema de transportación; (2) la existencia de un estacionamiento con paga —o que se haya "separado espacio de estacionamiento para alguna actividad en particular"— dentro de "una distancia no mayor de 200 metros"; y (3) la existencia de "un sistema de 'Valet Parking'".[70]

Tras un análisis de las disposiciones antes citadas, concluimos que la resolución emitida por la Junta de Planificación es una regla interpretativa, no sujeta al procedimiento de aprobación de reglamentos. Mediante dicha resolución, la Junta de Planificación aclaró una aparente contradicción entre las reseñadas secciones del Reglamento Núm. 4 y del Reglamento del Condado.

La sección del Reglamento del Condado referente a los estacionamientos establece que los requisitos de estacionamiento se determinarán conforme al Reglamento Núm. 4, en general, y a unos requisitos allí esbozados. En cuanto a las variaciones, dicha sección no las prohíbe, la misma se limita a señalar que "[n]o se considerará como fundamento para conceder una variación la no-existencia de estacionamiento dentro de una pertenencia contruida." Sec. 3.11 del Reglamento del Condado, supra. Por otro lado, al momento de autorizar variaciones en el área de El Condado, debemos recurrir, en primer lugar, al Reglamento Núm. 4, *supra*, y, luego, al Reglamento del Condado, *supra*.[71] En su Sec. 98.06, el Reglamento Núm. 4 menciona, a modo de

---

La celebración de vistas en estos casos será discrecional.

[69] Apéndice del recurso de *certiorari*, Apéndice IV, Anejo 29, pág. 163.
[70] *Íd.*, págs. 163-164.

[71] El Reglamento Núm. 4 aprobado seis (6) años después del Reglamento del Condado, en su Sec. 1.07, dispone:

ejemplo, de forma general, unos factores que deben ser considerados durante la evaluación de una solicitud de variación.[72] Tal enumeración no es una *numerus clausus*; por el contrario, el legislador dejó la puerta abierta para que tanto la Junta de Planificación como ARPE, dentro de su discreción, pudiesen evaluar otros factores. De igual forma, llegaríamos al mismo resultado si entendiéramos que, por el contrario, el Reglamento Núm. 4 complementa al Reglamento del Condado en aquello que no sea incompatible con este último.[73]

La Resolución Núm. JPI-4-15-99 de la Junta de Planificación no cambió ni derogó los criterios a utilizarse al momento de determinar si procede cierta variación. La Junta de Planificación tampoco ordenó que los criterios incluidos en la resolución tendrían que emplearse. Por el contrario, la Junta se circunscribió a mencionar unos criterios que, a su juicio, ARPE podría considerar cuando evaluase una solicitud de variación. Además, la resolución interpretativa no es irreconciliable con las disposiciones referentes a las variaciones.

Por último, una resolución que incluya más criterios que la regla interpretada no constituye de por sí una enmienda. *American Min. Congress v. MSHA*, supra. La Junta de Planificación no actuó irrazonable ni arbitrariamente al emitir tal resolución. En vista de lo cual, dicha

---

"Las disposiciones de este Capítulo <u>prevalecerán y se complementarán</u> con las disposiciones de <u>cualquier otro reglamento de planificación</u>

continúa...

[58] ...continuación

<u>en vigor que sea de aplicación al caso en particular</u>. Sus disposiciones se complemetarán e interpretarán a la luz de las políticas públicas y los planes sobre usos de terrenos adoptados por la Junta de Planificación." (Énfasis y subrayado nuestro.) 23 R.P.R. sec. 650.1643.

[72] Véase, nota al calce núm. 55, *ante*.

[73] La resolución interpretativa impugnada no es óbice para que la Junta de Planificación o ARPE calculen el número de espacios de estacionamientos cuando hay múltiples usos conforme a la Sec. 84.01(5), 23 R.P.R. sec. 650.1731(1)(e). Ello es así ya que, previo a esta resolución, tanto la Junta como ARPE toman en consideración otros factores a los fines de conceder una variación reduciendo el número de estacionamientos. Cabe precisar que a pesar de que un estudio favorezca la reducción en el número de espacios de estacionamiento, la Junta de Planificación o ARPE podrían denegar la variación.

resolución interpretativa merece nuestra deferencia. *Rivera Concepción v. A.R.Pe.*, supra. Por lo cual, no erró el TCA al determinar que la resolución era una regla interpretativa, la cual no tenía que atravesar por el procedimiento de aprobación de reglamentos.

VII

En su segundo señalamiento de error, el Municipio aduce que fue privado de su derecho de intervención y participación efectiva ante ARPE, y que, por ende, esto violentó sus derechos. Ello debido a que ARPE contestó la solicitud de intervención con posterioridad a la aprobación del anteproyecto, de forma que ARPE resolvió *ex-parte* varios planteamientos sobre el proyecto, incluyendo variaciones. Por su parte, ARPE arguye que, contrario a una denegatoria de una solicitud de intervención, ni la LPAU, *supra*, ni el Reglamento Adjudicativo de ARPE exigen notificación alguna informando la aceptación de tal solicitud. Por otro lado, DMG y CDH alegan que el Municipio ha tenido libre acceso al expediente y que, incluso, desde que solicitó la intervención, ARPE le notificó todos los escritos.

La Sec. 3.5 de la LPAU establece que "[c]ualquier persona que tenga un interés legítimo en un procedimiento adjudicativo ante una agencia podrá someter una solicitud por escrito y debidamente fundamentada para que se le permita intervenir o participar en dicho procedimiento." 3 L.P.R.A. sec. 2155. A su vez, dicha sección enumera varios factores que la agencia debe evaluar al momento de aceptar o denegar la intervención, lo cual es a discreción de la agencia.[74] *Íd.* Por su parte, ARPE recoge

---

[74] La Sec. 3.5 de la LPAU, *supra*, menciona los siguientes factores a ponderar al determinar si procede o no la intervención:

    (a) Que el interés del peticionario pueda ser afectado adversamente por el procedimiento adjudicativo.

    (b) Que no existan otros medios en derecho para que el peticionado [sic] pueda proteger adecuadamente su interés.

    (c) Que el interés del peticionario ya esté representado adecuadamente por las partes en el procedimiento.

tales preceptos en su Reglamento de Procedimientos Adjudicativos (en adelante Reglamento Núm. 3915). *Asoc. Residentes v. Montebello Dev. Corp.*, 138 D.P.R. 412, 419 (1995). En particular, la Sec. 4.00 del mismo trata sobre el procedimiento de intervención. Así también, dicho reglamento clasifica como procedimiento adjudicativo la aprobación de un anteproyecto. Sec. 15.00 del Reglamento Núm. 3915.[75] Por lo que, cabe hablar del procedimiento de intervención al momento de la evaluación de un anteproyecto.

La intervención tiene como propósito proveerle a "una persona, que no fue parte original del procedimiento," un mecanismo para "defenderse de la determinación administrativa." *Asoc. Residentes v. Montebello Dev. Corp.*, supra, pág. 420. A los fines de cumplir con tal propósito, es indispensable que la agencia notifique su determinación tanto en la afirmativa como en la negativa a tal persona. La ausencia de notificación de la acogida de una solicitud de intervención desvirtúa el propósito de la misma, lo cual tendría el mismo efecto que una denegatoria ya que puede transcurrir mucho tiempo sin que el solicitante conozca si su solicitud fue aceptada o rechazada. Esto va en detrimento tanto de la agencia, que podría tener un expediente más completo, como del posible interventor. Además, el debido proceso de ley exige una notificación adecuada. Al denegar una petición de intervención, la LPAU,

---

(d)   Que la participación del peticionario pueda ayudar razonablemente a preparar un expediente más completo del procedimiento.

(e)   Que la participación del peticionario pueda extender o dilatar excesivamente el procedimiento.

(f)   Que el peticionario represente o sea portavoz de otros grupos o entidades de la

**continúa...**

[61] **...continuación**

comunidad.

(g)   Que el peticionario pueda aportar información, pericia, conocimientos especializados o asesoramiento técnico que no estaría disponible de otro modo en el procedimiento.

(h)

[75] Un procedimiento adjudicativo inicia con la presentación de una solicitud, petición o querella. Sec. 3.01 del Reglamento Núm. 3915. Posteriormente, la Sec. 15.01 del mismo cuerpo de reglas dispone el

*supra*, requiere que la agencia notifique al solicitante tal dictamen, mediante una determinación escrita y fundamentada, la cual debe incluir la opción del solicitante de acudir en revisión. Sec. 3.6 de la LPAU, 3 L.P.R.A. sec. 2156.[76] Aun cuando la LPAU, *supra*, no lo requiere, es obligatorio que, lo antes posible, una agencia informe al solicitante que su solicitud de intervención fue aceptada.

En la situación de autos, el 24 de noviembre de 1998, el Municipio sometió *Solicitud de Intervención y Oposición* ante ARPE.[77] Al no recibir respuesta alguna de ARPE, el 21 de abril de 1999, el Municipio presentó *Solicitud de Que Se Emita Resolución Final en Torno a Moción de Intervención*.[78] Ese mismo día, el Municipio también presentó una *Solicitud de Consolidación* para la consolidación de las solicitudes de los permisos de demolición y consulta sobre conformidad pendientes de adjudicación ante ARPE.[79] Finalmente, ARPE acogió la solicitud de intervención luego de aprobar el anteproyecto. Sin embargo, notificó dicha determinación con posterioridad a la presentación de una moción de reconsideración del Municipio con relación a la aprobación del anteproyecto. En vista de lo anterior, concurrimos con la mayoría, a los efectos de que la actuación de ARPE fue irrazonable. A nuestro parecer, ARPE abusó de su discreción al acoger una solicitud de intervención después de haber aprobado el anteproyecto, cuando claramente surgía de su faz que dicha moción procedía. Por lo cual, erró el TCA al determinar que no procedía una solicitud de intervención en un procedimiento de un anteproyecto.

A pesar de ello, entendemos que el Municipio no fue privado de su derecho a participar efectivamente durante los trámites ante ARPE. Un

---

plazo para resolver los tipos de solicitudes, entre las cuales se encuentran los anteproyectos y las consultas sobre conformidad.

[76] La Sec. 4.04 del Reglamento Núm. 3915 incorpora dicha norma.

[77] Apéndice del recurso de *certorari*, Volumen IV, Anejo 13, págs. 84-95.

[78] Apéndice del recurso de *certiorari*, Volumen IV, Anejo 24, págs. 130-133.

[79] Apéndice del recurso de *certiorari*, Volumen IV, Anejo 25, págs. 134-136.

examen del recurso presentado ante nos, así como de todos los documentos sometidos, demuestra que el Municipio tenía acceso al expediente adminsitrativo, así como conocimiento de los procedimientos ante ARPE. **Incluso, dicha agencia aprobó una moción de intervención referente a los procedimientos de demolición.**[80] Por otra parte, ARPE tenía conocimiento de la posición del Municipio acerca del proyecto propuesto, la cual tomó en consideración al aprobar el anteproyecto. Además, ARPE, al estimar que el Municipio era parte en los procedimientos, le notificó con prontitud la aprobación del anteproyecto impugnado. Por lo que, la tardanza de la notificación de la aceptación de la intervención no tuvo el efecto de privar al Municipio de una participación efectiva en los trámites ante ARPE.

                                    VIII

En su tercer señalamiento de error, el Municipio arguye que ARPE tenía la obligación de celebrar una vista pública antes de autorizar el anteproyecto ya que éste envuelve un gran interés público. Además, alega que las variaciones concedidas requerían de una vista pública. Por su parte, los proponentes exponen que la celebración de la vista pública es discrecional.

En lo atinente a la situación de autos, el Art. 7 de la Ley Orgánica de ARPE, Ley Núm. 76 de 24 de junio de 1975, según enmendada, 23 L.P.R.A. sec. 71f, establece que:

> [e]l Administrador, previo a cualquier actuación, decisión o resolución en su función adjudicativa discrecional en los casos que se disponga mediante reglamento, sobre consultas de Ubicación, Concesiones y Autorizaciones Directas, Proyectos Públicos o casos que revistan un gran interés social, entre otros, deberá seguir el procedimiento de vista pública y notificación dispuestos en este Capítulo.

Del artículo antes transcrito, advertimos que el Administrador de ARPE tiene el deber ministerial de celebrar vista(s) pública(s) en ciertas ocasiones, a saber: (1) al ejercer funciones adjudicativas

---

[80] Véase, *Mun. de San Juan v. J.C.A.*, supra, nota al calce núm. 6, pág. 129.

discrecionales cuando el reglamento así lo disponga, y (2) al tener ante sí un caso que envuelva "gran interés social". *Íd.*

En *Asoc. Res. Baldrich, Inc. v. J.P. de P.R.*, 118 D.P.R. 759, 767 (1987), expresamos que el Administrador de ARPE, o la persona a quien éste delegue, ejerce funciones adjudicativas discrecionales al examinar si proceden las variaciones solicitadas. A los fines de determinar la obligatoriedad de la vista pública en tales casos, acudimos, en última instancia,[81] a la Sec. 98.06 del Reglamento Núm. 4, 23 R.P.R. sec. 650.1745(5), que dispone que en los casos de variaciones que no sean en uso la celebración de una vista pública es discrecional.[82] En el caso de autos, no estamos ante unas variaciones en uso. Por tanto, ARPE no estaba obligada a celebrar una vista.[83]

Por otra parte, tras la búsqueda del significado del concepto "interés social",[84] concluimos que el CBR no reviste de un gran interés social ya que no va dirigido a atacar directamente un problema social.[85] El proyecto propuesto envuelve un interés turístico y comercial redundando en un interés social indirecto ya que tiene el efecto de generar empleos y aumentar el ingreso de ciertos individuos. Sin embargo, no es un proyecto que tiene un interés social *per se*. En vista de ello, ARPE no tenía la obligación de celebrar una vista pública.

---

[81] El Reglamento Núm. 3915 –sobre procedimientos adjudicativos–, en su Sec. 22.01, dispone que "[e]n el desempeño de aquellas funciones adjudicativas asignadas por las leyes o reglamentos aplicables se podrán celebrar vistas por iniciativa propia, o a petición de partes. Cuando estatuido, por tales leyes o reglamentos aplicables la celebración de tales vistas tendrán carácter obligatorio."

[82] Véase, nota al calce núm. 55, *ante*.

[83] Por otra parte, la Sec. 6.03 del Reglamento del Condado, 23 R.P.R. sec. 650.1853, establece que, en los casos de variaciones, "[l]a Junta de Planificación o la Administración de Reglamentos y Permisos podrá celebrar vistas públicas discrecionalmente...."

[84] En la gran mayoría de las situaciones, el legislador utiliza el concepto de "interés social" para referirse a las viviendas para personas con escasos recursos económicos.

[85] Los siguientes son ejemplos de proyectos con gran interés social: el mejoramiento de las comunidades especiales, la rehabilitación de los parques, la construcción de una represa, la edificación de escuelas, el Tren Urbano y el Superacueducto.

Por último, no encontramos indicio alguno que nos mueva a concluir que ARPE actuó de manera irrazonable o abusó de su discreción al no celebrar vista pública previa aprobación del anteproyecto. Por lo cual, no erró el TCA al determinar que ARPE no tenía que llevar a cabo una vista pública.

IX

En el cuarto señalamiento de error, el Municipio alega que "[l]a decisión emitida por ARPE es una arbitraria y caprichosa, pues no expresó la base fáctica de controversias que eran sustanciales y sólo consideró en forma acomodaticia los argumentos y prueba presentada por el proponente."[86] En esencia, el Municipio plantea que ARPE no debió utilizar el estudio pericial sobre los espacios de estacionamiento presentado por DMG y que debió expresar las razones por las cuales las variaciones cumplían con la Sec. 98.06 del Reglamento Núm. 4, *supra*, y con la Sec. 6.04 del Reglamento del Condado, *supra*. Mientras que, los proponentes aducen, en síntesis, que las determinaciones de hecho están sustentadas por evidencia sustancial que obra en el expediente administrativo.

Este Tribunal, conforme a lo previamente indicado, expresó que, para ejercer su función revisora, las agencias administrativas tienen que expresar de forma clara las determinaciones de hecho y los fundamentos para su decisión, "incluyendo los hechos básicos de los cuales, a través de un proceso de razonamiento e inferencia, se derivan aquéllos." *Mun. de San Juan v. J.C.A.*, supra, pág. 126. Tales dictámenes deben demostrar que la agencia consideró y dirimió los conflictos de prueba, e incluir tanto los hechos acogidos como los descartados. *Íd.*

Analicemos la resolución impugnada. Dicha resolución comienza con una explicación del proyecto. Luego, provee el trámite procesal de la DIA e indica las agencias que han emitido comentarios y recomendaciones. Posteriormente, enumera las variaciones y razones para las mismas. A

---

[86] Recurso de *certiorari*, pág. 34.

continuación, en lo pertinente, hace mención de la solicitud de variaciones de DMG y de una servidumbre de paso a favor del Gobierno de Puerto Rico, para garantizar el libre acceso a la playa a la ciudadanía. A renglón seguido, indica que el anteproyecto fue evaluado, tomando en consideración las normas vigentes y, a su vez, esboza los documentos utilizados para la autorización de las variaciones. Por último, tras la aprobación del anteproyecto, advierte que el acuerdo está condicionado a varias recomendaciones y requerimientos, los cuales constan en la resolución.

La resolución de ARPE es lo suficientemente detallada para ejercer nuestra función revisora y determinar que hay suficiente evidencia sustancial para sustentar las determinaciones de hecho esbozadas. 3 L.P.R.A. sec. 2175; *Rivera Concepción v. A.R.Pe.*, supra, pág. 160; *P.R.T.C. v. R. Reg. Tel. de P.R.*, supra, pág. 1266. Incluso, en su resolución, ARPE señala qué documentos tomó en consideración al momento de evaluar las variaciones solicitadas. En vista de ello, no erró el TCA al determinar que se incluyeron las determinaciones de hecho necesarias a los fines de la aprobación del anteproyecto.

X

El Municipio también alega que la resolución de ARPE es errónea ya que no se podía aprobar el anteproyecto sin una DIA-F que fuese final y firme.

Una DIA es un mecanismo de planificación que tras su aprobación no obliga a la JCA en la eventualidad de que el proyecto no se lleve a cabo conforme a lo aprobado o tenga consecuencias ambientales mayores. *Misión Ind. P.R. v. J.C.A.*, supra. En fin, la preparación y aprobación de la DIA es una etapa donde se garantiza que tanto la conservación como el uso racional de los recursos naturales fueron tomados en consideración. *Íd.*, págs. 1103-1104.

De otra parte, un anteproyecto es la "[f]orma **preliminar** de un plano de construcción de obras así como de estructuras, que se somete a la A.R.P.E. para determinar si cumple con las leyes y reglamentos

aplicables." Sec. 2.01 del Reglamento Núm. 4, 23 R.P.R. sec. 650.1648(20). Claramente, se desprende que un anteproyecto no es una autorización para el inicio de una construcción.[87] Incluso, tal aprobación está sujeta a las condiciones que requiera ARPE.

Tras un examen de la Ley Orgánica de ARPE y el Reglamento Núm. 3915, no hallamos disposición alguna que exija la posposición de la aprobación de un anteproyecto hasta que la JCA emita una resolución aprobando una DIA y que la misma advenga final y firme. *Misión Ind. de P.R. v. J.P.*, pág. 1166.[88]

En la situación de autos, ARPE aprobó el anteproyecto sin que la DIA-F hubiese advenido final y firme. Como agencia proponente, ARPE tenía conocimiento directo de los posibles efectos ambientales del proyecto, tan es así que dicha preocupación permea a través de las recomendaciones a las que estaba sujeto el anteproyecto. Incluso, la recomendación núm. 22 requiere que, "[a]l momento de certificar los planos", DMG presente los endosos finales o permisos de varias agencias, entre las que se encuentra la JCA y el Instituto de Cultura Puertorriqueña (preservación del Edificio Condado Vanderbilt).[89] Por lo que, en vista de que ARPE dio seria consideración a los efectos ambientales, concluimos que el TCA no erró al determinar que una DIA-F final y firme no era necesaria para la aprobación del anteproyecto.

XI

---

[87] Para comenzar una construcción está claro que se necesita una DIA-F debidamente aprobada. *Colón y otros v. J.C.A.*, res. el 2 de junio de 1999, 99 T.S.P.R. 85, 148 D.P.R. ___ (1999), 99 JTS 91, pág. 1130.

[88] Allí, expresamos lo siguiente:

   [e]n cuanto a la simultaneidad de los procesos de evaluación de la consulta de ubicación y ambiental, no existe disposición alguna, ni en el Reglamento de Adjudicación ni en la Ley Orgánica de la Junta de Planificación, que obligue a la Junta de Planificación a posponer la consideración de una consulta de ubicación hasta que la Junta de Calidad Ambiental haya completado la evaluación que le corresponda hacer. Todo lo que exige la sección 7.01 del Reglamento de Adjudicación es que la Junta tome en cuenta las consideraciones ambientales del uso propuesto al evaluar la consulta de ubicación. (Cita y escolio omitidos.) *Íd.*

[89] Apéndice del recurso de *certiorari*, Volumen IV, Anejo 1, pág. 7c.

Por último, el Municipio aduce que ARPE abusó de su discreción y, que actuó irrazonable y arbitrariamente al aprobar las variaciones solicitadas.

El Reglamento de Zonificación define variación como una "[a]utorización para utilizar una propiedad para un uso prohibido por las restricciones impuestas a una zona o distrito y que sólo se concede para evitar perjuicios a una propiedad que, debido a circunstancias extraordinarias, la aplicación estricta de la reglamentación equivaldría a una confiscación de la propiedad." Sec. 2.01 del Reglamento Núm. 4, 23 R.P.R. sec. 650.1648(202). Sin embargo, dicha sección no distingue entre las variaciones en uso y otras variaciones, como se desprende de las Secs. 98.00-98.06, *supra*. Éstas establecen requisitos y procedimientos distintos para la aprobación de cada tipo de variación.[90] El motivo de tales diferencias estriba en que, por un lado, la variación en uso se solicita con el fin de alterar el uso permitido en el distrito, y, por otro lado, las otras variaciones tienen como propósito eximir al propietario de uno o más requisitos establecidos para el distrito, sin la necesidad de modificar el uso de tal distrito. *Asoc. Res. Park Side, Inc. v. J.P.*, res. el 6 de noviembre de 1995, 139 D.P.R. 349, ___ (1995), 95 JTS 149, pág. 242.

A los fines de determinar la razonabilidad de las variaciones en cuestión, debemos utilizar tanto los criterios esbozados en la Sec. 98.06 del Reglamento Núm. 4, *supra*, por no ser éstas variaciones en uso, y en la Sec. 6.04 del Reglamento del Condado, *supra*.

En primer lugar, analizaremos las variaciones, a la luz de los requisitos esbozados en el Reglamento del Condado, *supra*. Surge de la *Moción en Cumplimiento de Orden* de DMG que la forma irregular del solar impide el disfrute de la propiedad ya que el mismo tiene poco fondo, lo cual implica que, para acatar el volumen requerido por ley para los

---

[90] Por ejemplo, como señaláramos anteriormente, en los casos de la evaluación de una variación que no sea en uso, el Reglamento no requiere de la celebración de una vista pública; por el contrario, al determinar

edificios y para dejar espacios abiertos para divisar el mar, se incumpla con el retiro de colindancia de la playa. La aplicación textual de varios requisitos resulta en una dificultad práctica ya que la reducción de la altura de los edificios hubiese tenido como efecto la eliminación de espacios abiertos y, por ende, una apariencia estética negativa y un restringido acceso a la playa. De otra forma, el proyecto hubiese sido un mero bulto de hormigón sin encanto alguno.

Las variaciones aprobadas aliviarán un perjuicio claramente demostrable porque la construcción del proyecto dará acceso a más playa en comparación con las edificaciones existentes y, además, proveerá más estacionamientos.[91] Tales variaciones redundan en el mejor provecho de la ciudadanía en general ya que la misma tendrá, contrario a las existentes edificaciones deterioradas, un sitio con diferentes facilidades donde acudir y disfrutar de la majestuosidad del mar.

La autorización de las variaciones no afectará adversamente el disfrute ni el valor de las estructuras cercanas. Por el contrario, mejorará el área, incluso aumentará el valor de las edificaciones adyacentes y permitirá que los vecinos puedan contemplar una estructura estéticamente agradable. Así también, las variaciones aprobadas no impactarán negativamente la idoneidad, seguridad y funcionamiento de las facilidades públicas ya que aumentará la seguridad del área, habrá más iluminación y se mantendrá con mayor rigor la limpieza del área. Incluso, tales variaciones hacen del proyecto uno viable, con el efecto de que tanto el Municipio como el Gobierno de Puerto Rico recibirán más dinero en impuestos, el cual reinvertirán en beneficio de la ciudadanía. El proyecto propuesto conforma a la zonificación existente, así como a los programas y planes requeridos.[92] Finalmente, respecto al Reglamento

---

la viabilidad de una variación en uso, el Reglamento ordena la celebración de una vista pública.

[91] El proyecto proveerá 1,507 espacios de estacionamiento cuando el estudio sobre el estacionamiento demuestra que sólo se requieren 1,246 espacios.

[92] "[L]a autorización de tal variación (concesión) es consistente con el documento de Objetivos y Políticas Públicas del Plan de Terrenos, el

del Condado, *supra*, ninguna de las variaciones autorizadas es una variación en uso, es decir, todos los usos solicitados son permitidos por la zonificación.

Por otra parte, las variaciones también cumplen con los requisitos delineados por el Reglamento Núm. 4, *supra*. Remontándonos a la DIA-F, la JCA entendió que la alternativa propuesta era la de menor impacto ambiental, tomando en consideración los objetivos perseguidos. En vista de lo cual, el alcance de las variaciones es necesario para garantizar la viabilidad del uso autorizado. El proyecto no afectará negativamente el sector del Condado, incluso mejorará los contornos del mismo. Además, el uso permitido no cambiará. El proyecto contempla un desarrollo urbano más compacto. La densidad que conlleva el proyecto es menor que la permitida y no conlleva convertir el distrito en otro. De acuerdo a lo expresado, se desprende que las variaciones conforman los propósitos de las secciones del Reglamento de las cuales se gestiona su dispensa.

Tras concluir que las variaciones están contestes tanto con el Reglamento Núm. 4 como con el Reglamento del Condado, es menester atender cada una de ellas por separado.

A.    Variaciones a los requisitos del número de estacionamientos.

El Municipio sostiene que la reducción en el número de espacios de estacionamiento de 1,962 a 1,507 no cumple con los requisitos establecidos para las variaciones.

En el presente caso, no podemos perder de perspectiva que la Junta de Planificación emitió, conforme expresarámos anteriormente, una resolución interpretativa válida, en virtud de la cual ARPE concedió las variaciones al número de espacios de estacionamientos. El Municipio centra su argumento en atacar el estudio pericial sometido por DMG, en que se basa principalmente la determinación de ARPE. De acuerdo al referido estudio, realizado mediante metodología científica, 1,507

---

Plan de Desarrollo Integral de Puerto Rico, el Programa de Inversiones de Cuatro Años y con la conservación y preservación de recursos naturales e históricos." Sec. 6.04(I) del Reglamento del Condado, 23 R.P.R. sec. 650.1854(I).

espacios de estacionamiento son más que suficientes ya que concluye que 1,246 espacios es el número máximo de espacios de estacionamiento necesarios durante las horas pico. El Municipio presentó dos informes periciales señalando varias deficiencias, las cuales causan, a su entender, que el estudio de DMG no justifique las variaciones. <u>No nos compete desde este estrado dirimir conflictos de pruebas periciales</u>.

Además, al evaluar si procedía la variación en el número de estacionamientos, ARPE tomó en consideración los otros factores mencionados en la resolución interpretativa, a saber: (1) existencia de un sistema de transporte colectivo; (2) existencia de facilidades de estacionamiento cercanas; y (3) existencia de un sistema de *valet parking*. Al aplicar tales requisitos, ARPE quedó convencida de que DMG había justificado la referida variación.

De igual forma, ARPE entendió que se justificaba la reducción de los estacionamientos de carga y descarga ya que dichos espacios están en un área protegida y, además, el uso de tales espacios estará sujeto a un itinerario, en el cual las personas interesadas deberán reservar los espacios. Un factor a considerar también fue el hecho de que los usos residenciales producirán poco movimiento de carga y descarga ya que las mudanzas ocurren aisladamente.

Respecto al número de estacionamientos públicos, el Municipio aduce que el proyecto requiere de estacionamientos públicos y que ARPE aprobó una variación relacionada a este asunto. El Reglamento del Condado, en su Sec. 4.02, no exige que en el área a construirse el proyecto se reserve cierto número de espacios de estacionamiento para uso público. 23 R.P.R. sec. 650.1832.

Por lo que, tomando en consideración la evidencia que obra en el expediente, no hallamos razón que nos mueva a determinar que ARPE actuó irrazonalmente o que abusó de su discreción al conceder estas variaciones.

B.   <u>Variaciones a los requisitos de retiro y altura.</u>

La Sec. 3.08.1 del Reglamento del Condado dispone lo siguiente:

> (A)  *Retiro y altura.* – En el área de playa, entre el Hotel Condado Beach y la Calle Cervantes, **no se permitirá nueva construcción que arroje sombra adicional sobre la arena.** Toda edificación a construirse en esta área observará un retiro de la más próxima línea de colindancia con la playa, el cual medido desde su base o pared más próxima a la colindancia con la playa será no menor que una y cuarta (1¼) vez su altura medida desde el nivel del terreno en tal base o pared.
>
>        Fuera de esta área se exigirá un retiro de la edificación con respecto a la más próxima línea de colindancia con la costa norte no menor que una tercera (1/3) parte de la altura de la edificación. (Énfasis nuestro.) 23 R.P.R. sec. 650.1818(A).

Conforme a dicha sección ARPE, tomando la altura de cada estructura, estimó que el retiro mínimo es de 63.3 metros para el Hotel, 67.0 metros para el *time sharing* y 71.65 metros para el Condominio. Sin embargo, debido a la circunstancia extraordinaria de la irregularidad del solar (poco fondo), la imposición de estos requisitos causa una restricción irrazonable al disfrute de la propiedad y menoscaba la viabilidad del proyecto, el cual, dentro de los objetivos propuestos, era la alternativa con menor impacto ambiental. Además, "[p]ara que el proyecto pudiera cumplir con el retiro especificado en el Artículo 3.08.1 del Reglamento de Zonificación Especial del Condado, sería necesario ubicarlo a más de 40 metros de distancia de la colindancia norte, resultando en la ubicación del proyecto en el medio de la Avenida Ashford."[93]

Cabe indicar que, a los fines de determinar el cumplimiento con el requisito de sombras, DMG sometió un estudio de sombras, el cual reveló que la mayoría de las sombras creadas eran mucho menores que las producidas por las edificaciones existentes, que es lo que persigue la ante citada disposición. No obstante, dicho estudio, no incluye las sombras que generará el Condominio ya que éstas caerán **sobre las rocas** y no sobre la arena.[94]

---

[93] Apéndice del recurso de *certiorari*, Volumen II, Anejo 7, pág. 264.

[94] Apéndice del recurso de *certiorari*, Volumen II, Anejo 7, pág. 228.

ARPE actuó correctamente al autorizar tales variaciones ya que la aplicación literal de las disposiciones tenía como consecuencia una prohibición irrazonable que atentaba contra el mismo proyecto. Por otra parte, las variaciones estaban justificadas porque con la consecución de este proyecto se aliviará el estado de deterioro en que se encuentra el área.

C.    Variaciones a los requisitos sobre vistas al mar.

El Municipio sostiene que ARPE concedió una variación implícita sobre esta cuestión. Sobre este asunto, es importante aclarar que ARPE, en su *Moción en Cumplimiento de Orden*, advierte que no otorgó variación alguna sobre las vistas al mar. Tras un detenido examen de la resolución de ARPE, observamos que en la parte de las variaciones no hay referencia alguna a tal variación.[95] Por el contrario, ARPE  señala lo siguiente:

> [l]a autorización de este anteproyecto se basa en que, con [el] desarrollo de las facilidades propuestas, se proveerá para mejorar notablemente las condiciones del sector del Condado, mediante la diversificación y ampliación de las facilidades de alojamiento turístico, mediante la integración de un centro urbano de entretenimiento que permitirá actividades culturales y recreativas con participación del visitante y de la comunidad existente, mediante la creación **de áreas abiertas amplias que permitirán una mayor visibilidad a la playa por tres (3) ejes visuales y mejor accesibilidad, mediante la estimulación de la actividad peatonal, uno de los objetivos trazados al crear el Reglamento de Zonificación del Condado y mediante la revitalización del comercio y el fomento de la actividad económica en el sector.**(Énfasis nuestro.)[96]

Por su parte, DMG alega que cumple con la disposición antes mencionada. Veamos.

La Sec. 100.15 del Reglamento Núm. 4 dispone que "[l]os edificios se orientarán con el lado más largo de su proyección horizontal, perpendicular a la costa o a un ángulo aproximado, para obstruir lo **menos posible la visibilidad del mar.**" (Énfasis nuestro.) 23 R.P.R. sec. 650.1747(14).

---

[95] Véase, Apéndice del recurso de *certiorari*, Volumen IV, Anejo 1, págs. 4-7.

[96] Apéndice del recurso de *certiorari*, Volumen IV, Anejo 1, pág. 7a.

Las estructuras del CBR estarán alineadas de forma perpendicular a la playa y no paralelamente como las existentes.[97] Ello tiene dos efectos, a saber: (1) obstruye la vista al mar lo menos posible, y (2) en pequeñas áreas causa más sombra que las estructuras existentes; por lo cual, como indicáramos previamente, se solicitó variación al respecto. El CBR tendrá tres accesos principales con vista al mar y varios accesos secundarios. En vista de ello, DMG no solicitó variación alguna sobre este asunto, por no entenderlo necesario, y ARPE, dentro del área de su peritaje, estimó que el proyecto cumple con lo exigido por el Reglamento Núm. 4, *supra*. No vemos razón alguna para sustituir dicha determinación.

## XII

En síntesis, habiendo examinado la totalidad del expediente, colegimos que obra en éste evidencia sustancial para sostener tanto las determinaciones de hecho de la JCA como las de ARPE. Tales determinaciones de hechos son suficientemente detalladas como para ponernos en posición de ejercer nuestra función revisora.

Recordemos que no nos corresponde sustituir nuestro criterio por el de la agencia ni juzgar la sabiduría de las decisiones sobre política pública que competen a otra rama gubernamental. Por el contrario, nos corresponde determinar si medió o no razonabilidad, o abuso de discreción en la determinación de la agencia. Por lo cual, concluimos que las actuaciones de la JCA y de ARPE están sostenidas por la evidencia sustancial y no fueron irrazonables, caprichosas o arbitrarias. No erró el TCA al denegar la expedición de los recursos de revisión, por lo cual sostendríamos su dictamen.

La opinión mayoritaria se aparta de las normas claramente establecidas para la revisión judicial de determinaciones de agencias administrativas y denota otra instancia de "activismo judicial" de parte

---

[97] Ello se puede percibir de los planos que el Municipio sometió como apéndice del recurso.

de este alto foro. Por todas las razones expuestas anteriormente, disentimos.


                         BALTASAR CORRADA DEL RIO
                              JUEZ ASOCIADO